IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KYLE SMITH** | : CIVIL ACTION NO. 02-CV-2718 |
| | : |
| vs. | : |
| | : |
| **PROMARK PRODUCTS WEST, INC.** | : |

## ORDER

    **AND NOW,** this _____ day of _____, 2004, upon consideration of the Motion of Defendant, Ariens Company to Compel Plaintiff's Full and Complete Response to Request to Production and Plaintiff's Response thereto, it is hereby ORDERED and DECREED that Defendants' Motion is DENIED.

                                         BY THE COURT:

                                         _____
                                                                          J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KYLE SMITH** | : CIVIL ACTION NO. 02-CV-2718 |
| vs. | : |
| **PROMARK PRODUCTS WEST, INC.** | : |

**PLAINTIFF'S ANSWER TO MOTION OF DEFENDANT, ARIENS COMPANY TO COMPEL PLAINTIFF'S FULL AND COMPLETE RESPONSE TO REQUEST TO PRODUCTION**

1. Admitted.

2. Plaintiff's Amended Complaint, being in writing, speaks for itself.

3. Admitted.

4. Admitted.

5. Plaintiff is searching for the requested income tax returns, the same will be provided if and when they are located.

6. Plaintiff is searching for the requested W-2 forms and the same will be provided if and when they are located.

7. Admitted.

8. Admitted. All of Plaintiff's medical records relating to this claim have been provided to Defendant. Plaintiff has not treated with a psychiatrist or psychologist in connection with the injuries that he sustained in the accident involved herein. Consequently, any such records are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Moreover, Defendant's request is overbroad as it is not limited in duration or scope but seeks all medical records relating to Mr. Smith for his entire lifetime whether or not related to his right leg that was injured in the accident involved herein.

270513.1
Aug 06 2004

9.   Admitted. Defendant did not provide authorizations for Mr. Smith to sign.

10.  Plaintiff does not possess sufficient knowledge or information to either admit or deny the allegations of this paragraph.

11.  Mr. Kellner's letter and the authorizations, being in writing, speak for themselves.

12.  Admitted in part; denied in part. It is admitted that Plaintiff provided redacted authorizations and that the redacted information pertained to Plaintiff's psychological, psychiatric and substance abuse records. Plaintiff denies the remaining allegations of this paragraph.

13.  Defense counsel's July 7, 2004 letter and authorization for Quest Diagnostics, being in writing, speak for themselves. Plaintiff objects to the authorization for Quest Diagnostics because there is no evidence that Plaintiff was under the influence of any drugs or alcohol at the time that the accident occurred. On the contrary, all evidence suggests that he was not in any way under the influence of drugs or alcohol at the time of the accident. No blood lab records evidence drugs or alcohol in Mr. Smith's system. The accident occurred in the afternoon on September 8, 2001. Plaintiff's co-worker, Karl Kirchoffer, who picked Plaintiff up in the morning on the date of the accident, testified that Plaintiff did not use alcohol or drugs while they were working and if Plaintiff had he would not have worked with Plaintiff. (Kirchhofer deposition at 33-34, Exhibit "A"). The Police officers, Daniel Monek and Wayne Smith, who provided assistance to Plaintiff after the accident testified that Plaintiff was not under the influence. (Monek deposition at 35-36, Exhibit "B"; Wayne Smith deposition at 30–32, Exhibit "C"). Moreover, several firefighters were recently deposed in connection with this matter on July 29th and July 30th. One of these firefighters testified that Plaintiff did not appear to be intoxicated. Plaintiff also testified that he had not used any drugs or alcohol on the date of the accident and that he has not used illicit drugs at any time. (Plaintiff's deposition at 59-63, Exhibit "D"). Consequently, any request or authorization pertaining to drug and/or alcohol is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

14.  Denied. Plaintiff denies that he ingested a large quantity of a controlled substance the night before the incident.

15.  The allegations of this paragraph contain conclusions of law to which no response is required under the applicable Pennsylvania Rules of Civil Procedure.

16. The allegations of this paragraph contain conclusions of law to which no response is required under the applicable Pennsylvania Rules of Civil Procedure.

17. The allegations of this paragraph contain conclusions of law to which no response is required under the applicable Pennsylvania Rules of Civil Procedure. By way of further answer, without waiving the foregoing, Defendant's request for Plaintiff's psychiatric or psychological care is overbroad, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence since Plaintiff has not treated with a psychiatrist or psychologist in connection with the injuries that he sustained in the accident involved herein.

18. The allegations of this paragraph contain conclusions of law to which no response is required under the applicable Pennsylvania Rules of Civil Procedure. By way of further answer, without waiving the foregoing, Plaintiff will provide relevant income tax records, W-2 forms and employment records, to the extent possible when they are available.

19. The allegations of this paragraph contain conclusions of law to which no response is required under the applicable Pennsylvania Rules of Civil Procedure. By way of further answer, without waiving the foregoing, it is denied that Plaintiff admitted that he used a controlled substance the night before this incident. At his deposition, Plaintiff denied having used a controlled substance. (See Plaintiff's deposition at 59-63, attached hereto as Exhibit "D"). All the available evidence suggests that Plaintiff was not under the influence of alcohol or drugs at the time of the accident. (See Plaintiff's answer to paragraph 13, _infra_). Defendant's discovery requests regarding controlled substances is therefore irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

20. The allegations of this paragraph contain conclusions of law to which no response is required under the applicable Pennsylvania Rules of Civil Procedure.

21. The allegations of this paragraph contain conclusions of law to which no response is required under the applicable Pennsylvania Rules of Civil Procedure.

22. Denied. Plaintiff has agreed to provide information pursuant to relevant and unobjectionable discovery requests when such information is available. Plaintiff does not agree to provide information regarding Plaintiff's psychiatric or psychological condition nor regarding

controlled substances since such information is irrelevant to this action and these requests are therefore not reasonably calculated to lead to the discovery evidence.

23. The allegations of this paragraph contain conclusions of law to which no response is required under the applicable Pennsylvania Rules of Civil Procedure. By way of further answer, all relevant information has or will be provided to Ariens, which will enable Ariens to prepare their defense.

24. Denied. Plaintiff has or will provide all relevant information to Defendant. Plaintiff objects to Defendant's request for psychiatric and psychological records and records regarding controlled substances since such information is irrelevant and these requests are therefore not reasonably calculated to lead to the discovery evidence.

25. Admitted.

WHEREFORE, Plaintiff, Kyle Smith, respectfully requests that this Honorable Court deny Defendant, Ariens Co.'s Motion to Compel Full and Complete Responses to Request for Production.

BEGLEY, CARLIN & MANDIO, LLP

By: _Todd M. Sailer_
S. Richard Klinges, III, Esquire
Attorney I.D. #02018
Todd M. Sailer, Esquire
Attorney I.D. #86013
680 Middletown Boulevard
Langhorne, PA 19047
(215) 750-0110

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KYLE SMITH** | : CIVIL ACTION NO. 02-CV-2718 |
| | : |
| vs. | : |
| | : |
| **PROMARK PRODUCTS WEST, INC.** | : |

I hereby certify that a true and correct copy of Plaintiff's Answer to Motion of Defendant, Ariens Company to Compel Plaintiff's Full and Complete Response to Request to Production was sent by First Class Mail, postage prepaid to the following:

> Howard Donahue, Jr., Esquire
> Lavin, Coleman, O'Neil, Ricci
> Penn Mutual Tower, Suite 1000
> 510 Walnut Street
> Philadelphia, PA 19106

_____
Todd M. Sailer, Esquire

Date: 8/6/04

270513.1
Aug 06 2004

5

EXHIBIT "A"

1  A.    Well, for the day, I was giving him money for
2  the both jobs he helped me on.
3  Q.    Say just for that job then -- or you would make
4  a determination about the whole day and then pay him?
5  A.    Yes.
6  Q.    Do you know, do you remember how much you got
7  paid for the morning job?
8  A.    No, I don't.
9  Q.    Describe Kyle for me.
10 A.    Can you specify that?  Like, as a person?
11 Q.    Yes.  What was your impression of him?
12 A.    Hard worker.  Reliable.  Just kind of easygoing.
13 A nice guy.
14 Q.    Were there ever days that you'd work with him
15 where you'd have an impression that contradicted what
16 you just told me?
17 A.    No, I didn't.
18 Q.    When you and Kyle would work together, did you
19 ever talk about his personal life?
20 A.    No.
21 Q.    Do you have any awareness of Kyle Smith's
22 personal issues or problems?
23 A.    No.  Didn't really ask him; it's none of my
24 business.
25 Q.    Do you know whether Kyle Smith ever took drugs

1  at the time you were working with him?
2              MR. KLINGES:  Objection.  You can
3      answer.
4              MR. KELLNER:  Yes, you can answer.
5              THE WITNESS:  I can answer?
6              MR. KELLNER:  Yes.
7              THE WITNESS:  At the time he was
8      working with me, no, I wouldn't have let
9      him work with me.
10 BY MR. KELLNER:
11 Q.   At any time when you were on a site with him,
12 was it ever your impression that he was under the
13 influence of some kind of elicit drug?
14             MR. KLINGES:  Objection.
15             THE WITNESS:  No.
16 BY MR. KELLNER:
17 Q.   Once you would have unloaded your equipment and
18 spoken to the homeowner, do you have a recollection
19 of what the next thing is that you did at this site,
20 the Groner residence?
21 A.   Just started working.
22 Q.   Do you remember what you did?
23 A.   Grind stumps.
24 Q.   And at some point, there was some kind of
25 incident, right?

EXHIBIT "B"

Page 35

1  MR. DONAHUE           DANIEL MONEK-DIRECT         35
2  department and by the county.
3      Q  Did you recognize any of the
4  individuals that were at the scene, the
5  bystanders?
6  A  No, I did not. I assumed most of them were
7  from the neighborhood. As -- you know, there were
8  some kids that were playing on bikes, and a couple
9  of times, I saw people tell their kids to stay
10 back over in the yard and not to come over.
11     Q  When you summoned Lieutenant Demarco to
12 come over and photograph the scene, did he arrive
13 on foot or did he arrive by vehicle?
14 A  He arrived in his private vehicle.
15     Q  Did anybody take any video of the
16 scene?
17 A  I believe it was just 35 millimeter photos
18 that were taken.
19     Q  Excluding this incident, have you ever
20 had any contact with Mr. Kyle Smith?
21 A  No.
22     Q  When you were with Mr. Smith at the
23 scene, did you detect any smell of alcohol?
24 A  I did not.
25     Q  Did you make a determination whether or

Page 36

1  MR. DONAHUE           DANIEL MONEK-DIRECT         36
2  not he was under the influence of any controlled
3  substance?
4  A  My contact with him was so limited, I didn't
5  pick up on any visible factors. It was, like I
6  said, no odors of the alcohol and, you know, smell
7  of burnt marijuana, nothing like that that was
8  present that I picked up on, no.
9      Q  Would it be something that you would
10 look for in a situation like this?
11 A  I think being a police officer, it's just
12 kind of a natural reaction that any time you go on
13 a scene, whatever kind of call, it's always your
14 quick scan. At least that's the way I do it. You
15 know, I'm very intense when I'm working as far as
16 I'm going to evaluate a situation real quick and
17 see how it can be handled and how it can be
18 handled appropriately. So that's something I'm
19 always looking for, yes.
20     Q  Before you you have a copy of the
21 police report for this incident.
22 A  Yes.
23         MR. DONAHUE: If we can go off
24     the record for a second.
25         (There is a discussion off the

EXHIBIT "C"

Page 30

| | |
|---|---|
| 1 | MR. DONAHUE       WAYNE SMITH-DIRECT       30 |
| 2 | incident at all? |
| 3 | A  No, I did not. |
| 4 | Q  I remember about a year ago, I was |
| 5 | reading in the newspaper about a new program that |
| 6 | a lot of police officers -- a new training program |
| 7 | that they undergo to determine whether or not |
| 8 | somebody is under the influence of drugs or |
| 9 | alcohol as far as looking into their eyes and |
| 10 | things of that nature. And I'm sorry. The formal |
| 11 | name of the training slips my mind. Have you |
| 12 | undergone any type of training like that? |
| 13 | A  Field sobriety testing? Is that what you're |
| 14 | asking? |
| 15 | Q  I think it's beyond that but yes. |
| 16 | A  I went through a course in field sobriety -- |
| 17 | standard field sobriety testing but nothing |
| 18 | further than that. |
| 19 | Q  What did that type of training entail? |
| 20 | A  That was more inclined for detection of |
| 21 | driving under the influence. |
| 22 | Q  Of alcohol or other -- |
| 23 | A  Or controlled substance, correct. |
| 24 | Q  What were some of the things that that |
| 25 | training involved as far as the evaluation of an |

Page 32

| | |
|---|---|
| 1 | MR. DONAHUE       WAYNE SMITH-DIRECT       32 |
| 2 | Q  Did you make any type of an assessment |
| 3 | of whether or not anybody actually -- |
| 4 |         MR. DONAHUE: Let me rephrase |
| 5 |     that. |
| 6 | Q  Did you make any assessment of whether |
| 7 | or not Mr. Smith was under the influence of any |
| 8 | controlled substances? |
| 9 | A  No, I did not. |
| 10 | Q  Have you ever had any contact with Mr. |
| 11 | Smith, other than this incident? |
| 12 | A  No. |
| 13 | Q  Did you perform any accident |
| 14 | investigation as to how this accident occurred? |
| 15 | A  No. |
| 16 | Q  You didn't make any measurements or |
| 17 | anything like that at the scene? |
| 18 | A  No. We were not investigating this as a |
| 19 | criminal act. |
| 20 | Q  Other than Mr. Kirchhofer, did you take |
| 21 | any statements from anybody else at the scene? |
| 22 | A  No. |
| 23 | Q  I'm going to show you the 21 |
| 24 | photographs that were taken by Detective -- |
| 25 | Lieutenant Demarco at the scene. |

EXHIBIT "D"

Page 59

```
1         K. Smith
2  away -- that they were?
3    A. I don't know.
4    Q. 25 yards?
5    A. I don't know. I didn't measure
6  them.
7    Q. So it could be the stumps were 25
8  yards from the house?
9        MR. KLINGES: Objection. He
10 said he doesn't know.
11 BY MR. KELLNER:
12   Q. As far as you know, they could be 25
13 yards from the house?
14   A. I don't know. I don't know how far
15 they were. I mean, they were around the house,
16 on the property -- you know, on the side of the
17 property.
18   Q. What did you do the night before?
19   A. I don't know. I really don't know.
20   Q. Can you remember one thing you did
21 the night before?
22   A. No. It's three years ago.
23   Q. Well, I understand, but --
24   A. I don't know. I can't remember.
25   Q. Have you ever taken any illegal
```

Page 60

```
1         K. Smith
2  substances?
3        MR. KLINGES: Objection.
4        THE WITNESS: No.
5        MR. KLINGES: I direct him
6  not to answer. We're not going to get into the
7  crimes that he's committed.
8        MR. KELLNER: I'm not talking
9  about crimes. I'm talking about drugs.
10       MR. KLINGES: Well, taking an
11 illegal substance is a crime the last time I
12 looked at the criminal code.
13 BY MR. KELLNER:
14   Q. Have you ever used cocaine?
15   A. No.
16       MR. KLINGES: Objection.
17       MR. KELLNER: Are you
18 instructing him not to answer?
19       MR. KLINGES: He answered
20 that one, I think.
21       MR. KELLNER: I'm going to
22 continue on this line. Are you going to
23 instruct him not to answer?
24       MR. KLINGES: Well, I'm going
25 to direct him not to answer anything about
```

Page 61

K. Smith

1
2  consumption of any illegal drugs. It has
3  nothing to do with this case. There's nothing
4  in this case -- you have blood exams from the
5  hospital that do not indicate any type of drugs
6  in this guy, so let's not waste time doing
7  something like this.
8         MR. KELLNER: I have records
9  that indicate otherwise.
10        MR. KLINGES: Well, all
11 right. Go ahead. Ask the question then.
12 BY MR. KELLNER:
13    Q. Have you used cocaine?
14    A. No.
15    Q. You've never used cocaine?
16    A. No.
17        You have records saying I
18 do?
19        MR. KLINGES: Wait a minute.
20 Wait a minute.
21        THE WITNESS: No.
22        MR. KLINGES: Just answer the
23 question.
24 BY MR. KELLNER:
25    Q. Have you ever told anyone that you

Page 62

K. Smith

1
2  have?
3     A. No.
4         MR. KLINGES: I direct him
5  not to answer this line of questioning about use
6  of illegal drugs.
7  BY MR. KELLNER:
8     Q. The night before your incident, did
9  you use cocaine?
10    A. No.
11    Q. The night before your incident, did
12 you use any other illegal substances?
13    A. No.
14    Q. The night before your incident, did
15 you consume any alcohol?
16    A. No.
17    Q. How about the day of, did you take
18 cocaine?
19    A. No.
20    Q. Any other illegal drugs?
21    A. No.
22    Q. Did you consume any alcohol?
23    A. No.
24    Q. Did you ever tell anyone that you
25 had any of those things -- taken any of those

Page 63

K. Smith

1
2  things?
3     A. No.
4     Q. The night before, the day of?
5     A. No.
6     Q. Has anyone ever told you that you
7  have a substance abuse problem?
8     A. No.
9     Q. Or that you've ever had one?
10    A. No.
11    Q. So any medical records otherwise
12 would be a mistake, as far as you're concerned?
13 They wouldn't refer to you? It would be a
14 mistake?
15    A. Yeah.
16    Q. Why don't you tell me what happened
17 in the incident.
18    A. What happened?
19    Q. Tell me what happened.
20    A. The accident? Well, we were
21 working. We got to the third stump, and that's
22 pretty much it. I blacked out. I was like in
23 shock, and all I can remember is afterwards
24 going in a helicopter, and that was about it.
25    Q. Okay. Let me take you back. You

Page 61 - Page 64