## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| KYLE SMITH, | : |
| | : |
| *Plaintiff,* | : |
| | : |
| v. | : |
| | : **CIVIL ACTION** |
| PROMARK PRODUCTS WEST, INC. | : |
| | : **NO. 02-CV-2718 (RLB)** |
| and | : |
| | : |
| ARIENS COMPANY, | : |
| | : |
| *Defendants.* | : |
| | : |

## MOTION FOR SUMMARY JUDGMENT

Defendants, Promark Products West, Inc. and Ariens Company, move for summary judgment on all of plaintiff's claims as fully set forth in the accompanying brief.

**LAVIN, O'NEIL, RICCI, CEDRONE & DISIPIO**

BY: _____(GC1270)
Gerard Cedrone, Esquire
Leland I. Kellner, Esquire
Howard W. Donahue, Jr., Esquire
Attorneys for Defendants,
Promark Products West, Inc. and Ariens Company

DATED:  October 6, 2004

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KYLE SMITH, | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | **CIVIL ACTION** |
| PROMARK PRODUCTS WEST, INC. | : | |
| | : | **NO. 02-CV-2718 (RLB)** |
| and | : | |
| | : | |
| ARIENS COMPANY, | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

<u>**BRIEF IN SUPPORT MOTION FOR SUMMARY JUDGMENT**</u>

Kyle Smith suffered an injury in September of 2001 when the cutting wheel of a stump grinder operated by someone else came in contact with his leg. What follows addresses plaintiff's theory of the accident as determinable by reference to the report submitted by his expert, Richard Colberg.

**I.    <u>FACTS.</u>**

The machine involved is alleged to have been a model 16-SP stump grinder (the "16-SP") manufactured by the now defunct Promark Products West, Inc. (hereinafter "Promark") in 1985. At the time of the incident, it was owned by Joe Huber (now deceased), presumably for use in his business, Action Tree Service. Karl Kirchhofer had borrowed it for a side job involving the removal of stumps from a residential property. Smith was there to assist Kirchhofer with clean-up duties.

The configuration of the stump grinder consists of two wheels attached to the mid-point of a metal frame. Aft of the wheels and beneath the frame and body of the machine was a circular cutting wheel, powered by a gasoline-powered engine attached to the frame. The top half of the cutting wheel is guarded by location and the frame. The 16-SP was designed for a single operator, who stood behind the machine,

maneuvering it by means of a handlebar-like apparatus which extended from the rear of the frame.  *See* Advertisement for 16-SP, attached hereto at Exhibit "A."

Directly in front of the operator were the controls.  *Id*.  A manual for the machine instructed the operator to pull the 16-SP back toward the stump to be removed until the cutting tool was directly above it, to lock the throttle in the open position, to engage the cutting tool, and then to move the machine laterally back and forth by means of the handlebar-like apparatus, grinding the stump in the process.  This process is repeated until the stump is removed to the desired level.  Complete removal requires cutting to the stump down to the roots.  During operation, the cutting wheel rotates at approximately 2,400 rpm.

According to Kirchhofer, he was operating the 16-SP in that fashion when it "started to jump around on [him] a little bit."  *See* Deposition of Karl Kirchhofer, taken on June 15, 2004, at page 39, lines 22-23, a true and correct copy of which is attached hereto as Exhibit "B."  Believing the work would proceed more quickly with help holding the machine, Kirchhofer called for Smith to assist him.  *Id*. at pages 42-43.

The stump Kirchhofer was grinding was located on a slight grade and surrounded by mulch.  *Id*. at pages 36-38.  Smith came over to the 16-SP and, standing to the left of Kirchhofer, grabbed hold of one of the sidebars connecting the operator handlebars to the machine.  *See* Deposition of Kyle P. Smith, taken on June 4, 2004 at page 78, a true and correct copy of which is attached hereto as Exhibit "C," and *see* Exhibit "B" at page 43.  According to Smith, he was standing on flat ground.  *See* Exhibit "C" at page 66, lines 7-11. In some manner, perhaps because Smith slipped in the mulch, his right leg came in contact with the cutting wheel.  *See* Exhibit "C" at page 64, and Exhibit "B" at 44.  Though Kirchhofer immediately moved the 16-SP aside, it was too late to prevent Smith's injury.  *See* Exhibit "B" at pages 50, 52.

## II.    **PLAINTIFF'S THEORIES.**

For the purposes of this Motion, defendants agree that Ariens Company (hereinafter "Ariens") purchased Promark before Promark ceased operations.  Plaintiff alleges that Ariens was negligent and strictly liable in the design and manufacture of the 16-SP and breached expressed and implied warranties.

*See* Plaintiff's Amended Complaint, a true and correct copy of which is attached hereto as Exhibit "D." With respect to the alleged breach of warranties claims, they have been mentioned in the context of the negligence count of the Amended Complaint and thus, the following discussions would also apply to those claims. If plaintiff is asserting some unidentified breach of express warranty based on some written warranty, he has provided no evidence of any such warranty. Notwithstanding the foregoing, there is a four year statute of limitations on breach of warranty claims that runs from the date of sale. *See* 42 Pa.C.S. §5525; 13 Pa.C.S. §2725; *Cucchi v. Rollins Protective Services Co.*, 574 A.2d 565, 572-73 (Pa. 1990). This machine was sold at least fifteen years before the date of the incident and any such claim would be barred by the statute. If this claim is meant to encompass any warranties implied by law to recover for alleged personal injuries, the same standards imposed by Restatement (Second) of Torts §402A would apply and plaintiff would have to establish causation, which he has not, as demonstrated below.

The report of plaintiff's expert Richard Colberg concludes with six numbered paragraphs under the heading "Findings." The first consists of a conclusion about which there is no dispute - Smith's injury occurred "when his leg came into contact with the cutter wheel." *See* Report of Richard A. Colberg, dated August 27, 2004, a true and correct copy of which is attached hereto as Exhibit "E" at page 7. The remaining five paragraphs address what Colberg believes to be three defects in the stump grinder's design: (1) inadequate warnings; (2) lack of devices to shut down the grinder immediately in the event of an accident; (3) an unguarded cutting wheel.[1] None is legally sufficient to support plaintiff's claim.

**A.      Inadequate Instructions and Warnings.**

Plaintiff's expert references one combination instruction/warning found in the operation, maintenance and part's manual for the 16-SP. Its subject is the machine's stability, the operator being instructed to "[a]void deep side angles" by proceeding "straight up or down steep hills." *See* Operation and

---

[1]   Although plaintiff alleges in the Amended Complaint that the 16-SP contained a manufacturing defect as well, neither plaintiff nor Colberg have provided any evidence of a manufacturing defect.

Parts Manual, a true and correct copy of which is attached hereto Exhibit "F" at page 6.  According to Colberg, that warning, or one like it, "should have been placed conspicuously on the machine for all to see." *See* Exhibit "E" at page 3.

There are two difficulties with that position.  One is that Colberg has got it backwards.  The placement of the warning in the manual is more than just sufficient to render the product safe for its intended use.  It is preferable.  The manual contains an entire page of safety instructions, including a dozen separate Do's and Don'ts.  The unstated implication of Colberg's position is that each one of them should have appeared on the body of the grinder "for all to see."

That would not represent an improvement in safety.  Too little information may not communicate the necessary caution, but too much information will not communicate it either.  And the implications of Colberg's opinion go well beyond this case, which concerns a product with about a single page of safety instructions.  When the typical new car manual is considered, the magnitude of the problem Colberg's suggestion would create becomes readily apparent.

But the court need not deal with that conceptual analysis.  There is a far more fundamental problem with plaintiff's lack of warnings theory.  Neither Kirchhofer nor Smith has suggested that the terrain on which they were working had anything to do with the incident.

Whatever the product defect, a plaintiff asserting a strict liability claim must also establish its causal connection to the injury sustained.  *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893, 899 (Pa. 1975) (elements of product liability claim include defect, lack of substantial change, and proximate cause).  Proximate cause begins with cause in fact.  *See Sherk v. Daisy-Heddon*, 450 A.2d 615, 621 (1982) (Hutchinson, J. concurring) (proximate cause involves policy decision and "should not be reached until cause in fact is shown").  If cause in fact cannot be established, it is unnecessary to consider the issue of proximate cause.  Plaintiff cannot establish cause in fact here.

The point of the safety instruction is the machine's stability.  *See* Exhibit "F" at page 6 ("STABILITY – The self-propelled grinder has a narrow wheel base and can become unstable under adverse conditions.") (emphasis in original).  Kirchhofer denied any such problem:

> Q.  When you were using the stump grinder, did you ever feel like the stump grinder was out of control?
>
> A.  No.

*See* Exhibit "B" at page 42, lines 4-6.

So did Smith:

> Q.  So you grabbed the left bar coming out of the machine?
>
> A.  Right.  Yes.
>
> Q.  Did you feel that the machine was in danger of tipping over?
>
> A.  No.

*See* Exhibit "C" at page 78, lines 20-25.

The machine's stability only comes into play in certain situations.  As Colberg notes, the safety instruction references steep hills.  Kirchhofer characterizes the work area quite differently:

> Q:  So the only thing of what I just told you that you think is not accurate is that Kyle Smith was in front of the machine?
>
> A:  Right. And the hill, I mean, it wasn't really a hill, it was a slight grade.

*See* Exhibit "B" at page 59, line 25 - 60, line 5.

Smith does too:

> Q.  Were you on flat ground, or were you on a hill?
>
> A.  For the most part, it was flat ground.  I just must have had something under my foot or something and slipped.

*See* Exhibit "C" at page 66, lines 7-11.

5

An instruction concerning product use has a specific purpose. It is to convey information so as to affect the behavior of the product user. The available evidence must "support a reasonable inference that the existence of additional warnings may have prevented the accident from occurring." *Conti v. Ford Motor Co.*, 743 F.2d 195, 198 (3d Cir.1984), *cert. denied*, 470 U.S. 1028 (1985). The available evidence here does not pass that test.

The instruction Colberg believes should have been on the machine is designed to affect behavior only when the user perceives his work area as being a steep hill. If the user fails to perceive the work area that way, the instruction is meaningless. As Colberg would surely agree, even the best instruction alters only behavior. It cannot alter perceptions.

For plaintiff to establish the causal connection here, he must demonstrate that Kirchhofer would have responded to the additional information. He cannot provide that proof. Given that Kirchhofer did not consider the work area a steep incline, a view plaintiff shared, telling him how to operate the grinder on the steep incline could not possibly have elicited the desired response.

Should plaintiff persist with a negligent failure to warn claim, the result would be the same, as made plain in *Sherk*. With the Superior Court having awarded a new trial "because, in its view, the trial court had improperly refused to charge the jury on negligence," the issue was squarely framed. *Sherk*, 450 A.2d at 617. The argument was squarely rejected:

> [The Superior Court] erroneously concluded that the trial court's failure to charge on negligence. . . requires a new trial. Liability in negligence or strict liability is not imposed upon a manufacturer simply for the manufacture of a defective product. Rather, the plaintiff must demonstrate that the injuries sustained were proximately caused by the product's defect.

*Id.* (citations omitted.)

Plaintiff has not established cause in fact with respect to his injuries and the alleged failure to warn. Without establishing causation, he has failed to establish a *prima facie* case for warning defect. As such, summary judgment on plaintiff's strict liability and negligent failure to warn claims should be dismissed.

**B.     Lack of Automatic Shut-off Devices.**

Three of the remaining four design changes Colberg advocates suffer from the same lack of causal connection. What the alleged design improvements are intended to accomplish, and what actually occurred here, are two entirely different matters.

Colberg's theory is that Smith's injury resulted from a design flaw which prevented Kirchhofer from "immediately shutting down the machine." *See* Exhibit "E" at page 7. The testimony offered by Kirchhofer and Smith suggest nothing of the kind.

According to Kirchhofer:

> Q.     What happened next?
>
> A.     Well, it happened so fast, but he just slipped into the wheel and it tore his leg up.

*See* Exhibit "B" at page 44, lines 18-20.

> Q.     What happened next after he got caught in the machine?
>
> A.     I flipped it to the right, and then it was pretty much chaos from there.
>
> Q.     Did you actually turn the machine over?
>
> A.     I turned the machine over to the right, yeah.

*Id.* at 50, lines 16-21.

> Q.     What did Kyle do after he got his leg caught in the machine? You turn it over immediately?
>
> A.     Yes.

*Id.* at 52, lines 15-17.

7

> Q.  Do you know whether your foot slipped underneath the cutting wheel?
>
> A.  Yes.
>
> Q.  What do you remember?
>
> A.  I just know it got my leg. It just pulled it. I don't know. It just pulled it in or something.

According to Smith:

> Q.  Do you remember actually slipping – that your foot got under the cutting wheel?
>
> A.  No. I don't remember it, like I said.
>
> Q.  The first part of you that touched the cutting wheel, was that pants?
>
> A.  I – I don't know. I had – like I said, when it happened, it happened like – like a flash (indicating).

*See* Exhibit "C" at page 93, line 11 to 94, line 2.

> Q.  All right. What happened as your leg was being pulled in? What was going on? What happened?
>
> A.  It just took a second. Like I said, I don't know.

*Id*. at 94, lines 15-19.

Expert opinion is admissible so long as it "is based upon sufficient facts." *See* Fed. R. Evd. 702. That is not the nature of the testimony Colberg is proposing to offer here. There are no facts from which he can conclude that any of his supposed design improvements would have either prevented or lessened Smith's injury. The available information is that the accident "just took a second." Injury was immediate.

Kirchhofer's reaction was too, and by moving the machine aside achieved a better result than any of the Colberg design alternatives would have achieved. They might have brought the cutting wheel to a stop, but Kirchhofer's action removed it from Smith's leg immediately when he perceived that Smith had been injured. This response was undoubtedly much quicker than any of Colberg's alternatives.

8

The absurdity of these alternatives is evident when it is considered their intent and how they operate. These devices are designed to benefit and protect the operator, not an intervening party.  For instance, the operator presence control is a lever or bail on a machine's handle that the **operator** must hold in order for the tool mechanism to rotate.  These devices are commonly used on walk behind lawnmowers.  As the name suggests, they are designed to prevent the operator from leaving the operator position and becoming involved with the tool mechanism.

However, if an intervener becomes involved with the tool mechanism as it is being operated by another, like Smith did here, the operator presence control provides no benefit to the intervening person. This is because the involvement occurs when the tool mechanism is being engaged by the operator.  The operator must also recognize the involvement, release the control, and - no matter what brake or clutch is part of the unit - wait for the tool to stop.  Since the involvement causes immediate injury, the damage is done before the operator has recognized what has happened and releases the control.  More damage could occur to the intervening person while waiting for the tool to stop after the operator presence control has been released.  The same arguments can be made against the positive clutch and brake as they are designed to protect operators and also depend largely on reaction time.  Contrary to Colberg's belief, it is evident that these devices are useless in protecting interveners from injury and would not have prevented Smith from being injured or reduced his injury.

Colberg's opinion on causation then is speculation, pure and simple.  The result is to render his design alternatives of no legal significance.  To be meaningful, design alternatives must represent an improvement in overall product safety, and must be of a type that would have provided a benefit to the injured plaintiff.  *See Short v. WCI Outdoor Products, Inc.*, 2000 U.S. Dist. LEXIS 16006, *20 (E.D.Pa. 2000).  The alternatives Colberg advocates would have helped Smith not at all.  Plaintiff thus cannot prevail on his design defect theory of liability either and summary judgment on these claims is appropriate.

**C.    Lack of a Guard**

The remaining design defect theory put forth by Colberg requires a different analysis.  That the cutting wheel came in contact with Smith's leg is not open to question.  That the possibility of contact between the cutting wheel and Smith's leg rendered the stump grinder automatically defective in design is very open to question.

Colberg's approach is simplistic.  According to an oft-cited design hierarchy, guarding is preferable to warning.  Colberg states a guard for the 16-SP's operator could have been manufactured "for about $10." *See* Exhibit "E" at page 5.  He asserts that it would have afforded a non-operator like plaintiff here the same protection.    Colberg mixes these ingredience together, avoids any real analysis, and produces an unsupported conclusion of defect.

There is a bit more to the problem than that.  Under Pennsylvania law, whether a product design represents an unreasonable danger so as to expose the manufacturer to strict liability is a matter of social policy.  *Azzarello v. Black Bros. Co., Inc.*, 391 A.2d 1020 (Pa. 1978).  That does not mean the standard to which manufacturers are held is an absolute.   *Davis v. Berwind Corp.*, 690 A.2d 186 (Pa. 1997). Manufacturers are not insurers.  *Azzarello*, *supra.*  Their products need not achieve "Platonic ideals of perfection." *Lewis v. Coffing Hoist Div., Duff-Norton Co., Inc.*, 528 A.2d 590, 595 (Pa. 1987)  (Flaherty, J. dissenting.)  The design process is by necessity one of trade-offs between risk and utility, the goal being to achieve a reasonable level of both.  *See Phatak v. United Chair Co.*, 756 A.2d 690 (Pa. Super. 2000).  The question here then is whether the manufacturer made the right trade-offs.

Colberg does not provide an answer.  The concept he endorses is one which could make the product safer, but an already safe product need not be made safer.  *See Pascale v. Hechinger Co. of PA*, 627 A.2d 750,753 (Pa. Super. 1993); *Lewis*, 528 A.2d at 595 (Flaherty, J. dissenting).  And while he speculates as to the cost of putting his concept into production, he offers not a word on how the stump grinder's utility might

be affected by it.  The only simple conclusion to be drawn then is this:  The evidence on which plaintiff intends to base his claim of design defect is simply inadequate.

The Supreme Court decision in *Phillips v. Cricket Lighters*, 841 A.2d 1000 (2003), is another problem facing plaintiff's claim.  As explained there, a plaintiff asserting a design defect claim "must establish that the product was unsafe for its intended user."  *Phillips*, 841 A.2d at 1007.

The product in *Phillips* was a cigarette lighter, which a stump grinder is not, and the user a two-year old, which Smith is not.  That does not mean *Phillips* is inapplicable here.  Smith is an unintended user in an entirely different sense.

The stump grinder is designed for a single operator, positioned behind the machine at its controls.  Absent a decision to leave that position, with the engine running, the operator physically cannot reach the cutting wheel.  So with respect to the intended user, the stump grinder is absolutely safe.

Smith was not a bystander or an operator, but rather was an intervener, out of position, who deliberately placed himself where the intended user would not and could not -- in close proximity to the cutting wheel.  The question then is whether social policy requires that the manufacturer be held to a strict liability standard with respect to an individual like Smith.  The answer is no.

To hold otherwise would be to engage in the search for Platonic ideals against which former Chief Justice Flaherty warned, and it would have the practical effect of making the manufacturer an insurer.  *See Riley v. Warren Mfg., Inc.*, 688 A.2d 221 (Pa. Super. 1997).  This is an extension of responsibility the Pennsylvania Supreme Court has expressly disavowed.  *Azzarello*, *supra*.

The 16-SP is unfortunately one of those products that when properly used is perfectly safe, but when improperly used carries with it a risk of extraordinary injury.  But extraordinary injury does not equate to unreasonable danger.  *Short*, at *17 ("Merely because some injuries may occur does not mean that a product

is defective") (internal quotations omitted).  That they are not reflects a willingness to accept a design trade-off that recognizes risk, and accepts utility.  Courts have recognized this trade-off in a number of products:

> Some products, by their nature, (or in modern parlance, by their conscious design), place both user and bystanders in some measure of danger.  A knife or an axe may cut persons, as well as their intended targets.  Fish hooks can wound; saws can maim, and revolving propellers can cause fearful damage.

*Fitzpatrick v. Madonna*, 623 A.2d 322, 325 (Pa. Super. 1993), *citing Elliott v. Brunswick Corp.*, 903 F.2d 1505, 1507 (11th Cir. 1990).

In *Fitzpatrick*, the plaintiff brought a wrongful death and survival action after the decedent was run over by an open propeller boat while swimming at the Jersey shore.  *Id*. at 323.  Plaintiff alleged that the outboard motor was defective because it lacked a protective guard around the propeller.  *Id*.  The jury found that the engine was defective because it lacked a guard and found the manufacturer strictly liable and negligent based thereon.  *Id*.

On appeal, the manufacturer argued that the engine was not defective and the Superior Court agreed.  *Id*. at 325.  The court found that a guarded propeller would "at best, reduce one type of risk while creating other undesirable effects," including the possibility that human limbs could become wedged between the guard and propeller.  *Id*.  When analyzing the propeller, the Court found:

> From recreation to transportation, the open screw propeller has proven it utility for its intended purpose, *i.e.*, powering a boat through water.  When used for its intended purpose, the open screw propeller functions safely and well.  It must be conceded, nevertheless, that open screw propellers possess inherently dangerous qualities.  The public, however, is aware of these qualities.  **A component person knows that he or she must stay clear of the churning blades of an outboard motor in the same way as a person avoids airplane propellers, chain saw teeth, and lawn mower blades**.

*Id*. (emphasis added).

A parallel between the decedent in *Fitzpatrick* and Smith can be drawn.  The decedent was not the operator of the boat, just like Smith was not the operator of the 16-SP.  The decedent was swimming when he was run over by the defendant's boat that was being operated by another.  Smith placed himself in close

12

proximity to the cutting wheel while it was being operated by another, Kirchhofer. Simply put, neither the propeller nor the 16-SP can be guarded against someone interjecting themselves in harms way.

The cutting wheel of the 16-SP is very similar to the propeller in *Fitzpatrick*. The intended purpose of the 16-SP is to grind stumps, from the trunk above the ground down to the roots below the ground. Its utility and safety are unmatched for that use, particularly in light of common alternatives like explosives, chain saws, motor vehicles and chemicals. The 16-SP was designed to be able to go into tight areas to grind stumps. When using the 16-SP properly, it is nearly impossible for the operator to become involved with the cutting wheel. Just like the cutting edge of a knife, the blade of an axe, the teeth of a chain saw, the cutting wheel of the 16-SP must be exposed in order for it to contact the stump and grind it. The 16-SP is designed to grind very large diameter stumps to smaller diameter stumps, which is why the bottom half the cutting wheel is exposed.

As recognized by the court in *Fitzpatrick*, attempting to add a guard to an already safe product can create a host of other risks. For example, Colberg's proposed retractable guard, which has not been used on any stump grinder that has ever been sold on the market, would jam or become hung up on the stump or the ground. This would impair the ability of the 16-SP to grind the roots of a stump and would force operators to move closer to the cutting wheel to un-jam the guard or cause the guard to become damaged. Many operators may even attempt to un-jam the guard without bothering to turn the machine off or rig some countermeasure to defeat the guard altogether. Certainly, anything that forces an operator closer to a rotating cutting wheel would be undesirable. Another undesirable effect would be that the operator gives up on the now useless machine for a more effective alternative but unsafe alternative, such as dynamite or a chain saw. The bottom line is that any guard would nearly defeat the utility of the machine while creating a host of undesirable and dangerous effects. It is evident that any such guard would not be a safer alternative.

The 16-SP has inherently dangerous qualities, which are quite similar to a propeller. It rotates at a high speed. It has to be open in order to grind the trunk and it roots below ground, just like the propeller has to be open to move the boat through water. If the unguarded propeller was found to not be defective, the 16-SP should not be either.

The *Fitzpatrick* court also pointed out several other products with the same inherently dangerous characteristics as the 16-SP – lawnmower blades, airplane propellers and chain saw teeth – which competent persons know they should avoid. The 16-SP specifically and stump removers in general should certainly be added to this class of products. Two of these products (the chain saw and lawnmower) are one operator, outdoor products, like the 16-SP. They have a cutting mechanism or blades that rotate at high rpms. The cutting wheel has to be exposed in order for it to perform its intended function. Just like the teeth of a chain saw, the blades of a lawn mower and the propellers of boats and airplanes have to be exposed to perform their intended functions, the 16-SP's cutting wheel must be exposed to the tree stump to cut the wood.

For the 16-SP to be an effective tool, the design trade-off favors its great utility, at the expense of the inherent risk of a rotating cutting wheel. Imposing liability under these circumstances defeats the product's utility and renders the manufacturer's liability absolute. That is not, and ought not to be, Pennsylvania law.

## III.    CONCLUSION.

Plaintiff has failed to meet his burden with respect to his claims in this case. What Colberg has done is presented several devices that he believes would have afforded Smith some benefit or reduced his injury. But that is all that Colberg provides – mere belief and speculation. First, the failure to warn claim fails as a matter of law because plaintiff has failed to establish that the alleged failure to warn was the cause in fact for his alleged injury. The record is clear that neither Smith nor Kirchhofer believed that the work area was on a steep hill, making the effect of any such warning useless for this incident.

Second, Colberg's proposed devices also fail for lack of causation. All of the devices are intended to protect operators, not interveners like Smith. Kirchhofer's reactions after realizing what had happen benefited Smith far more than any of Colberg's devices would have.

Lastly, the 16-SP is a safe product when used by one operator, properly positioned, which was not the case here. Its utility and safety are unmatched for its purpose of grinding tree stumps. When used improperly, the 16-SP carries a risk of extraordinary injury, like knives, axes, chain saws and lawn mowers. This risk does not mean that the 16-SP is unreasonably dangerous. The 16-SP possesses inherently dangerous characteristics, like knives, axes, chain saws and propellers, that just cannot be guarded without impairing its utility. The situation is all the more complicated when the injured person is an intervener, who places himself in close proximity to an obvious danger. Defendants, Promark Products West, Inc. and Ariens Company, respectfully respect that summary judgment be entered in its favor and that all of plaintiff's claims are dismissed with prejudice.

**LAVIN, O'NEIL, RICCI, CEDRONE & DISIPIO**


BY:    _____(GC1270)
             Gerard Cedrone, Esquire
             Leland I. Kellner, Esquire
             Howard W. Donahue, Jr., Esquire
             Attorneys for Defendants,
             Promark Products West, Inc. and Ariens Company

DATED: October 6, 2004

823950v1