IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KYLE SMITH,<br><br>        *Plaintiff,*<br><br>v.<br><br>PROMARK PRODUCTS WEST, INC.<br><br>and<br><br>ARIENS COMPANY,<br><br>        *Defendant.* | CIVIL ACTION<br><br>NO. 02-CV-2718 (RLB) |

**MOTION TO PRECLUDE THE REPORT AND TESTIMONY OF PLAINTIFF'S
EXPERT WITNESS, RICHARD A. COLBERG**

Defendants, Promark Products West, Inc. and Ariens Company, hereby move for the entry of an order precluding the report and testimony of plaintiff's expert, Richard A. Colberg, for the reasons set forth and on the basis of the authorities cited in the accompanying memorandum of law.

        LAVIN, O'NEIL, RICCI, CEDRONE & DISIPIO

BY: _____ (GC1270)
        Gerard Cedrone, Esquire
        Leland I. Kellner, Esquire
        Howard W. Donahue, Jr., Esquire
        Attorneys for Defendant, Promark Products West, Inc.
        and Ariens Company
        Suite 500
        190 North Independence Mall West
        6th & Race Streets
        Philadelphia, PA  19106
        (215) 627-0303

DATED:  October 18, 2004

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KYLE SMITH,** | : |
| *Plaintiff,* | : |
| v. | : |
| **PROMARK PRODUCTS WEST, INC.** | : CIVIL ACTION |
| and | : NO. 02-CV-2718 (RLB) |
| **ARIENS COMPANY,** | : |
| *Defendant.* | : |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS, PROMARK PRODUCTS WEST, INC. AND ARIENS COMPANY, MOTION *IN LIMINE* TO PRECLUDE THE REPORT AND TESTIMONY OF PLAINTIFF'S EXPERT WITNESS, RICHARD A. COLBERG**

**I.   Introduction**

Plaintiff intends to support his claim of product defect with the opinion testimony of Richard A. Colberg. An engineer by education, Colberg attacks the design of the product and the information provided for its safe use. An examination of his opinions demonstrates that they fail the tests of reliability and relevance necessary for admissibility.

**II.   Facts**

The machine involved is alleged to have been a model 16-SP stump grinder (the "16-SP") manufactured by the now defunct Promark Products West, Inc. in 1985. At the time of the incident, it was owned by Joe Huber (now deceased), presumably for use in his business. Karl Kirchhofer had borrowed it for a side job involving the removal of stumps from a residential property. Plaintiff Kyle Smith was there to assist Kirchhofer with post-grinding clean-up duties.

1

The configuration of the stump grinder consists of two wheels attached to the mid-point of a metal frame. Aft of the wheels and beneath the frame and body of the machine was a circular cutting wheel, driven by a gasoline-powered engine attached to the frame. During operation, the cutting wheel rotates at approximately 2,400 rpm. The cutting wheel is guarded by location and the frame. The 16-SP was designed for a single operator, who stood behind the machine, maneuvering it by means of a handlebar-like apparatus which extended from the rear of the frame. *See* Advertisement for 16-SP, attached hereto at Exhibit "A."

Directly in front of the operator were the controls. *Id*. A manual for the machine instructed the operator to pull the 16-SP back toward the stump to be removed until the cutting tool was directly above it, to lock the throttle in the open position, to engage the cutting tool, and then to move the machine laterally back and forth by means of the handlebar-like apparatus, grinding the stump in the process. This process is repeated until the stump is removed to the desired level. Complete removal requires cutting to the stump down to the roots.

According to Kirchhofer, he was operating the 16-SP in that fashion when it "started to jump around on [him] a little bit." *See* Deposition of Karl Kirchhofer, taken on June 15, 2004, at page 39, lines 22-23, a true and correct copy of which is attached hereto as Exhibit "B." Believing the work would proceed more quickly with help holding the machine, Kirchhofer called for Smith to assist him. *Id*. at pages 42-43.

The stump Kirchhofer was grinding was located on a slight grade and surrounded by mulch. *Id*. at pages 36-38. According to plaintiff, he came over to the 16-SP and, standing to the left of Kirchhofer, grabbed hold of one of the sidebars connecting the operator handlebars to the machine. *See* Deposition of Kyle P. Smith, taken on June 4, 2004 at page 78, a true and correct copy of which is attached hereto as Exhibit "C," and *see* Exhibit "B" at page 43. According to

Smith, he was standing on flat ground. *See* Exhibit "C" at page 66, lines 7-11. In some manner Smith cannot explain, his right leg came in contact with the cutting wheel. *See* Exhibit "C" at page 64, and Exhibit "B" at 44. Though Kirchhofer immediately moved the 16-SP aside, it was too late to prevent Smith's injury. *See* Exhibit "B" at pages 50, 52.

### III.     Plaintiff's Theories

The report of plaintiff's expert Richard Colberg concludes with six numbered paragraphs under the heading "Findings." The first consists of a conclusion about which there is no dispute - Smith's injury occurred "when his leg came into contact with the cutter wheel." *See* Report of Richard A. Colberg, dated August 27, 2004, a true and correct copy of which is attached hereto as Exhibit "D" at page 7. The remaining five paragraphs address Colberg's belief that there were three defects in the stump grinder's design: (1) inadequate warnings; (2) lack of devices to shut down the grinder immediately in the event of an accident; (3) an unguarded cutting wheel. *Id*. The key word in the preceding sentence is "belief" – as that is all that Colberg has offered to support these opinions. He does not possess the sufficiently reliable basis of an expert witness. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

### IV.     Argument

#### A.     The Standard for Admissibility of Expert Opinion and Testimony.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The Court of Appeals has addressed the requirements of Rule 702 by focusing on a trilogy of restrictions - qualification, reliability and fitness. *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3rd Cir. 2003). The "qualification" element is virtually self-explanatory, requiring that the expert possess "specialized expertise" in the relevant field. *Id*.

The second element, reliability, requires that the expert's opinions be "based on the methods and procedures of science rather than on subjective belief or unsupported speculation . . .

3

." *Id*. The proposed testimony must satisfy the criteria imposed by *Daubert*: 1) whether the theory or technique is scientific knowledge will assist the trier of fact and can be or has been tested; 2) whether the method has been subject to peer review; 3) known or potential rate of error; 4) the existence and maintenance of standards controlling the technique's operation within the community. *Daubert*, at 593-94. That list has been expanded to include: 5) whether the method is generally accepted; 6) the relationship of the technique to methods which have been established to be reliable; 7) the qualifications of the expert witness testifying based on the methodology; and 8) the non-judicial uses to which the method has been put. *Oddi v. Ford Motor Company*, 234 F.3d 136, 145 (3rd Cir. 2000).

The fitness element is less complex, in effect, parroting the standard relevance requirement. *Calhoun,* 350 F.3d at 321 (testimony needs to "relevant for the purposes of the case and must assist the trier of fact"). For an expert's opinion to be fit, there must be a connection between the "scientific research or test result to be presented and particular disputed factual issues in the case." *Oddi*, at 145, *quoting In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717 (3rd Cir. 1994). Although the test is whether the particular opinion is based on valid reasoning and reliable methodology, the court still must "examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Id*. at 146 (internal citations omitted). If the court finds too large of a gap between the opinion and the data provided, the opinion is unfit and unreliable and provides no assistance in the case. *Id*., *quoting General Electric Co. v. Joiner*, 522 U.S. 136 (1997). Rule 702 and *Daubert* ensure that an expert's opinion "is based on the methods of science rather than on subjective belief or unsupported speculation." *Id*. at 158, *quoting In re Paoli Railroad*, 35 F.3d at 742.

4

Colberg's opinions violate the reliability and fitness parts of this trilogy. His approach is very simplistic. He relies upon an oft-cited design hierarchy: that guarding is preferable to warning, if you cannot guard, warn. This hierarchy, coupled with his mere belief and speculation, is the extent of the methodology used and the analysis performed. That is not enough.

### 1. Colberg's Inadequate Warning And Instruction Opinions Are Inadmissible.

Colberg opines that an instruction in the Operator's Manual pertaining to stability should have been placed in some unspecified location on the actual 16-SP. The Operator's Manual's safety instruction on this topic is as follows:

> **STABILITY** – The self-propelled grinder has a narrow wheel base and can become unstable under adverse conditions. Always go straight up or down on steep hills. Avoid steep side angles.

*See* Operation and Parts Manual at page 6, a true and correct copy of which is attached hereto as Exhibit "E" (emphasis in original).

#### a   Reliability and Fit.

Colberg's opinion that the lack of the warning played a role in causing Smith's injury is just not reliable. All Colberg provides is a series of assumptions – that Kirchhofer was working on a steep hill, that the machine became instable, that a warning on it would have altered Kirchhofer's behavior – and there is not a shred of evidence to support any of them.

In order for an expert's opinion to be reliable, it must be based upon a scientific methodology and must actually have been designed and tested. *See* Fed. R. Evd. 702. Colberg has failed to provide any of the necessary scientific and engineering work in support of his warning opinion. He has used no methodology beyond his own intuition. *See Oddi*, at 158 (where the Third Circuit upheld the preclusion of plaintiff's expert for failing to provide a

5

methodology and failing to test his proposed alterative designs) and *see e.g.*, *Short v. WCI Outdoor Products, Inc.*, 2000 U.S. Dist. LEXIS 16009 (E.D. Pa. 2000).

The plaintiff in *Short* was mowing his lawn with a walk-behind lawn mower. *Short*, 2000 U.S. Dist. LEXIS 16009, *2. At some point, the plaintiff slipped and slid down the sloped lawn. When he slipped, he let go of the operator presence control. The mower followed him down the hill and contacted his left foot. *Id*.

The plaintiff in Short retained expert Richard Colberg. Colberg opined that the OPC cable was too long, which allowed moisture to collect inside the cable and corrode the metal cable and he also opined that the cable should have been made corrosion resistant. *Id*. at *10-12. When concluding that Colberg did not offer a design that would have made the cable non-defective, the court found that he did not have a suggestion about the length of the cable. The court also criticized Colberg for not testing his conceptual cable on the mower to determine whether it would have been appropriate to integrate it onto the mower. *Id*. at *10. The court echoed its criticisms of Colberg when analyzing his opinions on the cable material. Colberg neither offered a material that his conceptual cable would be made, nor did he perform any testing to determine if any materials would have made the cable non-defective. Not surprisingly, the Court concluded that no safer and feasible alternative design was presented by plaintiff.

Just like Colberg did in *Short*, he provides no methodology in support of his opinion, offers no design, plan or blueprint for his warning and he offers no opinion as to where it should have been integrated onto the 16-SP. Since the warning has not been designed, it is not a surprise that Colberg has not tested the effect of his proposed warning.

The fact is, Colberg's warning opinion is defeated by all of the available evidence. There is nothing to suggest the 16-SP became unstable before Smith was injured. The record indicates just the opposite. Kirchhofer had this to say:

> Q. When you were using the stump grinder, did you ever feel like the stump grinder was out of control?
>
> A. No.
>
> Q. I think you said before that it would make it take longer and that it would require more effort. Are those the reasons why you would ask someone to help you?
>
> A. Yeah, for the most part.
>
> Q. It wasn't because you thought the machine would actually fall down?
>
> A. No. If I thought the machine would fall down, I wouldn't have touched it. Back then, time was money to us, so getting done and out was important.

*See* Exhibit "B" at page 42, lines 4-16.

Smith affirmed this:

> Q. So you grabbed the left bar coming out of the machine?
>
> A. Right. Yes.
>
> Q. Did you feel that the machine was in danger of tipping over?
>
> A. No.

*See* Exhibit "C" at page 78, lines 20-25.

The machine's stability only comes into play in certain situations, like steep hills. Kirchhofer characterized the work area quite differently:

> Q: So the only thing of what I just told you that you think is not accurate is that Kyle Smith was in front of the machine?
>
> A: Right. And the hill, I mean, it wasn't really a hill, it was a slight grade.

*See* Exhibit "B" at page 59, line 25 - 60, line 5.

Smith agreed:

>   Q.   Were you on flat ground, or were you on a hill?
>
>   A.   For the most part, it was flat ground. I just must have had something under my foot or something and slipped.

*See* Exhibit "C" at page 66, lines 7-11.

An instruction concerning product use has a specific purpose. It is to convey information so as to affect the behavior of the product user. The available evidence must "support a reasonable inference that the existence of additional warnings may have prevented the accident from occurring." *Conti v. Ford Motor Co.*, 743 F.2d 195, 198 (3d Cir.1984), cert. denied, 470 U.S. 1028 (1985). The available evidence here does not pass that test.

The instruction Colberg believes should have been on the machine is designed to affect behavior only when the user perceives his work area as being a steep hill. If the user fails to perceive the work area that way, the instruction is meaningless. As Colberg would surely agree, even the best instruction alters only behavior. It cannot alter perceptions.

For plaintiff to establish the causal connection here, Colberg must demonstrate that Kirchhofer would have responded to the additional information. He cannot provide that proof. Given that Kirchhofer did not consider the work area a steep incline, a view plaintiff shared, telling him how to operate the grinder on the steep incline could not possibly have elicited the desired response.

The stability of the 16-SP played no role in plaintiff's injury. Colberg's conclusion that the lack of the stability instruction somehow caused plaintiff's injury does not "reliably flow from the facts known to the expert and the methodology used." *Oddi*, at 146 (internal citations omitted). What Colberg has offered is an opinion that serves only to confuse the issues, and is so contrary to the facts of the case as to render it completely and utterly irrelevant. How can the lack of a stability warning on the machine be a cause of plaintiff's injury after both the operator

and Smith testified that the 16-SP was not unstable, did not tip and was not the cause of the slip? The answer is it cannot. The gap between the factual record and Colberg's opinion is just too large for the latter to be admissible.

### 2. Colberg's "Alternative Design" Opinions are Inadmissible.

Colberg opines that plaintiff's injury would have been prevented, or lessened in severity, had the following devices been added to the 16-SP: an operator presence control (OPC), positive clutch and brake (collectively "automatic shut off devices") and a retractable guard. *See* Exhibit "D" at page 7. Each of these proposed "alternatives" violates the reliability and fitness elements of the admissibility trilogy.

It is actually a misnomer to call these opinions "alternative designs." Actually, they are only concepts. As the phrase "alternative design" expressly indicates, there must be an actual design that has been developed, tested and manufactured. Otherwise, it is only a concept. The alternative design must be safer and feasible. *Van Buskink v. West Bend Co.*, 100 F.Supp. 2d 281, 287 (E.D.Pa. 1999). The feasibility inquiry focuses on the time when the product was developed and manufactured, not the technology available when the expert authors his report:

> Alternative designs may indicate that the product was unreasonably dangerous, but only if they were available at the time of manufacture. We fail to see how an alternative design, developed by another person years after the product in question was manufactured, is relevant to whether the product was reasonably safe at the time it was made.

*Diehl v. Blaw-Knox*, 360 F.3d 426, 432 (3rd Cir. 2004) *quoting Grenada Steel v. Alabama Oxygen Co.*, 695 F.2d 883, 889 (5th Cir. 1983) (internal citations omitted).

9

### a      Automatic Shut-Off Devices.

### (i)      Reliability.

Colberg has not provided any reliable scientific and engineering methodology to support his bare conclusions that the automatic shut off devices would have reduced plaintiff's injury. He relies instead on mere speculation. Colberg has to offer an alternative design that is safer and feasible. He has not. All that he provides is mere concepts, not alternative designs.

In order for an expert's alternative design opinion to be reliable, it must be based upon a scientific methodology and must actually have been designed and tested to show whether the alternative is feasible and safer. *See Short*, at *19. Colberg has provided no plans, drawings or other engineering medium to demonstrate the feasibility and enhanced safety of his proposed designs. He has used no methodology beyond his own intuition.

Colberg has done the exact same thing in this case as he did in *Short* and his concepts here fail for the same reasons. To satisfy *Daubert*, Colberg's alternatives must have been developed, designed and tested to determine whether there actually are safer and economically feasible alternative designs. *Id*. at *19. Without actually designing the alternatives, incorporating them on to the 16-SP and testing the product, Colberg has relied upon mere conjecture, belief and speculation for his opinions that his concepts are safer, feasible alternative designs.

The next reliability factor is the submission of the alternative design to peer review. There is nothing here to submit to peer review because these opinions are hollow and unsupported by design materials or sound methodology. There is no known or potential rate of error indicated anywhere in the report. Colberg is unable to provide any field history for his concept, because none exists.

Conspicuous by its absence from Colberg's report is the mention of any standards governing the use of the automatic shut off devices on the 16-SP. For example, there is no standard that requires the 16-SP to have a band brake. That could explain why no stump grinders currently being sold have such brakes on them.

Concerning the general acceptance of Colberg's alternatives, he has indicated only that OPCs and positive clutches are used on lawn mowers. Colberg does not offer any information on whether the band brake and positive clutch were generally accepted alternative design devices for a stump grinder.

The next reliability factor is the relationship of the technique to methods which have been established to be reliable. Notwithstanding the lack of engineering and scientific work performed by Colberg, he attempts to use devices implemented on lawnmowers as alternatives. The band brake and positive clutch have not been used on stump grinders. The OPC has, but only recently. These devices may be reliable and feasible on a lawnmower, but Colberg has not provided any methodology demonstrating that they are on stump grinders.

Colberg's opinions that the automatic shut off devices would have prevented or reduced plaintiff's injury are nothing more than mere speculation. He has done little or no scientific or engineering research into his concepts to determine whether any of his concepts are actually feasible on the 16-SP and whether they would have reduced the extent of plaintiff's injury.

### (ii) Fit.

Colberg's opinions regarding automatic shut off devices opinions are also not fit and are not relevant. The record overwhelmingly contradicts Colberg's opinions. Colberg opined that had the 16-SP been "equipped with an [OPC] and a positive clutch and braking means the cutter wheel would have stopped almost immediately after Kirchhofer took his hands off of the

controls. The time saved could have lessened the extent of Mr. Smith's injury." *See* Exhibit "D" at page 6. The testimony offered by Kirchhofer and Smith suggest nothing of the kind.

    According to Kirchhofer:

> Q.    What happened next?
>
> A.    Well, it happened so fast, but he just slipped into the wheel and it tore his leg up.

*See* Exhibit "B" at page 44, lines 18-20.

> Q.    What happened next after he got caught in the machine?
>
> A.    I flipped it to the right, and then it was pretty much chaos from there.
>
> Q.    Did you actually turn the machine over?
>
> A.    I turned the machine over to the right, yeah.

*Id.* at 50, lines 16-21.

> Q.    What did Kyle do after he got his leg caught in the machine? You turn it over immediately?
>
> A.    Yes.

*Id.* at 52, lines 15-17.

    According to Smith:

> Q.    Do you know whether your foot slipped underneath the cutting wheel?
>
> A.    Yes.
>
> Q.    What do you remember?
>
> A.    I just know it got my leg. It just pulled it. I don't know. It just pulled it in or something.
>
> Q.    Do you remember actually slipping – that your foot got under the cutting wheel?
>
> A.    No. I don't remember it, like I said.
>
> Q.    The first part of you that touched the cutting wheel, was that pants?

      A.    I – I don't know. I had – like I said, when it happened, it happened like – like a flash (indicating).

*See* Exhibit "C" at page 93, line 11 to 94, line 2.

      Q.    All right. What happened as your leg was being pulled in? What was going on? What happened?

      A.    It just took a second. Like I said, I don't know.

*Id.* at 94, lines 15-19.

Expert opinion is a "fit" if it reliably flows from the facts known to the expert. Colberg indicates that he has reviewed the depositions of both Smith and Kirchhofer and still provided this opinion. *See* Exhibit "D" at page 1. There are no facts from which he can conclude that any of his supposed design improvements would have either prevented or lessened Smith's injury. The available information is that the accident "just took a second." Injury was immediate.

Kirchhofer's reaction was too, and by moving the machine aside achieved a better result than any of the Colberg design alternatives would have achieved. Kirchhofer's reaction was immediate. According to Colberg, his design alternatives would have provided an "almost immediate" reaction. What an "almost immediate" lapse of time is was never defined or calculated by Colberg. This concept is another in a string of speculation tied together by Colberg in his attempt to formulate an opinion in this case. By his own admission, Colberg's devices might have brought the cutting wheel to an "almost immediate" stop, but Kirchhofer's action removed it from Smith's leg immediately when he perceived that Smith had been injured. This response was undoubtedly much quicker than any of Colberg's alternatives.

The absurdity of these alternatives is evident when it is considered their intent and how they operate. These devices are designed to benefit and protect the operator, not an intervening party. For instance, the operator presence control is a lever or bail on a machine's handle that the **operator** must hold in order for the tool mechanism to rotate. These devices are commonly used

13

on walk behind lawnmowers. As the name suggests, they are designed to prevent the operator from leaving the operator position and becoming involved with the tool mechanism.

If an intervener becomes involved with the tool mechanism as it is being operated by another, like Smith did here, the operator presence control provides no benefit to the intervening person. The involvement occurs when the tool mechanism is being engaged by the operator. Once involved with an intervener, the operator must recognize the involvement, release the control, and - no matter what brake or clutch is part of the unit - wait for the tool to stop. Kirchhofer never saw Smith slip into the wheel. *See* Exhibit "B" at page 45, lines 15-16. Since the involvement caused immediate injury, the damage was done before the operator recognized what had happened and could release the control. More damage could occur to the intervening person while waiting for the tool to stop after the operator presence control has been released, the positive clutch throttled down and the brake engaged. All of these devices depend largely upon operator reaction time. Contrary to Colberg's belief, it is evident that these devices are useless in preventing injury to interveners and would not have prevented Smith from being injured. Colberg offers no evidence from the record to support any claim that any alternative would have reduced plaintiff's injury.

Because Colberg's opinions regarding the automatic shut off devices are based on speculation alone, the result is to render his "design alternatives" a legal nullity. To be meaningful, design alternatives must represent an improvement in overall product safety, and must be of a type that would have provided a benefit to the injured plaintiff. *See Short, at* *20. The alternatives that Colberg advocates would not have helped Smith at all. As his opinions do not fit the matter in dispute, Colberg should be precluded from offering them at trial.

### b    Lack of Guard.

The last alternative design that Colberg proposes is a retractable guard over the cutting wheel. He opined that this guard would have prevented Smith from being injured. *See* Exhibit "D" at page 7. Like his other opinions, this one is also inadmissible.

### (iii)    Reliability.

Colberg has neither designed any such guard, nor tested one to determine whether his concept would be feasible and safer on the 16-SP. As with his automatic shut-off device concepts, he has provided no design drawings, no blueprints, no plans, no information in any engineering medium. The little information that Colberg provided about the guard is that it could retract into a housing, or retract outside of a housing. Or, that it could be gravity operated, or possibly spring loaded. The weight, dimensions, materials all remain unknown. Colberg has provided not an alternative design. He has provided only an alternative concept, nothing concrete that can be analyzed and tested to determine if it is feasible and safer. More is needed to support an expert opinion. *See Short*, at *10-12, 19-20.

Nowhere in Colberg's report does he mention that he has subjected his retractable guard concept to peer review. Of course, without actual design drawings or prototypes, peer review would be rather difficult. Colberg cannot provide a potential rate of error for his retractable guard.

There is no general acceptance of retractable guards in the stump grinder industry. No such guard has ever been used on a stump grinder. The acceptance of retractable guards in the saw industry is no substitute. Despite the leap that Colberg would like to take, there is no relationship between a saw and the 16-SP. They are two separate and distinct products used entirely differently, and designed for separate and distinct functions and operation. The attempt by Colberg to relate these products to one another is simply misplaced. What remains is

15

precisely what *Daubert* is intended to prevent: a proposed "alternative" for which a supposed expert can identify not a single non-judicial use.

## V.   Conclusion

None of Colberg's opinions satisfies the reliability and fitness elements of the trilogy of admissibility. "It is because I say so"- a phrase so commonly used by parents - is not a sufficient basis for expert opinions. Colberg needs to provide more than mere mussings as alternative designs, which he has not.

His warnings and automatic shut off device opinions are not a fit. The opinions offered by Colberg are speculation and conjecture, pure and simple. More than that is needed for expert testimony to be admissible under Federal Rule of Evidence 702 and *Daubert*. Colberg has not come close to providing any reliable expert testimony in this case. There is no evidence in the record that the 16-SP was unstable when plaintiff was injured or that plaintiff would have benefited in some way by an automatic shut off device. These opinions are irrelevant as they are not grounded in the facts of this case.

Colberg created a myth of defect in the 16-SP with his opinions. When they are examined, his opinions fail and his myth is exposed. The fact is that Colberg has not designed an alternative warning or an alternative design for the 16-SP. Similarly, he has not installed these "alternatives" on the 16-SP and tested them to demonstrate that they will work on the 16-SP – that is that they are feasible and safe, let alone that they would have prevented this incident. Colberg is in familiar territory here and should be precluded from offering any of his opinions at trial, just like he was in *Short*.

For the foregoing reasons, defendants, Promark Products West, Inc. and Ariens Company, respectfully request that this Motion be granted and that the Court enter the attached

proposed order precluding the report, opinions and testimony of plaintiff's expert, Richard Colberg, in this case.

                    LAVIN, O'NEIL, RICCI, CEDRONE & DISIPIO

BY: _____ (GC1270)
      Gerard Cedrone, Esquire
      Leland I. Kellner, Esquire
      Howard W. Donahue, Jr., Esquire
      Attorneys for Defendant, Promark Products West, Inc.
      and Ariens Company
      Suite 500
      190 North Independence Mall West
      6th & Race Streets
      Philadelphia, PA  19106
      (215) 627-0303

DATED:  October 18, 2004

824823v1