### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYLE SMITH | : | CIVIL ACTION - LAW |
| | : | |
| v. | : | No. 02-CV-2718 (RLB) |
| | : | |
| PROMARK PRODUCTS WEST, INC. | : | |
| | : | |
| and | : | |
| | : | |
| ARIENS COMPANY | : | |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

_____This is a strict liability and negligence action brought by Plaintiff, Kyle Smith, brought against Defendants' Promark Products West, Inc. and Ariens Company, Inc.

_____

## I.      Facts

Plaintiff, Kyle Smith, sustained severe injuries to his right leg as a result of his leg coming into contact with a moving cutting wheel of Defendants' product, a Promark Model 16SP stump grinder. *(See photographs of stump grinder, Exhibit "A").*   The accident happened on September 8, 2001 while Plaintiff was assisting a person by the name of Karl Kirchofer in removing stumps from a dirt/mulch mound on  the property of John and Barbara Groner located at 1324 Camelot Drive, Easton, Pennsylvania, 18045.  *(See photograph of work area, Exhibit "B").*

Mr. Kirchofer was operating the stump grinder to grind stumps while Plaintiff assisted by filling  in holes left after the stumps were removed with dirt.  Plaintiff had never operated a stump grinder before the date of the accident.  *(Plaintiff's deposition, Exhibit "C" at 30).*

As Mr. Kirchofer was grinding one stump, he experienced difficulty in that the stump grinder was "jumping around" on the stump.  He therefore requested Plaintiff to assist him in steadying the stump grinder by standing to the left of the stump grinder and holding on to the left handlebar. *(Kirchofer deposition, Exhibit "D" at 39-40).*    At this time, Mr. Kirchofer was operating the stump grinder across the slope rather than up or down on the slope with the left side of the grinder facing up the slope and the right side facing down the slope.  *(Exhibit "D" at 47-48).*    Therefore, since Plaintiff was positioned on the left side of the stump grinder he was up the slope from the stump grinder.  As Mr. Kirchofer was grinding the stump, Plaintiff's right leg slipped into the moving cutting wheel of the stump grinder.  After Mr. Kirchofer became aware that Plaintiff's leg had contacted the cutting wheel, he realized from prior experience with the machine that there was no way that he could quickly shut down the machine and stop the cutting wheel.  *(Kirchofer Affidavit, Exhibit "E").*  He then attempted to determine how he could assist Plaintiff.   Mr. Kirchofer stated that since he  was startled and had never been presented with this type of situation before, this process took in excess of five seconds before he decided that his only option was to try to flip the stump grinder away from Plaintiff.  *(Exhibit "E").*  The stump grinder weighs 490 pounds.  Mr. Kirchofer stated that due to the weight of the stump grinder, it was difficult to flip the machine and in order to do so he had to reposition his feet, bend down at the knees and exert a great amount of force upon the stump grinder.  This process of flipping the machine away from the Plaintiff took additional time.    As a result of the accident, Plaintiff sustained severe injury to his right leg including an open proximal tibial fracture with soft tissue loss, bone loss of the right lower extremity, severely comminuted proximal tibia and a large open wound of the right lower extremity.

Plaintiff alleges that the stump grinder at issue is defective.  Approximately 8 l/2 inches  of the 14 inch  cutting wheel of the stump grinder was exposed and unguarded. *(Photographs of stump grinder, Exhibit "G").*  Plaintiff therefore claims that the stump grinder was defective due to inadequate guarding of the cutting wheel.   *(Plaintiff's expert Colberg report, Exhibit "H")*. Additionally, the stump grinder did not possess any devices to enable the cutting wheel to be quickly stopped.   Plaintiff's expert, Richard Colberg has opined that the stump grinder should have

2

equipped with a operator presence control, positive clutch and a braking system on the cutting wheel to allow immediate stoppage of the wheel. *(Colberg report, Exhibit "H").* Plaintiff further alleges that the stump grinder is defective due to inadequate warnings and instructions as no decals were attached to the stump grinder alerting the user to always operate the stump grinder up or down on a slope and to read and understand the owner's manual prior to use. *(Colberg report, Exhibit "H")*.

Defendants have filed the instant Motion for Summary Judgment challenging Plaintiffs' claims of negligence and strict liability. For the reasons set forth below, Defendants' Motion should be denied.

## II.   Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c) the District Court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is not genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Moreover, the court will resolve all reasonable doubts and inferences in favor of the non-moving party when reviewing a motion for summary judgment. Arnold Pontiac – GMC, Inc. v. General Motors, 700 F.Supp. 838, 840 (W.D. Pa. 1988).

In reviewing a Motion for Summary Judgment,"'[p]laintiff's allegations as to the accident and attendant injuries must be taken as true, even if in conflict with those of the moving party." Id. at 656 quoting Gans v. Mundy, 762 F.2d 338, 340 (3d. Cir.) cert denied, – U.S., 106 S.Ct. 537, 88 L.Ed.2d 467 (1985) (emphasis added). "Any inference drawn from the underlying facts contained in the evidentiary sources must be viewed in a light most favorable to plaintiff." "Id. at 656-657 (emphasis added).

Because a summary judgment is a drastic remedy "that prevents a claimant from presenting his cause of action to a jury of his peers," the court must apply a "standard which mirrors the criteria for a directed verdict" under Fed.R.Civ.P.50(a). Id. at 657. "Under a motion for a directed verdict, plaintiff need only present evidence from which a jury might return a verdict in his favor under the

governing law." Id. at 657.

## III.    Argument

### A.    *Defendants' Motion should be denied as untimely*.

Pursuant to the Court's Amended Scheduling Order dated May 30, 2003, the discovery period ended on March 31, 2004.  The Scheduling Order further provided that "all dispositive motions are due five (5) days after the discovery  period." *(See Scheduling Order, Exhibit "I").* Therefore, any Motion for Summary Judgment was due on or before April 5, 2004.

Defendants' counsel forwarded a letter to Plaintiff's counsel dated July 27, 2004, advising of Defendants' counsel erroneous interpretation that the Scheduling Order provided that dispositive motions were due on October 5, 2004, five (5) days after the conclusion of the expert deadlines *(Defendants' 7/27/04 letter, Exhibit "J").*  Plaintiff's counsel did not respond to this letter since Plaintiff's counsel deemed that this was a matter for the court to address if Defendants' counsel required clarification of the Order.  However, the plain language of the Order clearly provides that motions for summary judgment were due five (5)  days after the "discovery period" and not the established expert deadlines.  On October 4, 2004, Ariens'  counsel sent Plaintiff's counsel an additional letter stating that Ariens' counsel incorrectly noted the deadlines for motions for summary judgment as October 5, 2004, but that such motions were actually due on October 7, 2004 pursuant to Federal Rule of Civil Procedure 6 on the flawed basis that the last Saturday and Sunday are not included in the time computation when the total period of time prescribed or allowed is less than eleven days *(Defendants' 10/4/04 letter, Exhibit "K").*  Plaintiff's counsel forwarded a letter to Ariens' counsel dated October 5, 2004, asserting that Plaintiff's counsel disagreed with Defendants' counsel's assertions, since Defendants clearly had a much greater opportunity then eleven days to file a motion for summary judgment in this action and that if Defendants' interpretation of Rule 6 is correct, then deadlines set in scheduling orders would have little meaning.  *(Plaintiff's 10/5/04 letter, Exhibit "L").*  Only confusion and uncertainty would result with respect to scheduling orders if Defendants' position is accepted.

In sum, dispositive motions were due in this action on April 5, 2004.  Even under

4

Defendants' counsel's incorrect interpretation of the Scheduling Order, motions for summary judgment were due, at the latest, on October 5, 2004. Ariens did not file its Motion for Summary Judgment until October 6, 2004. Therefore, Ariens' Motion is untimely and should be dismissed.

     B.      ***Defendants' Motion for Summary Judgment on the basis that it was not required to provide a guard over the cutting wheel of the subject stump grinder should be denied.***

Ariens incredibly asserts in its Motion that the subject stump grinder, which was designed with 8.5 inches of its 14 inch cutting wheel exposed and unguarded, was safe for its intended use. Defendants assert that there was no need to provide any guarding over the wheel even though this could have easily been accomplished for what Plaintiff's expert, Richard Colberg, estimates would have cost approximately $10.00. Defendants are liable to Plaintiff in strict liability since the stump grinder was defective and unreasonably dangerous due to the lack of a guard around the cutting wheel.

In his report, Mr. Colberg noted that there is no guarding for the exposed portion of the cutter wheel which consisted of 8.5 inches of exposed portion of the cutter wheel below the machine frame. (***Colberg Report, Exhibit "H" at 2).*** He also noted that the rules of practice for safe design dictate that if practical, a hazard should be designed out of the product through engineering means. If the hazard can not be eliminated entirely, the hazard is to be enclosed or guarded to protect the user. Finally, if the hazard cannot be guarded, users are to be warned or instructed as to the dangers of the product under reasonably foreseeable conditions. ***(Exhibit "H" at 4).*** The A.N.S.I. Standard 5.5 governing stump grinders provides that "stump grinders shall be equipped with enclosures or guards that effectively protect the operator." *A.N.S.I. Z133.1-1982****. (Colberg Report Exhibit "H" at 5)***. Mr. Colberg noted that Plaintiff was severely injured when his right foot slipped and entered the path of the moving cutters and that there was no guard, as required by the A.N.S.I. Standards around the cutter wheel to protect Plaintiff. He concluded that the stump grinder should have been equipped with a retractable guard around the exposed portion of the cutter wheel and explained that the retractable guard would be able to compensate for varying levels of ground and tree stump while providing protection from contact with the cutter wheel. ***(Exhibit "H " at 5).*** He also explained that

5

this type of guard is found on hand-held circular saws and bench mounted miter saws and that it rotates to expose cutters to the work piece. Mr. Colberg added that this type of guard may be designed to rotate up inside an existing portion of the housing or it may be designed to rotate outside of the housing and that it may be gravity operated or spring loaded to the closed position. He estimated that this type of a guard could have been manufactured for the stump grinder for about $10.00. Mr. Colberg concluded to a reasonable degree of engineering certainty that the lack of required guarding rendered the design of the stump grinder defective, unreasonably dangerous, and unsafe for its intended use and that it was the cause of Plaintiff's injuries. (*Colberg report, Exhibit "H" at 5 and 7).*

To prevail under a strict liability claim a plaintiff must demonstrate that 1) the product was defective; 2) the defect existed when it left the hands of defendant; and 3) the defect caused the harm. DeSantis v. Frick Company, 745 A.2d 624, 631 (Pa.Super. 1999); Berkebile v. Brantley Helicopter Corp., 462 Pa. 83, 98, 337 A.2d 893, 898 (1975). Manufacturers and others in the chain of distribution, are guarantors of the safety of their product and have a non-delegable duty to provide a produce with every element necessary to make it safe for its intended use. Azzarello v. Black Brothers Co., Inc., 480 Pa. 547, 558-60, 391 A.2d 1020, 1026-27 (1978); Berkebile v. Brantley Helicopter Corp., 462 Pa. 83, 103, 337 A.2d 893, 903 (1975); Sheehan v. Cincinnati Shaper Co., 382 Pa.Super. 579, 585, 555 A.2d 1352, 1355 (1989). Under Pennsylvania's products liability law, all suppliers of a defective product in the chain of distribution, whether retailers, part makers, assemblers, owners, sellers, lessors, or any other relevant category, can be liable to the ultimate user injured by the defect. Francioni v. Gibsonia Truck Corp., 472 Pa. 362, 372 A.2d 736 (1977); Bialek v. Pittsburgh Brewing Company, 430 Pa. 176, 187-88, 242 A.2d 231, 236 (1966). The reasoning behind the adoption of strict liability in Pennsylvania is that risk of loss for injury resulting from defective products should be borne by the suppliers and not by the injured party since the suppliers are in the best position to absorb the loss by distributing it as a cost of doing business. Azzarello v. Black Brothers Co., Inc., 480 Pa 547, 552, 391 A2d 1020, 1023 (l978). In a design defect case, the question is whether the product should have been designed more safety. Spino v. John S. Tilley Ladder Co., 548 Pa 286, 293, 696 A2d 1169, 1172 (l99). The question whether a product is unreasonable dangerous is a question of law and resolution of this question requires a balancing of

6

the utility of the product against the seriousness and the likelihood of the injury and the availability of precautions that, although not fool proof, might prevent the injury.  Burch v. Sears, Roebuck & Co., 320 Pa Super 444, 450, 467 A2d 615, 6l8 (1983).  The court must view the evidence in the light most favorable to the plaintiff to determine if a defect may be found.  Id. at 618-l9.  (citing Azzarello, supra).

It is inconceivable that Defendants could allege that their machine with absolutely no guard around the cutter wheel is perfectly safe and does not lack an element necessary to make it safe for use.   In addition to Mr. Colberg's opinions that the stump grinder is defective and unreasonably dangerous due to the absence of a guard, photographs of stump grinders designed by other manufacturers which were  inspected by Defendants' expert, John E. Myers, Ph.D., establish that such manufacturers provided guarding mechanisms to protect against human involvement with the cutting wheel *(See photographs of Vermeer SE 90 stump grinder, Exhibit  "M"; photographs of Praxis Stump Machine, Exhibit "N"; and photographs of Dosko Stump and Root Grinder, Exhibit "O").*  The decision of these machines are in stark contrast to the Promark machine which leaves over sixty percent of the cutting wheel exposed and unguarded.  *(See photographs of Promark cutting wheel, Exhibit "G").*   Further, products have been found to be defective on the basis of inadequate guarding.   See Putt v. Yates-American Machine Co. 722 A.2d 2l7, (Pa. Super. l998) (upholding the trial court's conclusion that a wood-molding machine was defective on the basis that there were no protective guards covering the cutter heads of the machine which permitted users to come into contact with the dangerous running blades and also because the machine cutter heads had an excessively long coasting time before coming to  a stop);   Van Scoy v. Powermatic 810 F.Supp. 131, 133 (MD Pa. 1992); (indicating that a jury could find that a table band saw was defective for failing to have a blade guard);  Smith v. Hobart Manuf. Co., 302 F.2D 570 (3d Cir. l962)  (finding that a meat grinder was required to have a guard to prevent operator contact with the worm of the machine);   Voss v. Black & Decker Manufacturing Co., 59 N.Y. 2d 102, 45 N.E. 2d 204 (Ct. App. NY 1983) (finding that a circular saw blade guard allowed excessive amount of blade to be exposed).

The case of Fitzpatrick v. Madonna, 623 A.2d  322 (Pa. Super. 1993) relied upon by Defendants is inapplicable to this matter based upon significant factual differences.  In Fitzpatrick,

the Superior Court overturned a jury verdict in favor of the plaintiff who alleged that a boat engine was defective because it lacked a guard around the propeller where the Plaintiff's decedent was struck and killed by the propeller while swimming in New Jersey. Fitzpatrick, 623 A.2d at 323. The Fitzpatrick court applied the risk/utility standard to determine whether the boat motor was defective for lacking a propeller guard. The court found that it could not conclude that a guard around the propeller would reduce the risk of injury since the presence of the guard would present its own risks to swimmers in that human limbs may become wedged between the guard and the propeller which would expose a swimmer to even greater injury. The court also found that a propeller guard would also pose risks as it would affect the maneuverability of the boat. Additionally, the court determined that the utility of the boat would be greatly reduced by a propeller guard since there was evidence that such a guard would have a substantial degrading effect on boat performance" reduce a boat's speed and thereby reduce its efficient use of fuel. Fitzpatrick, 623 A.2d at 325. Therefore, the court found that since a propeller guard would not reduce risks to swimmers but would significantly reduce a boat's utility, the lack of a propeller guard did not render the boat engine defective. It is clear that the court was also significantly influenced by the fact that a boat is designed to move through water but it is not designed to allow motor boats to move among swimmers. The court was thus influenced by the fact that the likelihood that swimmers would be injured by the rotating blades of the motor is not great. Id.

Converse to the situation presented in Fitzpatrick, the risk/utility analysis weighs in favor of a finding that Defendants' stump grinder is defective in the instant matter. The risks of the subject stump grinder substantially outweigh its utility. Moreover, the utility of the stump grinder would not be greatly affected if proper guarding was provided over the cutter wheel to reduce the tremendous risk of injury from human contact with the wheel.[1] The stump grinder at issue could have been designed to grind stumps while simultaneously providing protection against contact with the cutting wheel. It is certainly not necessary to expose 8½ inches of a 14 inch cutting wheel for

_____

[1]Moreover, the addition of the alternative designs proposed by Mr. Colberg in the form of an operator presence control, positive clutch and band brake, which would have permitted immediate stoppage of the cutting wheel, would not have decreased the utility of the stump grinder at all, but would have tremendously reduced the risks posed by the machine.

the utility of the product to be preserved.  This is supported by the designs of the Vermeer, Praxis and Dosko  stump grinders  which are designed to grind stumps and also provide greater guarding around the cutting wheel.  *(See photographs of stump grinders, Exhibits "M" to "O").*   Further, Defendants' arguments that the guard proposed by Plaintiff's expert Colberg would cause greater danger because it would become jammed is pure speculation and conjecture and should be dismissed.  Defendants' provide no support for this argument.  This is essentially a challenge to the feasibility of Mr. Colberg's design.   Not only is such an argument unfounded, but at the very minimum, such an argument is insufficient for the entry of summary judgment with respect to Plaintiff's strict liability claim.  It has been held that expert testimony alone may be sufficient to demonstrate feasibility for purposes of summary judgment.  Surace v. Caterpillar, Inc., 111 F.3d l039, l049 (3d Cir. l997) (citing Holinger v. Wagner Mining Equip. Co., 667 F.2d 402, 409-10 (3d Cir. l981).  The Surace court further explained that in accordance with Azzarello v. Black Brothers Co., 480 Pa. 547, 391 A.2d 1020 (l978), the technical feasibility of the proposed safety device should go to the jury in determining whether the device was an element necessary to make the product safe for its intended use.  Id.  (citing Azzarello, 480 Pa. at 557, 391 A.2d at 1026).  Defendants offer no evidence in support of their arguments that the retractable guard would be unfeasible.  Obviously, Mr. Colberg believes that the guard he proposed is feasible or he would not have proposed such a device.  Summary judgment should not be awarded to Defendants merely on the basis of Defendants' speculative and unsupported argument that the  retractable guard  is unfeasible because it would catch on the ground and/or stumps.   It is the function of the jury to determine the weight and credibility to be given to expert testimony.  Therefore, the issue of Mr. Colberg's proposed guard's feasibility should be determined by the jury.

Additionally, unlike the situation in Fitzpatrick where the risk of  human involvement with a boat engine propeller is slight, the risk that a person would contact the cutting  wheel of the subject stump grinder on a worksite where there are likely to be workers performing tasks in the surrounding area of the stump grinder is obviously much greater.  Further, while there is absolutely no reason for a swimmer to come into the proximity of a boat while it is in motion, there obviously are situations where a worker would have reason to be present in the area where a stump grinder is being operated.  Indeed, prior to the accident  in the instant matter,  Plaintiff was assisting Karl Kirchofer by filling

in holes created after stumps were removed  while  Mr. Kirchofer was operating the stump grinder on the same mound to grind stumps.  He was then caused to be in the proximity of the stump grinder to assist Mr. Kirchofer in steadying  the machine on a stump since it was jumping around.  Thus, while there  is  no valid reason for a swimmer to approach a moving boat, there are certainly reasons for a worker to be in the proximity of an operating  stump grinder in order to complete tasks on a jobsite and the likelihood  that a worker would be so positioned  and would come into contact with a stump grinder  is substantially greater than the likelihood of a swimmer approaching  and coming into contact with a boat engine propeller.  Since the risk/utility analysis weighs in favor of a finding that the stump grinder is unreasonably dangerous or defective, this matter should be submitted to a jury for resolution.

Defendants' comparison of the stump grinder to products such as knives, axes and chain saws is also flawed.  Pennsylvania law has recognized a distinction between products that are defective because of an unreasonably dangerous products that are defective and products that are "inherently dangerous."  Whereas a manufacturer is held strictly liable for a defective product due to an unreasonably dangerous design, a manufacturer is not held strictly  liable where the product is inherently dangerous.  Pegg v. General Motors Corp., 258 Pa. Super. 59, 76, 391 A.2d 1074 1082 (1978).  Inherently dangerous products are those that can cause injury despite perfection in manufacture, design or distribution, such as whiskey or knives.  The test to determine whether a product is inherently dangerous is a determination of the extent to which the dangers are technologically unavoidable and the public need for the product great.  Id. In Pegg, there was evidence that a competing product to the product at issue had been  manufactured in a manner which reduced the dangers associated with the product while not interfering with its utility.  This  supported the court's  finding that the product at issue was not inherently dangerous because its dangers were not technologically unavoidable.  Id. at 1082-83.

The examples of knives, axes and chain saws are inherently dangerous products.   The dangers posed by these products are technologically unavoidable as there is no design alternative that could be added to these products which would not destroy their utility to complete the taks for which they were designed to accomplish.  For example, for a knife to retain its utility, it  must be designed to enable a user to pierce or slice items and there is no design alternative to reduce risks associated

with a knife without destroying its utility to accomplish these tasks.  Likewise, an axe must be designed to chop and slice through wood.  There is no way to guard against the dangers posed by an axe blade through any design alternative that would not substantially reduce its utility in performing this task.  Chain saws must be designed to be able to be placed in tight areas to cut tree limbs and branches using either side of the blade so there likewise is no design alternative to eliminate the dangers of this product without interfering with its useful purpose.

Conversely, the dangers associated with the stump grinder at issue could have clearly been eliminated or greatly reduced if guarding was provided around the cutting wheel.  Such guarding is clearly feasible and would not sufficiently reduce the utility of the machine in grinding stumps as explained above.  As will be explained in the following section, the safety of the stump grinder also could have been greatly improved through the use of an operator presence control, positive clutch and cutting wheel braking mechanism and these devices also would not have affected the ability of the stump grinder to fulfill its purpose of grinding stumps.   As explained above, Plaintiff's expert engineer, Mr. Colberg, opined that the subject stump grinder should have been designed to incorporate a guard around the cutting wheel which would reduce or eliminate the danger of human contact with the cutting wheel.  Moreover, the competing manufacturers of Vermeer, Praxis and Dosko all provided guarding around the cutting wheels on their stump grinders, which evidences that guarding could have been provided around the cutting wheel of the Promark stump grinder without affecting its utility.

Defendants' reliance upon the case of Phillips v. Cricket Lighters, 841 A.2d 1000 (Pa. 2003) is also misplaced.  The Phillips case involved a claim that a butane cigarette lighter designed and manufactured by the defendant therein was defective due to the lack of a child safety device.  Under Pennsylvania law, a product is deemed to be defective if it "left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." Phillips, 841 A.2d at 1005. (citing Azzarello, supra, at 1027).  The court determined that the lighter was not defective under the Restatement (2d) of Torts, Section 402A since it was only intended to be used by adults and not children. Id. at l007-08.  Defendants ask the Court to extend Phillips to this matter based upon its allegation that the stump grinder was designed for an operator positioned behind the machine at its controls.  In doing so, Defendants are urging a

11

much broader interpretation of Phillips than that intended by the Phillips court. Phillips was merely distinguishing between a two (2) year old child who came into possession of a lighter and an adult. No Pennsylvania Court has extended the intended user doctrine beyond the adult/child distinction in design defect cases and no reason to exists for this court to do so in the instant action. The Phillips court should be construed narrowly. Any broad interpretation of Phillips such as an application of its holding to this matter would be contrary to the purpose for strict liability of holding suppliers responsible for defects in their products which cause injury as suppliers are more capable of bearing the costs of injury.     The Phillips court reasoned that whereas an adult would  be cognizant of the obvious dangers posed by a lighter and would not engage in careless activities with the lighter resulting in  a  residence catching on fire such as those engaged in by the child at issue therein.  It is also found that  in the ordinary course of events, a lighter would not be used by a child. Conversely, in the instant matter before the Court, there is no adult/child distinction regarding the intended user of the stump grinder.  The stump grinder was intended to be used by adults and in fact was used by adults in this case.     However, regardless of their status as adults, they would nonetheless be subject to the dangers posed by the defective condition of the stump grinder due to the lack of adequate guarding and the lack of  devices to  allow the immediate stoppage of the grinding wheel.

Defendants confuse the unintended user rule pronunciated in Phillips, which is based solely upon a distinction between the age characteristics of the intended user and the actual user, with an argument that Plaintiff's method of using the machine was improper.   The method of use of a machine by an adult does not fall under any rule enunciated by Phillips even if Defendants were to argue that Plaintiff's use was of the stump grinder was abnormal.   Allegedly abnormal use is only a defense to liability if  it was not reasonably  foreseeable by the seller. Burch v. Sears, Roebuck & Company, 320 Pa. Super. 444, 452, 467 A.2d 615, 619 (l983).   As will be discussed below, Plaintiff's use of the machine was not unforeseeable to Defendants.  Moreover, the abnormal use defense may no longer be viable since it involves the negligence principle of foreseeability.

The Phillips case should be limited to the peculiar facts presented to the court in that case. Even Defendants recognize that "Smith is an  [alleged] unintended user in an entirely different sense" from the subject two (2) year child in Phillips.  The reality is that numerous persons have been

injured through the use of the Promark model stump grinder at issue or similar models and these injuries could have easily been   prevented by   the implementation of the reasonable design alternatives suggested by Mr. Colberg.  Defendants' engineer, Hugh Grow, testified that he has investigated more than twenty (20)  stump grinder accidents on behalf of Defendants in his career.  (**_Grow deposition, Exhibit "P" at 12_**).    In testimony involved in another case given in 2000, Mr. Grow stated that he was aware of more than thirty-five (35) lawsuits against Promark based upon injuries sustained through contact with the grinding wheel on the Model l6SP stump Grinder and its predecessor, the Model  l6D.  (**_Grow deposition, Exhibit "P" at 73-75)._**  He was also aware of at least a dozen (12) other cases of injuries that did not result in lawsuits.  (Id.)  Furthermore, as will be addressed in a following section herein, if the stump grinder was only  safe if no one came into the proximity of  the machine other than the operator positioned behind the controls, clear warnings should have been issued to this effect but they were not.    The failure of Defendants to provide adequate warnings and instructions regarding a product is an additional ground establishing that the stump grinder was defective.

Furthermore, the Phillips court determined that the plaintiffs could not pursue their strict liability design defect claim against the defendant therein on the basis that a child's use of the lighter was foreseeable on the ground that the negligence principle of foreseeability did not enter into the strict liability analysis.  However, the court upheld the plaintiff's  claim of negligence against the defendant manufacturer.  This finding was based upon the reasoning that it was foreseeable that a child could use the lighter and start fighters with it in the absence of a child safety device which would result in severe and potentially fatal injuries.  Phillips,  841 A.2d at l009.

In the instant matter before the court, Plaintiff has claimed not only that the stump grinder was defective under strict liability principles but also that Defendants were negligent in manufacturing, designing and distributing the stump grinder lacking adequate guarding, instructions and warnings and design alternatives that would reduce the stopping time of the cutting wheel.  Although Plaintiff disagrees that his strict liability claim is deficient based upon the intended user rule as stated above, even if the court were to accept Defendants' request to broadly expand the intended user rule, Plaintiff's negligence claim would remain uneffected by such rule.  Just as the Phillips court found that it was foreseeable to the manufacturer of the lighter that the lighter would

13

fall into the hands of children that could start destructive fires due to a lack of a child safety device, it was absolutely foreseeable to Defendants that persons could come into close proximity with the stump grinder while it was being used on a worksite. Aside from the obviousness of such a scenario, direct evidence exists which establishes that Defendants were aware of the danger that the exposed cutting wheel posed to such individuals. Hugh Grow, who was an engineering consultant on product design with regard to product safety and standards for Promark and its successor Ariens beginning in 1987, testified that Promark had developed a guard for the cutting wheel on the Model 16D machine which was a predecessor to the Model 16SP machine involved herein, but that it was taken off production after three months. *(Grow deposition, Exhibit "P" at 24-26, 31-32).* Thus, Promark was obviously aware that the cutting wheel posed a danger and realized that an operator or user could come into contact with the cutting wheel. The severe injuries that are likely to result from such contact are evident. Furthermore, Kirchofer testified that he needed assistance from Plaintiff in steadying the machine because it was "jumping around" on a stump. Plaintiff's expert, Mr. Colberg, stated that the design of the cutting wheel with six cutters per side and with a cutting tooth engaging the stump every 60 degrees of wheel rotation causes considerable vibration during use in grinding stumps and that the severity of the vibration depends upon the hardness of the stump wood, the sharpness of the cutter teeth and the depth to which the cutter teeth are set. *(Colberg report, Exhibit "H" at 3).* Defendant knew or should have known of this tendency of its stump grinder and therefore, it would be foreseeable to Defendants that an operator would engage the assistance of another person to come into close proximity with the machine to help steady it just as Plaintiff came to the assistance of Kirchofer in this case. Consequently, under the reasoning of Phillips, Plaintiff's negligence claim against Defendants should prevail.

### *C. Defendants' Motion for Summary Judgment on the basis that Plaintiff cannot satisfy the causation element with regard to Defendants' claim that the subject stump is defective due to the lack of automatic shut-off devices should be denied.*

Aside from the lack of adequate guarding, Plaintiff alleges that the stump grinder is also defective due to the lack of an operator presence control, positive clutch and cutting wheel braking mechanism that once activated would bring the cutting wheel to an immediate stop.

Plaintiff's expert, Richard Colberg, noted that the subject stump grinder does not possess a brake to stop the cutter wheel from rotating.  He also stated that after the engine speed is throttled down, the cutting wheel is still under power until the engine speed falls below about 1400 rpm and that the cutting wheel still powered until the engine speed reaches this level even if the "push to stop" control on the machine is activated.  *(Colberg report, Exhibit "H" at 3).*  Mr. Colberg also reported that there is no operator presence control on the subject stump grinder.  He explained that an operator presence control  is designed to be held by the operator such that if it is released, the power to the cutting wheel is immediately removed. (*Exhibit "H" at 2).*  Mr. Colberg opines that in an emergency situation, precious seconds are wasted in the slow down procedure of the machine. (*Exhibit "H" at 5).*  He  concluded that the machine should have been designed with an operator presence control which have been required on walk behind lawn mowers for approximately 25 years and are required to cause the blade to stop turning within three seconds after being actuated. (*Exhibit "H" at 6).*  Mr. Colberg estimated that the stump grinder could have been equipped with an operator presence control for between $5.00 and $10.00.

Mr. Colberg also opined that rather than using a centrifugal  clutch for transferring engine power to the cutting wheel, which usually requires a time delay for deactivation, Defendants should have used a positive clutch which would immediately remove motive power from  the cutting wheel.
  Mr. Colberg further opined that Defendants should have added a band braking mechanism to the cutting wheel which would act to stop the cutting wheel when power is removed from it.  The brake would have eliminated the coasting time of the wheel before it stopped.  Mr. Colberg stated that the positive clutch and band brake could have been integrated with the operator presence control on the stump grinder and estimated that the cost for the clutch and braking  system would be approximately $10.00 to $15.00 over the  centrifugal clutch on the subject machine.  (*Exhibit "H" at 6).*  Mr. Colberg stated that "precious time was lost while the operator, Mr. Kirchofer, tipped the machine over on its right side and finally turned off the power." (*Exhibit "H" at 6).*  He added that "had the subject Promark 16SP stump grinder been equipped with an operator presence control and positive clutch and braking  means, the cutter wheel would have stopped almost immediately after Mr. Kirchofer took his hands off of the controls.  The time saved could have lessened the extent of Mr. Smith's injury." (*Exhibit "H" at 6 ).*  Finally, Mr. Colberg opined that the lack of an operator

presence control and positive clutch and braking means rendered the design of the subject stump grinder defective, unreasonably dangerous, unsafe for its intended use and that such defects were the cause of Plaintiff's injuries.   (***Exhibit "H" at 6-7).***  He found that Defendants' failure to provide these devices prevented Kirchofer from immediately shutting down the machine. (***Exhibit "H" at 7).***

Defendants erroneously and speculatively assert that Kirchofer's reaction in flipping the machine to the right from Plaintiff's leg removed the cutting wheel from Plaintiff's leg faster than the design alternatives explained above would have stopped the cutting wheel.  Defendants thereby assert that Plaintiff cannot satisfy the element of causation.   Defendants' argument is both legally and factually deficient.

Cause in fact is a question of fact for the jury.  Griggs v. Bic Corp., 982 F.2d 1429, 1439 (3d Cir. l992) (citing Estate of Flickinger v. Ritsky, 452 Pa. 69, 305 A.2d 40, 42-43 (l973) ).   The issue of whether a defect or the Defendants' negligent conduct was a substantial factor or proximate cause in bringing about the plaintiff's harm is also question of fact reserved for the jury, which should only be removed from the jury's consideration where it is clear as a matter of law that reasonable minds could not differ on the issue.  Id.; Little v. York County Earned Income Tax Bureau, 333 Pa. Super. 8, 16, 481 A.2d 1194, 1198 (1984) (citing Topelski v. Universal South Side Autos, Inc., 407  Pa. 339, 180 A.2d 414 (1962); Restatement Second of Torts §434); Ford v. Jeffries, 474 Pa. 588, 595 379 A.2d 111, 114 (1977); Vattimo v. Lower Bucks Hosp., 502 Pa. 241, 247, 465 A.2d 1231, 1234 (1983); Fiorentino v. Rappoport, 693 A.2d 208, 217 (Pa. Super. 1997).   The question of proximate cause is almost always one of fact for the jury. Griggs,  supra.  (citing White v. Rosenberry, 441 Pa 34, 271, A2d 341, 342 (l970); Takach v. B.M. Root Company, 279 Pa. Super. l67, 420 A.2d 1084- 1086 (l980).)

In the instant matter, Plaintiff presents more than sufficient evidence for the issue of causation to be determined by the jury.  As stated above, Mr. Colberg stated that the operator presence control is required to stop the blade from moving within three seconds.  If the positive clutch, which would immediately remove motive power from the cutting wheel, and the band brake were utilized,  this stopping time would be further reduced.   If these design alternatives were available, the wheel would have stopped no later than three seconds after the release of the operator

presence control by Kirchofer and likely sooner than that. Mr. Colberg opined that precious time was lost while Kirchofer tipped the machine over on its side. He stated that the presence of an operator presence control and positive clutch and braking system would have stopped the cutting wheel almost immediately after Kirchofer would have released the controls, which would have saved time and lessened the extent of Plaintiff's injury. (*Colberg report, Exhibit "H" at 6).* Nonetheless, rather than implement the design alternatives identified above, Defendants suggest that it is preferable to rely upon a user to flip the machine away from someone who has come into contact with the cutting wheel. Defendants speculate that Kirchofer's action removed the cutting wheel from Smith's leg in a shorter amount of time than the cutting wheel would have been brought to a stop had the design alternatives been present. Defendants rely upon deposition testimony by Plaintiff and Kirchofer to assert that the machine was flipped from Plaintiff's leg immediately. However, this testimony only establishes that Mr. Kirchofer did not continue to grind the stump after he realized that Plaintiff had slipped in to the cutting wheel, but that he started to take action to turn the machine over at such point in time. Mr. Kirchofer stated that after he realized Plaintiff's leg had contacted the cutting wheel, he was startled and had to decide how to help Plaintiff since he realized that he could not bring the cutting wheel to a rapid stop from prior experience with the machine. He stated that he then arrived at the decision to flip the machine, but that the process of deciding what action to take took in excess of five seconds. (*Kirchofer Affidavit, Exhibit "E").* The machine weighs 490 pounds and it was positioned in loose dirt and mulch. (*Promark Model 16SP specifications, Exhibit "F").* Mr. Kirchofer further stated that to be able to complete the task of flipping the machine, it was necessary to reposition his feet and bend downward in order to gain the leverage required to flip the machine and that he had to exert great force upon the machine to move it away from Mr. Smith, which took additional time. (*Kirchofer Affidavit, Exhibit "E").* Thus, it clearly took a much longer period of time for Mr. Kirchofer to decide on a course of action, position his body to enable him to flip the machine and to exert force upon the machine to actually flip it than it would for Mr. Kirchofer to simply let go of an operator's presence control which would have stopped the wheel in under three seconds. Consequently, it is likely that the design alternatives proposed by Mr. Colberg would have stopped the cutting wheel in a much more expedient fashion than Kirchofer was able to flip the machine over after realizing that he could not stop the cutting

wheel rapidly and arriving  at the decision to physically remove the machine away from Plaintiff's leg.

Moreover, Plaintiff testified that he was cut from his lower shin up to his knee cap. **(Smith deposition, Exhibit "C" at  92-93; see also photographs of Plaintiff's wound, Exhibit "R").** If Kirchofer was able to release an operator's presence control which would have immediately brought the cutting wheel to a stop, Plaintiff's wound would likely have been contained solely to the area where the cutting wheel first made contact with his leg.  However, since the design of the machine did not allow for immediate stoppage of the cutting wheel and Kirchofer was thus required to flip the machine to the right to remove it from Plaintiff's leg, Plaintiff's wound was expanded from the initial point of contact on his lower shin all the way up to his knee.  The lack of devices to rapidly stop the cutting wheel therefore substantially increased the severity of the wound.

Defendants do not and cannot challenge causation due to its lack of a guard as it is undeniable that Plaintiff would not have contacted the cutting wheel had a proper and adequate guard been provided.

Based upon the arguments set forth above, the issue of causation is a factual issue which should be submitted to the jury for determination.

D.	*Defendants' Motion for Summary Judgment challenging Plaintiff's claims regarding the inadequate instructions and warnings of the subject stump grinder should be denied.*

Plaintiff claims that Defendants are both liable in strict liability and in negligence for failing to provide adequate warnings and instructions on the subject stump grinder.  A product can be considered defective for strict liability purposes if it is distributed without sufficient warnings to notify the ultimate user of the dangers inherit in the product. If the product is absent of such warnings and the defect is the proximate cause of the injury, than the seller is strictly liable without proof of negligence.  Toth v. Economy Forms Corp., 391 Pa.Super. 383, 388, 571 A.2d 420, 423 (1990) (citing Berkabile, 337 A.2d 902)  In Davis v. Berwyn Corp., 547 Pa.Super. 260, 267, 690 A.2d 186, 190 (1997), a determination whether a warning is adequate and whether a product is defective due to inadequate warnings are questions of law to be determined by the trial judge.  Id.

At the time of the accident, Kirchofer was grinding a stump on sloped terrain.    Kirchofer positioned the stump grinder on the side of the slope with the left side of the machine facing up the slope and the right side of the machine facing down the slope. *(Kirchofer deposition, Exhibit "D" at 47-48).* Kirchofer clearly stated that the ground to the left of him was higher and the ground to the right of him was lower. (**Id.** at 48) Plaintiff also stated that the machine was on a slight angle. *(Plaintiff's deposition, Exhibit "C" at 61).* By both Plaintiff's and Kirchofer's account, Plaintiff was located to Kirchofer's left holding the left handlebar of the machine just prior to the accident. (*Kirchofer deposition, Exhibit "D" at 49; Smith deposition, Exhibit "C" at 60).* While Plaintiff stated that for the most part he was on flat ground, given that the stump grinder was on angled terrain with the area to the left of the machine angled upward and the area to the right of the machine angled downward and

Plaintiff was situated to the left of the machine holding the left handle bar, Plaintiff must have been situated on angled ground.   It is likely that Plaintiff's leg was caused to slip into the cutting wheel of the machine as a result of the sloped terrain angled toward the stump grinder.

The Promark 16SP manual instructs users to "Always go straight up or down on steep hills. Avoid steep side angles." *(Promark 16SP manual, Exhibit "S").*   Although the above instruction is located in the Promark 16SP manual, the instruction does not appear on the machine itself. Moreover, there are no instructions on the machine advising the operator to read and understand the operator's manual.   *(Grow deposition, Exhibit "P" at 57; Photograph of stump grinder instructions, Exhibit "T").* Kirchofer did not even know that a manual existed for the machine. *(Kirchofer deposition, Exhibit "D " at 14-15, 74).*   Kirchofer stated that he would have absolutely read the operator's manual before he operated the machine had he known that one existed. *(Kirchofer deposition, Exhibit "D" at 74)*.   Had Kirchofer been using the machine straight up and down on the slope as instructed in the operator's manual as opposed to sideways on the slope, it is likely that Plaintiff would not have slipped downward into the cutting wheel of the machine.  Mr. Colberg noted that some stump grinder manufacturers, including Vermeer, provide a secure location on their machines for storing the operator's manual and that Vermeer even attaches the manual to the machine with a length of cable.  Mr. Colberg opined that the Promark manual should have been available with the machine for Mr. Kirchofer to read.  *(Colberg report, Exhibit "H" at  4).*

Defendants stress the importance of an operator reading the operator's manual and safety instructions prior to operating the stump grinder. Defendants state in the manual that every operator should read the owner's manual to be sure of safety instructions and proper operating procedure. *(Operator's manual, Exhibit "S" at 3).* Defendants also state in the section of the operator's manual titled Safety Instructions "Be Aware-unit should not be operated until the owners manual is studied, all safety decals are noted and the user has complete knowledge of all controls." Twelve instructions to users of the stump grinder are listed under the safety instructions section of the manual in addition to the instruction to operate the grinder up or down on steep side angles. *(Operator's Manual, Exhibit "S" at 6).* Thus, despite Defendants' strong belief in the importance that an operator read the operator's manual prior to use, Defendants did not include an instruction to the operator on the machine to read the operator's manual prior to use. Two out of the three stump grinders examined by Defendants' expert provided such a decal on their machines. *(See Praxis photograph, Exhibit "U", Vermeer photograph, Exhibit "V").* Additionally, Defendants could have easily included a decal on the machine instructing the operator to always go straight up or down on steep hills and to avoid steep side angles. They also could have attached the twelve safety instructions included in the manual on the machine.

Defendants have asserted in their Motion for Summary Judgment that the machine is safe for use if operated behind the control panel. Although Defendants included an instruction in the operator's manual stating "do not operate in any position but from the rear and behind the control panel," Defendants did not include this instruction on the machine, nor did Defendants alert the user that the operator's manual should be examined prior to use. Plaintiff's expert, Mr. Colberg, opined that the failure to include the instructions to always operate the stump grinder up or down on steep hills and to avoid steep side angles and the failure to instruct an operator to read and understand the operator's manual rendered the subject stump grinder defective, unreasonably dangerous, unsafe for its intended use and the cause of Plaintiff's injury. *(Colberg report, Exhibit "H" at 3-4, 7).*

Defendants' argument that placing such instructions on the machine would not represent an improvement in safety because it would convey too much information to the operator is baseless. Defendants concede that this case involves a product with only a single page of safety instructions. In actuality, there are only a total of thirteen instructions under the Safety Instructions section of the

operator's manual.  As can be seen on page 6 of the operator's manual, such instructions could have been contained in a decal which would approximate a quarter of a page.  *(Exhibit "S").*  At the very least, Defendants could have provided an instruction for the user to read and understand the operator's manual before use which would direct the operator to the instructions included within the manual.  Nonetheless, Defendants failed to accomplish either of these alternatives and the stump grinder is thus defective.

Further, Defendants' argument that Plaintiff can not establish the causation element with regard to the defective condition of the stump grinder due to inadequate warnings and instructions is groundless.  As stated previously, causation is largely a question of fact to be resolved by a jury.  Griggs, supra.  Defendants argue that the instruction only references the machine's stability and that Plaintiff and Kirchofer did not state that they felt that the machine was in danger of tipping over.  It is evident that had the machine been operated straight up or down the hill, in conformance with the safety instructions contained in the operator's manual, Plaintiff likely would not have slipped downward into the cutting wheel of the machine.  Therefore, the lack of adequate warnings and instructions on the machine directly led to Plaintiff's involvement with the cutting wheel of the machine and the causation element is established.

Defendants also assert that Kirchofer and Smith would not have heeded the warning to operate the stump grinder up and down on the slope since the safety instruction references steep hills and Kirchofer and Plaintiff characterized the work area as a slight grade.  This argument is erroneous.  Defendants' instruction containing the words "steep hill" is ambiguous and it cannot be said that a user would not follow the safety instruction based upon a perception or conclusion regarding the steepness of a slope.  Indeed, Kirchofer has stated that he he been aware of this instruction on the date of the accident he would have operated the stump grinder up or down on the slope and not across the slope.  (*Kirchofer Affidavit, Exhibit "E").*  He further asserted that if it was not possible to operate the stump grinder up or down the grade in accordance with the instruction then he would not have utilized the stump grinder at the Groner residence (**Id.**)  In light of the above, Defendants' argument that the above cited instructions and warnings would not have been heeded by Kirchofer and Plaintiff had they been adequately provided with the same should be dismissed.

## IV.  Conclusion

Based upon the foregoing, Plaintiff, Kyle Smith, respectfully requests that the Court deny Defendants' Motion for Summary Judgment.


BEGLEY, CARLIN & MANDIO, LLP


BY: /s/ S. Richard Klinges, III, Esquire
S. RICHARD KLINGES, III, ESQUIRE #*I.D. 02018*
TODD M. SAILER, ESQUIRE #*I.D. 86013*
*680 Middletown Boulevard*
*Langhorne, PA l9047*
(215) 750-0110
***Attorneys for Plaintiff***


Dated: October 21, 2004

## CERTIFICATE OF SERVICE

_____I hereby certify that a true and correct copy of  Plaintiff's Response to Defendants' Motion for Summary Judgment was forwarded to Defendants' counsel listed below by federal express mail on October 21, 2004.

_____

Gerard Cedrone, Esquire
Lavin, Coleman, O'Neil, Ricci
Penn Mutual Tower, Suite 1000
510 Walnut Street
Philadelphia, PA l9l06

 /s/ S. Richard Klinges, III, Esquire
S. RICHARD KLINGES, III, ESQUIRE
TODD M. SAILER, ESQUIRE