**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| KYLE SMITH | : | CIVIL ACTION - LAW |
| | : | |
| v. | : | No. 02-CV-2718 (RLB) |
| | : | |
| PROMARK PRODUCTS WEST, INC. | : | |
| | : | |
| and | : | |
| | : | |
| ARIENS COMPANY | : | |
| | : | |

_____

## ORDER

AND NOW, this          day of                    , 2004, upon consideration of the Motion to Preclude the Report and Testimony of Plaintiff's expert, Richard A. Colberg, by Defendants Promark Products West, Inc. and Ariens Company, Inc., and Plaintiff's response thereto, it hereby ORDERED and DECREED that said Motion is DENIED.

BY THE COURT:

_____
Honorable Ronald L. Buckwalter

278043.1
Nov 09 2004

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYLE SMITH | : | CIVIL ACTION - LAW |
| | : | |
| v. | : | No. 02-CV-2718 (RLB) |
| | : | |
| PROMARK PRODUCTS WEST, INC. | : | |
| | : | |
| and | : | |
| | : | |
| ARIENS COMPANY | : | |
| | : | |

## <u>PLAINTIFF'S ANSWER TO DEFENDANTS' MOTION TO PRECLUDE THE REPORT AND TESTIMONY OF PLAINTIFF'S EXPERT, RICHARD A. COLBERG</u>

Plaintiff, Kyle Smith, hereby responds to the Motion to Preclude the Report and Testimony of Plaintiff's expert witness, Richard A. Colberg, by Defendants.  Defendants' Motion should be denied for the reasons set forth in the brief attached hereto.

BEGLEY, CARLIN & MANDIO, LLP


BY: /s/ S. Richard Klinges, III, Esquire

S. Richard Klinges, III, Esquire
I.D. # 02018
Todd M. Sailer, Esquire
I.D. # 86013
680 Middletown Boulevard
Langhorne, PA l9047
(215) 750-0110
Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KYLE SMITH | : | CIVIL ACTION - LAW |
| | : | |
| v. | : | No. 02-CV-2718 (RLB) |
| | : | |
| PROMARK PRODUCTS WEST, INC. | : | |
| | : | |
| and | : | |
| | : | |
| ARIENS COMPANY | : | |
| | : | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO THE MOTION IN LIMINE TO PRECLUDE**
**THE REPORT AND TESTIMONY OF PLAINTIFF'S EXPERT, RICHARD A.**
**COLBERG BY DEFENDANTS, PROMARK PRODUCTS WEST, INC.**
**AND ARIENS COMPANY, INC.**

I.    <u>Facts</u>

This is a strict liability and negligence action brought by Plaintiff, Kyle Smith, brought against Defendants' Promark Products West, Inc. and Ariens Company, Inc. Plaintiff, Kyle Smith, sustained severe injuries to his right leg as a result of his leg coming into contact with a moving cutting wheel of Defendants' product, a Promark Model 16SP stump grinder. *(See photographs of stump grinder, Exhibit "A").*   The accident happened on September 8, 2001 while Plaintiff was assisting a person by the name of Karl Kirchofer in removing stumps from a dirt/mulch mound on the property of John and Barbara Groner located at 1324 Camelot Drive, Easton, Pennsylvania, 18045.

Mr. Kirchofer was operating the stump grinder to grind stumps while Plaintiff assisted by filling in holes left after the stumps were removed with dirt.  Plaintiff had never operated a stump grinder before the date of the accident.  As Mr. Kirchofer was grinding one stump, he experienced difficulty in that the stump grinder was "jumping around" on the stump.  He therefore requested Plaintiff to assist him in steadying the stump grinder by standing to the left of the stump grinder and holding on to the left handlebar. At this time, Mr. Kirchofer was operating the stump grinder across

the slope rather than up or down on the slope with the left side of the grinder facing up the slope and the right side facing down the slope. Therefore, since Plaintiff was positioned on the left side of the stump grinder he was up the slope from the stump grinder. As Mr. Kirchofer was grinding the stump, Plaintiff's right leg slipped into the moving cutting wheel of the stump grinder. After Mr. Kirchofer became aware that Plaintiff's leg had contacted the cutting wheel, he realized from prior experience with the machine that there was no way that he could quickly shut down the machine and stop the cutting wheel. He then attempted to determine how he could assist Plaintiff. Mr. Kirchofer stated that since he was startled and had never been presented with this type of situation before, this process took in excess of five seconds before he decided that his only option was to try to flip the stump grinder away from Plaintiff. The stump grinder weighs 490 pounds. Mr. Kirchofer stated that due to the weight of the stump grinder, it was difficult to flip the machine and in order to do so he had to reposition his feet, bend down at the knees and exert a great amount of force upon the stump grinder. This process of flipping the machine away from the Plaintiff took additional time. As a result of the accident, Plaintiff sustained severe injury to his right leg including an open proximal tibial fracture with soft tissue loss, bone loss of the right lower extremity, severely comminuted proximal tibia and a large open wound of the right lower extremity.

Plaintiff alleges that the stump grinder at issue is defective. Approximately 8 1/2 inches of the 14 inch cutting wheel of the stump grinder was exposed and unguarded. *(Photographs of stump grinder, Exhibit "B").* Plaintiff therefore claims that the stump grinder was defective due to inadequate guarding of the cutting wheel. Additionally, the stump grinder did not possess any devices to enable the cutting wheel to be quickly stopped. Mr. Colberg opined that the stump grinder should have equipped with a operator presence control, positive clutch and a braking system on the cutting wheel to allow immediate stoppage of the wheel. *(Colberg report, Exhibit "C").* Plaintiff further alleges that the stump grinder is defective due to inadequate warnings and instructions as no decals were attached to the stump grinder alerting the user to always operate the stump grinder up or down on a slope and to read and understand the owner's manual prior to use. *(Colberg report, Exhibit "C").*

Defendants have filed the instant Motion in Limine to attempt to preclude Mr. Colberg's opinions pursuant to <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.,</u> 509 U.S. 579 (1993) and related authorities. For the reasons set forth below, Defendants' Motion should be denied.

## II.    <u>Standard for Expert Testimony</u>

Under Federal Rule of Evidence 702 an expert can be called to testify to "scientific, technical, or other specialized knowledge [that] will assist the trier of fact." Fed. R.Evid.702. This Rule has been construed to mean that an expert's testimony is admissible as long as the process that the expert used to formulate his or her opinion is reliable. <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.,</u> 509 U.S. 579, 589-90 113 S. Ct. 2786, 2794-95 (1993). Rule 702 "has a liberal policy of admissibility." <u>Kannankeril v. Terminix Inter. Inc.,</u> F.3d 802, 806 (3d Cir. 1997). The standard for determining reliability "is not that high." <u>In Re TMI</u>, 193 F.3d 613, 665 (3d Cir. 1999). The main goal is to exclude "junk science." <u>Main St. Mortgage, Inc. v. Main St. Bancorp, Inc.,</u> 158 F. Supp. 2d 510, 513 (E.D. Pa. 2001). An expert's opinion testimony should be admitted where there is a logical basis for it. Bredor v. Sears, Roebuck & Co., 722 F.2d 1134, 1139 (3d Cir. 1983). The credibility and weight of the expert's testimony is to be determined by the jury, not the trial judge. <u>Id</u>. A judge should find an expert opinion reliable under Rule 702 if it is based on 'good grounds'. <u>In Re Paoli Railroad Yard,</u> <u>PCB litigation</u>, 35 F.3d 717, 744 (3d Cir. 1994). In considering whether there are "good grounds" for the expert's opinions it has been stated that the court may consider:

1.    Whether a method consists of a testable hypothesis;
2.    Whether the method has been subject to peer review;
3.    The known or potential right of error;
4.    The existence and maintenance of standards controlling the techniques, operations;
5.    Whether the method is generally accepted;
6.    The relationship of the technique to methods which have been established to be reliable;
7.    The qualifications of the expert witness testifying based on the methodology; and
8.    The non-judicial uses to which the method has been put.

<u>ID Security Systems Canada, Inc. v. Checkpoint Systems, Inc.,</u> 198 F.Supp 2d 598, 602 (E.D. Pa. 2002) (citing <u>In Re Paoli</u>, supra at 742 m.8). This list of factors "is non-exclusive and...each factor

need not be applied in every case." Id. (citing Elcock v. K-Mart Corp., 233 F.3d 734, 746 (3d Cir. 2000)). The Rule 702 inquiry is a flexible one and the Daubert factors do not constitute a definitive checklist or test. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 138, 150 119 S. Ct. 1167, 1170, 1175 (1999). The gatekeeping inquiry must be tied to the particular facts of the case before the court and the factors listed above "may or may not be pertinent in assessing reliability depending on the nature of the issue, the expert's particular expertise and the subject of his testimony." Id. In some cases reliability concerns may focus upon personal knowledge or experience as opposed to "scientific foundations". Protocomm Corp. v. Novell Advanced Services, Inc., 171 F. Supp. 2d 473, 477 (E.D. Pa. 2001) (quoting Kumho Tire, supra at 150). Paoli further instructs that:

> A judge will often think that an expert has good grounds to hold the opinion that he or she does even though the judge thinks that the opinion is incorrect... The focus... must be solely on principles and methodology, not on the conclusions that they generate....The grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for and expert's conclusion, even if the judge thinks there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.

In Re Paoli, supra (citing and quoting Daubert, supra). The Paoli Court explained that the evidentiary requirement of reliability is lower than the merits standard of correctness and further stated "[t]he reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence." Paoli, supra (quoting Paoli I, 916 F.2d 829, 857 (3d Cir. 1990). "The ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results." Deluca v. Merrill Dow Pharmaceuticals, Inc., 911 F.2d 941, 956 (3d Cir. 1990). "A judge frequently should find an expert's methodology helpful, even when the judge thinks that the expert's technique has flaws sufficient to render any conclusions inaccurate." In Re Paoli, supra at 744-45. Finally, the Paoli Court emphasized that "the reliability standard is not that high" and found that a judge should not exclude evidence on the ground that he or she thinks that there is a flaw in the

expert's investigative process which renders the expert's conclusions incorrect but should only exclude expert testimony if there is a flaw in the expert's methodology significant enough that the expert does not have "good grounds" for his or her opinions. Id. at 745-46.

The bases and sources of expert opinion goes to the credibility or weight of the testimony not the admissibility. Orson v. Miramax Film Corp., 983 F. Supp. 624, 635 (E.D. Pa. 1997); Tuman v. Genesis Assoc., 935 F. Supp. 1375, 1385 (E.D. Pa. 1996). The expert testimony merely should not be "so fundamentally unsupported that it can offer no assistance to the jury." Id. (quoting Loudermill v. Dow Chemical, 863 F.2d 566 (8th. Cir. 1988)). A court should only preclude expert testimony when the sources on which the expert relies are of such little weight or so fundamentally unsupported that the opinion offers no assistance to the trier of fact and may be more prejudicial than probative. Tuman v. Genesis Assoc., 935 F. Supp. 1375, 1385 (E.D. Pa. 1996). In assessing the reliability of an expert witness's testimony, "a court must be careful not to exclude evidence solely on the basis of the general credibility of an expert's testimony." Total Containment, Inc. v. Dayco Products, Inc. 2001 WL1167506 at 3 (E.D. Pa.)(citing Elcock v. Kmart Corp., 233 F.3d 734, 751 n.8 (3rd Cir. 2000)). The analysis of the weight to be given to the expert's conclusions themselves is to conducted by the trier of fact - the opposing party is free to challenge the expert's opinions through cross-examination. Kannankeril v. Terminix Inter., Inc., 128 F.3d 802, 807 (3d Cir. 1997). Moreover, the reliability standard "does not mean that Plaintiffs have to prove their case twice - they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." In Re Paoli, supra, at 744.

It has also been held that expert opinion must "fit" in that it must assist the trier of fact. Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000). A court must examine an expert's conclusions to determine whether they could reliably flow from the facts known and the methodology used. Id. at 146. This standard is not to be a high one, nor is it to be applied in a manner to require plaintiffs to prove their case twice. Id. at 145-46.

In applying the above-stated authorities to the instant matter, it is evident that Mr. Colberg's opinions are reliable and admissible in this action. Mr. Colberg makes sound conclusions based upon data that is customarily relied upon by experts in the field of mechanical engineering. Plaintiff should

be permitted to introduce the testimony of their expert engineer since it is based upon "good grounds" and is reliable and will assist the trier of fact in determining the issue of whether Defendants' product at issue is defective. The weight to be afforded to such opinions should be decided by the jury.

## III.    Argument

### A.    Defendants' arguments that Colberg's opinions regarding the lack of guarding on the stump grinder are unreliable should be denied.

In his report, Plaintiff's expert engineer Richard A. Colberg noted that there is no guarding for the exposed portion of the cutter wheel which consisted of 8.5 inches of exposed portion of the cutter wheel below the machine frame. (*Colberg Report, Exhibit "C" at 2*). He also noted that the rules of practice for safe design dictate that if practical, a hazard should be designed out of the product through engineering means. If the hazard can not be eliminated entirely, the hazard is to be enclosed or guarded to protect the user. Finally, if the hazard cannot be guarded, users are to be warned or instructed as to the dangers of the product under reasonably foreseeable conditions. *(Exhibit "C" at 4)*. The A.N.S.I. Standard 5.5 governing stump grinders provides that "stump grinders shall be equipped with enclosures or guards that effectively protect the operator." *A.N.S.I. Z133.1-1982*. *(Colberg Report Exhibit "C" at 5)*. Mr. Colberg noted that Plaintiff was severely injured when his right foot slipped and entered the path of the moving cutters and that there was no guard, as required by the A.N.S.I. Standards around the cutter wheel to protect Plaintiff. He concluded that the stump grinder should have been equipped with a retractable guard around the exposed portion of the cutter wheel and explained that the retractable guard would be able to compensate for varying levels of ground and tree stump while providing protection from contact with the cutter wheel. *(Exhibit "C" at 5)*. He also explained that this type of guard is found on hand-held circular saws and bench mounted miter saws and that it rotates to expose cutters to the work piece. Mr. Colberg added that this type of guard may be designed to rotate up inside an existing portion of the housing or it may be designed to rotate outside of the housing and that it may be gravity operated or spring loaded to the closed position. He estimated that this type of a guard could have been manufactured for the stump grinder for about $10.00. Mr. Colberg concluded to a reasonable degree of engineering certainty that

the lack of required guarding rendered the design of the stump grinder defective, unreasonably dangerous, and unsafe for its intended use and that it was the cause of Plaintiff's injuries. **(*Colberg report, Exhibit "C" at 5 and 7*).**

Defendant argues that Colberg has not designed a guard for the machine nor tested one to determine whether his concept would be feasible and safer on the stump grinder. Defendants' argument should be denied.

Colberg's opinions regarding the proposed guard for the machine are based on good grounds and are reliable under the relevant authorities. His opinions certainly are not mere speculation or conjecture. Colberg noted that 8 ½ inches of the 14 inch cutting wheel of the machine is exposed below the machine frame and is unguarded. *(Exhibit "C" at 2)*. Even Defendants' engineer Hugh Grow agreed that the cutting wheel is considered to be a hazard. *(Grow Deposition, Exhibit "D" at 26)*. Under established rules of practice for safe design, hazards should be eliminated out of the product if practical. If a hazard cannot be designed out of the product than the hazard should be enclosed or guarded to protect the user. *(Colberg Report, Exhibit "C" at 4)*. Moreover the A.N.S.I. Standard 5.5 relating to stump grinders states "stump grinders shall be equipped with enclosures or guards that would effectively protect the operator." *(Exhibit "C" at 5)*. Mr. Colberg correctly noted that there was no guard as required by A.N.S.I. around the cutting wheel of the subject stump grinder to protect Plaintiff. Mr. Colberg specifically detailed his proposed guard which should have been incorporated into the design of the stump grinder. Mr. Colberg describes his proposal as a retractable guard which would be able to compensate for varying levels of ground and tree stump while providing protection from contact with the cutting wheel. He explains that one type of retractable guard is seen on all hand held circular saws and many bench mounted mitre saws and that this type of guard rotates to expose cutters to the workpiece. Mr. Colberg also details that this type of guard may be designed to rotate up inside an existing portion of the housing or it may be designed to rotate outside of the housing. He also adds that the guard may be gravity operated or spring-loaded to the closed position and that either method would provide protection from unwanted contact with the cutters. Mr. Colberg concluded that without required guarding the design of the subject stump grinder is defective, unreasonably dangerous and unsafe for its intended use and was the cause of Plaintiff's injury. *(Exhibit "C" at 5, 7)*.

Not only does Mr. Colberg have good grounds for his opinion that the stump grinder should have been equipped with a guard through his explanation of such guard in his report, but Mr. Colberg relied upon his review of the exact type of guard that he proposes which was developed by the competing manufacturer Vermeer.  It has been ruled that an  "expert should not required to 're-invent the wheel' and  start his inquiry from square one in order to be deemed qualified under Daubert."  Eclipse Electronics v. Chubb Corp., 176 F. Supp. 2d 406, 412 (E.D. Pa. 2001).  Rather, an expert may rely on the research, studies, and expertise of others as long as it is the type of information regularly relied upon by experts in the relevant field.  Id. (citing Paoli II, 35 F.3d at 748).  The Eclipse court found that where an expert does not conduct extensive testing on his own but relies upon the studies of others, the expert's opinion is not rendered unreliable and unhelpful, but that any lack of testing is a more appropriate subject for cross-examination than a motion in limine since the analysis of the conclusions of an expert is for the trier of fact.  Id.  In this case, Mr. Colberg viewed a video of a stump grinder that employed the exact type of guard he describes in his report produced by Vermeer showing the stump grinder in actual operation grinding stumps.  *(Colberg Affidavit, Exhibit "E")*.  The video showed that the guard worked flawlessly and that it did not impede the utility of the machine for its intended purpose of grinding stumps.  *(Colberg Affidavit, Exhibit "E")*.  Testing of this nature is the type of information which is regularly relied upon by experts in the engineering field in reaching conclusions regarding product safety design.  *(Colberg Affidavit, Exhibit "E")*.

Defendant's arguments regarding general acceptance and peer review should not form the basis to preclude Mr. Colberg's opinions.  As stated in the relevant authorities, the Daubert factors are non-exclusive and each factor need not be applied in every case.  ID Security Systems Canada, Inc. v. Checkpoint Systems, Inc., 198 F. Supp. 2d 598, 602 (E.D. Pa. 2002).  The gatekeeping inquiry must be tied to the particular facts of the case before the court and the factors listed above may or may not be pertinent in assessing reliability depending upon the nature of the issue, the expert's particular expertise and the subject of his testimony."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 138, 150, 119 S.Ct. 1167, 1170, 1175 (1999).  In some cases reliability concerns may focus upon personal knowledge or experience as opposed to "scientific foundations."  Protcomm Corp. v. Novell Advanced Services, Inc., 171 F.Supp. 473, 477 (E.D. Pa. 2001).  Expert testimony should only be precluded when it is "so fundamentally unsupported that it can offer no assistance to the jury."

<u>Tuman v. Genesis Assocs.</u>, 935 F. Supp. 1375, 1385 (E.D. Pa. 1996). In this case, Mr. Colberg's opinions regarding his proposed guard are based upon good grounds and meet the standard of reliability and should therefore be admitted. Defendant's criticisms amount to no more than subjects which Defendant may pursue on cross-examination and go only to the weight or credibility of Mr. Colberg's testimony, which are subjects for consideration by the jury. Additionally, it is certainly generally accepted that guarding of a hazard should be employed where practical to protect against a hazard as embodied in the A.N.S.I. standards.

Moreover, the qualifications of the expert witness testifying based on the methodology is one factor to be considered. <u>ID Security Systems</u>, <u>supra</u>. Mr. Colberg graduated from Purdue University with a Bachelor of Science in mechanical engineering in 1965. He has had ample training and experience in machine safeguarding. From 1965 to 1968 Mr. Colberg worked as a project engineer with Outboard Marine Corporation designing lawnmowers and working to assure compliance with lawnmower safety standards. From 1970 to 1976 Mr. Colberg designed and developed small consumer chainsaws. From 1976 to 1984 Mr. Colberg worked for Black & Decker where he managed development engineering, manufacturing engineering and quality control for the Dewalt power tool division with regard to consumer and industrial radial arm saws, table saws, panel saws and related accessories. From 1984 to 1986 Mr. Colberg worked for Lancaster Machinery Company as a manager of engineering and quality control designing and developing industrial radial arm saws and accessories. From 1991 to 1992 he worked as a manager of engineering for Black & Decker managing manufacturing engineering, plant engineering and quality control departments. Mr. Colberg's work with lawnmowers, consumer chain saws, radial arm saws, table saws, panel saws and related accessories all involved designing and implementing guards and other safety devices for such products. From 1997 to present Mr. Colberg has worked for Robson Lapina, Inc. providing technical investigations, analysis, reports and testimony for failure analysis in personal injury litigation involving industrial operations, tools and appliances. *(Colbert Curriculum Vitae, Exhibit "F")*. He has reviewed stump grinders and rendered opinions regarding the safety of the same in four different cases. One of theses cases involved the exact stump grinder involved herein, a Promark Model 16SP stump grinder. In that case Mr. Colberg rendered the same or very similar opinions that he has rendered in this case and he was admitted as an expert to testify at trial in that matter by the U.S.

District Court for the Eastern District of New York. <u>Apostoleris v. Promark Products, et al.</u>, Docket No. 98 CV 6941 (E.D. NY). Therefore, Mr. Colberg has vast knowledge, training and experience in mechanical engineering and product safety design, including guarding of hazards, which he relied upon in addition to the testing of his proposed guard by Vermeer to conclude that the subject stump grinder should have been equipped with a guard around the cutting wheel and that such a device was feasible. Mr. Colberg's opinion is thus based upon "good grounds" and should be admitted.

> **B.      Defendants' arguments that Colberg's opinions regarding the alternative designs of automatic shut-off devices are unreliable should be dismissed.**

Mr. Colberg noted that the subject stump grinder does not possess a brake to stop the cutter wheel from rotating. He also stated that after the engine speed is throttled down, the cutting wheel is still under power until the engine speed falls below about 1400 rpm and that the cutting wheel still powered until the engine speed reaches this level even if the "push to stop" control on the machine is activated. *(Colberg report, Exhibit "C" at 3).* Mr. Colberg also reported that there is no operator presence control on the subject stump grinder. He explained that an operator presence control is designed to be held by the operator such that if it is released, the power to the cutting wheel is immediately removed. (*Exhibit "C" at 2).* Mr. Colberg opines that in an emergency situation, precious seconds are wasted in the slow down procedure of the machine. (*Exhibit "C" at 5).* He concluded that the machine should have been designed with an operator presence control which have been required on walk behind lawn mowers for approximately 25 years and are required to cause the blade to stop turning within three seconds after being actuated. (*Exhibit "C" at 6).* Mr. Colberg estimated that the stump grinder could have been equipped with an operator presence control for between $5.00 and $l0.00.

Mr. Colberg also opined that rather than using a centrifugal clutch for transferring engine power to the cutting wheel, which usually requires a time delay for deactivation, Defendants should have used a positive clutch which would immediately remove motive power from the cutting wheel. Mr. Colberg further opined that Defendants should have added a band braking mechanism to the cutting wheel which would act to stop the cutting wheel when power is removed from it. The brake would have eliminated the coasting time of the wheel before it stopped. Mr. Colberg stated that the

positive clutch and band brake could have been integrated with the operator presence control on the stump grinder and estimated that the cost for the clutch and braking system would be approximately $l0.00 to $l5.00 over the centrifugal clutch on the subject machine. (***Exhibit "C" at 6).***  Mr. Colberg stated that "precious time was lost while the operator, Mr. Kirchofer, tipped the machine over on its right side and finally turned off the power." (***Exhibit "C" at 6).***  He added that "had the subject Promark l6SP stump grinder been equipped with an operator presence control and positive clutch and braking means, the cutter wheel would have stopped almost immediately after Mr. Kirchofer took his hands off of the controls.  The time saved could have lessened the extent of Mr. Smith's injury." (***Exhibit "C" at 6 ).***  Finally, Mr. Colberg opined that the lack of an operator presence control and positive clutch and braking means rendered the design of the subject stump grinder defective, unreasonably dangerous, unsafe for its intended use and that such defects were the cause of Plaintiff's injuries. (***Exhibit "C" at 6-7).***  He found that Defendants' failure to provide these devices prevented Kirchofer from immediately shutting down the machine. (***Exhibit "C" at  7).***

Defendants argue that Colberg is not offered an alternative design that is safer and feasible with regard to the automatic shut-off devices.  Defendants' arguments in this regard are baseless and should be rejected.

Contrary to Defendants' arguments, Mr. Colberg did develop a drawing of the operator presence control and clutch and band brake design.  Mr. Colberg developed such a drawing in conjunction with the Apostoleris litigation and he relied upon such drawing in formulating his opinions in this action.  (***See Colberg drawing, Exhibit "G").***  Moreover, as stated in the previous section, an engineer may rely upon testing performed by others so long as such testing is of the type regularly relied upon by experts in the relevant field.  Mr. Colberg was aware of and reviewed testing performed by engineer John Sevart, P.E. from Wichita, Kansas who actually purchased a Promark Model 16SP stump grinder and modified it to incorporate the same automatic shut-off devices that Mr. Colberg has opined should have been included on the subject machine.  (***Colberg Affidavit, Exhibit "E").***  Mr. Colberg reviewed a deposition transcript of testimony of Mr. Sevart regarding such testing which involved operating the modified Promark 16SP machine to grind stumps. (***Affidavit of Richard Colberg, Exhibit "E").***  As stated by Mr. Sevart in the aforementioned deposition, he made a video of his testing which is approximately 10 minutes long and shows cutting

over a period of a couple of hours.  *(Sevart Deposition, Exhibit "H" at 4-5)*.  As was specifically represented by Mr. Sevart in literature which accompanied his video and which was read into the record at his deposition, the design changes consisted of adding a deadman brake and clutch system to the cutter wheel spindel and a moveable guard to prevent inadvertent contact with the cutting wheel.  (Id. at 23).  It was explained that the deadman cutter wheel brake system functions in conjunction with the existing centrifugal cutter wheel drive clutch.  A brake band mechanism was added to the machine to stop the cutter wheel and a double bail type control level was added to the handle bar to activate the cutter wheel brake mechanism. (Id. at 23-24).  Additionally, the throttle lever was interlocked with the cutter wheel brake control bail.  It was stated that to disengage the cutter wheel drive clutch and to set cutter wheel brake the operator simply releases the control bail. (Id. at 24).  The testing performed by Mr. Sevart established that the deadman control function (or operator presence control) in conjunction with the modified clutch  and band brake resulted in cutter wheel stop of one second.  (Id. at 25).  Mr. Sevart explained that if the bail or the operator presence control was released the throttle automatically returned to a low speed, the centrifugal clutch would drop out, and at the same time a spring set brake would engage to bring the cutter wheel to a rapid stop.  (Id. at 46-47).  Mr. Sevart stated that the system can be adjusted to bring the cutter wheel to a stop from approximately three quarters of a second to 2 seconds.  (Id.)  Mr. Sevart also explained that the modified machine was used to grind several stumps and it was observed that the machine modifications did not adversely affect the utility of the machine.  (Id. at 25, 48-49).  Mr. Sevart stated that the machine worked just as well with the modifications as it did prior to the modifications.  (Id. at 49).  He further reported in his observations that "the blade brake virtually eliminates the coast down time of the cutter wheel."  (Id. at 26).

Mr. Colberg has opined that the subject stump grinder should have been equipped with the same exact design modifcations that were actually implemented on the identical machine by Mr. Sevart.  Not only were such modifications proven to substantially reduce the cutter wheel coasting time to approximately one second and could be adjusted to be between three quarters of a second and two seconds, but it was also proven that such modifications are feasible and do not interfere with the utility of the machine.  Mr. Colberg's reliance upon Mr. Sevart's testing is certainly proper as the testing is the type of information that is regularly relied upon by experts in the engineering field to

render opinions regarding safety design. *(Affidavit of Richard Colberg, Exhibit "E")*.  Contrary to Defendant's arguments, Colberg's opinions are far from constituting mere conjecture or speculation. Consequently, Mr. Colberg's opinions regarding the automatic shut-off devices are clearly reliable and should be admitted at trial.

Moreover, Colberg stated in his report that operator presence control systems have been required on walk behind lawn mowers for approximately twenty five years and are required to cause the rotating blade to stop within three seconds after being actuated. *(Exhibit "C" at 6)*.  Therefore, the technology certainly existed at the time that the subject machine was manufactured in 1985 to enable such a device to be implemented on the subject machine.  Further, patent documentation establishes that the clutch and brake type mechanism and the operator presence control proposed technology has been available since the 1960s.  A Clutch and Brake Mechanism for a Rotary Type Mowing Machine patent exists which is dated May 30, 1961.  In this patent it is stated that the object of the invention is to provide clutch and brake mechanisms for rotary type mowing machines constructed in a manner to automatically prevent rotation of the mowing blade upon disengagement of the blade from the drive shaft of the mowing machine engine.  Another objective was to provide a brake and clutch mechanism constructed to automatically disengage the mower blade whenever a control lever on the mower handle is released. *(Clutch and Brake Mechanism patent, Exhibit "I")*. A patent entitled Lawn Mower Control Mechanism dated May 31, 1966 establishes that combination blade brake and clutch technology to render the blade stationary and harmless whenever a handle is released was in existence long before the subject machine was manufactured.  This patent specifically states that "it will...be understood that no limitation of the scope of the invention is thereby intended. Such alterations and further modifications in the illustrated devices, and such further applications of the principals of the invention as illustrated therein being contemplated as would normally occur to one skilled in the art to which the invention relates." *(Lawn Mower Control Mechanism, Exhibit "J")*.  An additional patent titled safety device propeller equipment came into existence January 11, 1966. *(Safety Device Propellor Equipment Patent, Exhibit "K")*.  The object of this invention was to provide means for automatically nullifying the power of the motor and braking the cutter to a stop whenever the operator fails to maintain pressure upon a manual control member conveniently located at the operator's station.  It was explained that by operation of this invention should the operator for

any reason fail to hold the bail against the handle a spring would immediately act to set the brake and stop rotation of the cutter shaft. The application of the brake would be accompanied by disabling the motor ignition system which it was stated would be best accomplished by grounding or short circuiting the hot terminal of the sparkplug. *(Exhibit "K" at 4)*. The explanation of this invention also stated that "while the present disclosure is directed to an item of power equipment referred to as a power mower of the rotary blade type, it will become evident that the present invention is readily applicable to other types of power equipment incorporating moving parts which may be braked or disabled in a fashion similar to that herein disclosed by way of example. It is therefore considered superfluous to illustrate and describe herein the many forms of power equipment which might be controlled by the safety device of the invention." *(Exhibit "K" at 3)*.

Mr. Colberg also relied upon the aforesaid patents in concluding that the subject stump grinder should have incorporated these automatic shut-of devices. *(Colbert Affidavit, Exhibit "E")*. While a lawnmower is used as the subject machine in the aforesaid patents, it is clear just from the language of the patents themselves that such designs are not limited for use only with regard to lawnmowers. Defendants' argument that lawnmowers are significantly distinctive from the subject stump grinder in this action is unfounded. The same hazard of a rotating cutting device is encountered with both types of machinery. *(Colbert Affidavit, Exhibit "E")*. Thus, devices which improve the safety of a lawnmower by way of providing for rapid stoppage of the cutting device would be equally applicable to stump grinders. *(Affidavit of Richard Colberg, Exhibit "E")*. Further it is customary in the engineering field to use already existing technology and modify it for different uses to improve product safety with regard hazards sought to be eliminated by such technology. Mr. Colberg relied upon his engineering knowledge and experience to opine that the devices could have been implemented on the subject stump grinder and also relied upon the testing by Sevart which concretely established that such implementation is perfectly feasible. *(Affidavit of Richard Colberg, Exhibit "E")*.

    **C.     Defendants' arguments that Colberg's opinions regarding automatic shut-off devices do not fit and are not relevant should be dismissed.**

    Defendants essentially repeat their causation argument they raised in their motion for summary judgment to argue that Colberg's opinions regarding the automatic shut-off device design alternatives on the subject stump grinder are not relevant or do not "fit" this case.  This argument is based upon the argument that Kirchhoffer's actions in tipping the machine away from Mr. Smith removed the cutting wheel from Mr. Smith's leg faster than the wheel would have stopped with the proposed modifications.  As stated in Plaintiff's answer to Defendant's motion for summary judgment, causation is an issue to be determined by the jury.  Further, Defendants' assertion amounts to nothing more than gross speculation at best and is in fact inconsistent with the available evidence.  The standard of whether an opinion "fits" is not a high one.  Colberg's opinions regarding the lack of automatic shut-off devices clearly fit this case as they will assist the trier of fact determine whether Defendants' stump grinder is defective and they should therefore be admitted.

    Mr. Colberg stated in his report that the operator presence control is required to stop the blade from moving within three seconds.  If the positive clutch, which would immediately remove motive power from the cutting wheel and the band brake were utilized,  this stopping time would be further reduced.  If these design alternatives were available, the wheel would have stopped no later than three seconds after the release of the operator presence control by Kirchofer and  likely sooner than that, especially give the results of Mr. Sevart's testing which establishes that such design alternatives stopped the cutting wheel in one second and could be adjusted to stop the wheel in a period of three quarters of a second to two seconds. ***(Sevart Deposition, Exhibit "H" at 46-47)***.  Mr. Colberg opined that precious time was lost while Kirchofer tipped the machine over on its side.  He stated that the presence of an operator presence control and positive clutch and braking system would have stopped the cutting wheel almost immediately after Kirchofer would have released  the controls, which would have saved time and lessened the extent of Plaintiff's injury.  (***Colberg Report, Exhibit "C" at 6).***

    Nonetheless, rather than implement the design alternatives  identified above, Defendants suggest that it is preferable to rely upon a user to flip the machine away from someone who has come into contact with the cutting wheel.  Defendants speculate that Kirchofer's action removed the cutting

wheel from Smith's leg in a shorter amount of time than the cutting wheel would have been brought to a stop had the design alternatives been present.  Defendants rely upon deposition testimony by Plaintiff and Kirchofer to assert that the machine was flipped from Plaintiff's leg immediately.  However, this testimony only establishes that Mr. Kirchofer did not continue to grind the stump after he realized that Plaintiff had slipped into the cutting wheel, but that he started to take action to turn the machine over at such point in time.  Mr. Kirchofer stated that after he realized Plaintiff's leg had contacted the cutting wheel, he was startled and had to decide how to help Plaintiff since he realized that he could not bring the cutting wheel to a rapid stop from prior experience with the machine.  He stated that he then arrived at the decision to flip the machine, but that the process of deciding what action to take took in excess of five seconds. *(Kirchofer Affidavit, Exhibit "L").*  The machine weighs 490 pounds and it was positioned in loose dirt and mulch.  *(Promark Model 16SP specifications, Exhibit "M").*  Mr. Kirchofer further stated that to be able to complete the task of flipping the machine, it was necessary to reposition his feet and bend downward in order to gain the leverage required to flip the machine and that he had to exert great force upon the machine to move it away from Mr. Smith, which took additional time. (*Kirchofer Affidavit, Exhibit "L").*  Thus, it clearly took a much longer period of time for Mr. Kirchofer to decide on a course of action, position his body to enable him to flip the machine and to exert force upon the machine to actually flip it than it would for Mr. Kirchofer to simply let go of an operator's presence control which would have stopped the wheel in under three seconds.  Consequently, it is likely that the design alternatives proposed by Mr. Colberg would have stopped the cutting wheel in a much more expedient fashion than Kirchofer was able to flip the machine over after realizing that he could not stop the cutting wheel rapidly and arriving at the decision to physically remove the machine away from Plaintiff's leg.

Moreover, Plaintiff testified that he was cut from his lower shin up to his knee cap. *(Smith deposition, Exhibit "N" at 92-93).*  If Kirchofer was able to release an operator's presence control which would have immediately brought the cutting wheel to a stop, Plaintiff's wound would likely have been contained solely to the area where the cutting wheel first made contact with his leg.  However, since the design of the machine did not allow for immediate stoppage of the cutting wheel and Kirchofer was thus required to flip the machine to the right to remove it from Plaintiff's leg,

Plaintiff's wound was expanded from the initial point of contact on his lower shin all the way up to his knee. The lack of devices to rapidly stop the cutting wheel therefore substantially increased the severity of the wound.

Based upon the foregoing, it is clear that Mr. Colberg's testimony regarding the alternative automatic shut-off devices is certainly relevant to this action and will assist the jury in determining causation. Consequently, such testimony should be admitted at trial.

> **D.    Defendants' arguments that Colberg's opinions regarding inadequate warning and instructions are inadmissible are unfounded and should be dismissed.**

Plaintiff alleges that the stump grinder is defective due to inadequate warnings and instructions as no decals were attached to the stump grinder alerting the user to always operate the stump grinder up or down on a slope and to read and understand the owner's manual prior to use. *(Colberg report, Exhibit "C")*.

At the time of the accident, Kirchofer was grinding a stump on sloped terrain. Kirchofer positioned the stump grinder on the side of the slope with the left side of the machine facing up the slope and the right side of the machine facing down the slope. *(Kirchofer deposition, Exhibit "O" at 47-48)*. Kirchofer clearly stated that the ground to the left of him was higher and the ground to the right of him was lower. (**Id. at 48**) Plaintiff also stated that the machine was on a slight angle. *(Plaintiff's deposition, Exhibit "N" at 61)*. By both Plaintiff's and Kirchofer's account, Plaintiff was located to Kirchofer's left holding the left handlebar of the machine just prior to the accident. (*Kirchofer deposition, Exhibit "O" at 49; Smith deposition, Exhibit "N" at 60)*. While Plaintiff stated that for the most part he was on flat ground, given that the stump grinder was on angled terrain with the area to the left of the machine angled upward and the area to the right of the machine angled downward and Plaintiff was situated to the left of the machine holding the left handle bar, Plaintiff must have been situated on angled ground. It is likely that Plaintiff's leg was caused to slip into the cutting wheel of the machine as a result of the sloped terrain angled toward the stump grinder.

The Promark 16SP manual instructs users to "Always go straight up or down on steep hills. Avoid steep side angles." *(Promark 16SP manual, Exhibit "P")*. Although the above instruction is located in the Promark 16SP manual, the instruction does not appear on the machine itself.

Moreover, there are no instructions on the machine advising the operator to read and understand the operator's manual. *(Grow deposition, Exhibit "D" at 57; Photograph of stump grinder instructions, Exhibit "Q").* Kirchofer did not even know that a manual existed for the machine. *(Kirchofer deposition, Exhibit "O" at 14-15, 74).* Kirchofer stated that he would have absolutely read the operator's manual before he operated the machine had he known that one existed. *(Kirchofer deposition, Exhibit "O" at 74).* Kirchofer has stated that he he been aware of the instruction to always operate the grinder up or down on a hill on the date of the accident he would have operated the stump grinder up or down on the slope and not across the slope. (*Kirchofer Affidavit, Exhibit "L").* He further asserted that if it was not possible to operate the stump grinder up or down the grade in accordance with the instruction then he would not have utilized the stump grinder at the Groner residence (**Id.**) Had Kirchofer been using the machine straight up and down on the slope as instructed in the operator's manual as opposed to sideways on the slope, it is likely that Plaintiff would not have slipped downward into the cutting wheel of the machine. Mr. Colberg noted that some stump grinder manufacturers, including Vermeer, provide a secure location on their machines for storing the operator's manual and that Vermeer even attaches the manual to the machine with a length of cable. Mr. Colberg opined that the Promark manual should have been available with the machine for Mr. Kirchofer to read. *(Colberg report, Exhibit "C" at   4).*

Defendants stress the importance of an operator reading the operator's manual and safety instructions prior to operating the stump grinder. Defendants state in the manual that every operator should read the owner's manual to be sure of safety instructions and proper operating procedure. *(Operator's manual, Exhibit "P" at 3).* Defendants also state in the section of the operator's manual titled Safety Instructions "Be Aware-unit should not be operated until the owners manual is studied, all safety decals are noted and the user has complete knowledge of all controls." Twelve instructions to users of the stump grinder are listed under the safety instructions section of the manual in addition to the instruction to operate the grinder  up or down on steep side angles. *(Operator's Manual, Exhibit "P" at 6).* One of these instructions states "do not operate in any position but from the rear and behind the control panel," Defendants did not include this instruction on the machine, nor did Defendants alert the user that the operator's manual should be examined prior to use. Despite Defendants' strong belief in the importance that an operator read the operator's manual prior to use,

Defendants did not include an instruction to the operator on the machine to read the operator's manual prior to use. As stated in Plaintiff's Answer to Defendants' Motion for Summary Judgment, two out of the three stump grinders examined by Defendants' expert provided such a decal on their machines. Additionally, Defendants could have easily included a decal on the machine instructing the operator to always go straight up or down on steep hills and to avoid steep side angles. They also could have attached the twelve safety instructions included in the manual on the machine, but did not do so.

Plaintiff's expert, Mr. Colberg, opined that the failure to include the instructions to always operate the stump grinder up or down on steep hills and to avoid steep side angles and the failure to instruct an operator to read and understand the operator's manual rendered the subject stump grinder defective, unreasonably dangerous, unsafe for its intended use and the cause of Plaintiff's injury. ***(Colberg report, Exhibit "C" at 3-4, 7).*** It is evident that had the machine been operated straight up or down the hill, in conformance with the safety instructions contained in the operator's manual, Plaintiff likely would not have slipped downward into the cutting wheel of the machine. Therefore, the lack of adequate warnings and instructions on the machine directly led to Plaintiff's involvement with the cutting wheel of the machine.

Defendants argue that Colberg's opinions regarding inadequate warnings or instructions are unreliable on the basis that Mr. Colberg does not offer a design plan or blueprint for an alternative warning or that Colberg does not test the effect of his proposed warning. Judging by such arguments, Defendants apparently fail to understand the nature of Mr. Colberg's opinions on the subject of warnings and instructions. Mr. Colberg opined that the stump grinder is defective in that the warning to always operate the stump grinder up or down on a hill is not included as a decal on the machine and also due to the fact that there is no decal on the machine instructing the operator to read and understand the operator's manual prior to use. Therefore, Mr. Colberg was not required to develop an alternative warning for the machine in order for testimony regarding the aforesaid opinions to be admitted at trial.

Moreover, Defendants are incorrect that Mr. Colberg has relied upon no methodology in support of his opinions. Rather, Mr. Colberg relied not only upon his own experience as a mechanical engineer for such opinions, but also relied upon studies performed which establish that where print warnings or directives are supplemented on the product in addition to be included in the product

manual, compliance with the instruction is substantially increased. *(Affidavit of Richard Colberg, Exhibit "E")*. One such study performed by Vincent C. Conzolla and Michael S. Wogalter showed that with regard to three different instructions supplementing a print warning on the product as opposed to only providing the instructions in the product manual compliance with the instructions was increased from 54.6 percent to 90 percent, 54.6 percent to 70 percent and 63.6 percent to 90 percent. *(Conzolla and Wogalter study, Exhibit "R" at 553, Table 1)*. An additional study by Shirley M. Otsubo showed that the use of a warning label on the product over no warning was clearly apparent in that it was observed that where a warning label to wear gloves when using an electric saw was included on the saw 64.3 percent of the persons noticed the warning, 38.8 percent read the warning and 25.5 percent complied with the warning. This was in contrast to the control group where no warning was included and no one was observed wearing gloves. *(Otsubo study, Exhibit "S" at 171)*. Therefore, Mr. Colberg's opinions regarding the placement of the warnings are based upon good grounds and should be admitted at trial.

Defendants go on to argue that Mr. Colberg's opinions are not relevant to this matter on the alleged basis that the machine stability did not factor into the accident. Defendants' argument amounts to nothing more than a challenge on the causation element, which is a subject to be decided by the jury. It is evident that had the machine been operated straight up or down the hill, in conformance with the safety instructions contained in the operator's manual, Plaintiff likely would not have slipped downward into the cutting wheel of the machine. Therefore, the lack of adequate warnings and instructions on the machine directly led to Plaintiff's involvement with the cutting wheel of the machine and the causation element is established. Colberg's testimony regarding warnings and instructions will assist the trier of fact and fits the facts of this case. Such opinions are therefore admissible.

Defendants also assert that Kirchofer and Smith would not have heeded the warning to operate the stump grinder up and down on the slope since the safety instruction references steep hills and Kirchofer and Plaintiff characterized the work area as a slight grade. This argument is erroneous. Defendants' instruction containing the words "steep hill" is ambiguous and it cannot be said that a user would not follow the safety instruction based upon a perception or conclusion regarding the steepness of a slope. Indeed, Kirchofer has stated that he had been aware of this instruction on the

date of the accident he would have operated the stump grinder up or down on the slope and not across the slope. (***Kirchofer Affidavit, Exhibit "L"***).   He further asserted that if it was not possible to operate the stump grinder up or down the grade in accordance with the instruction then he would not have utilized the stump grinder at the subject property (**Id.**)  In light of the above, Defendants' argument that Mr. Colberg's opinions regarding instructions and warnings are not relevant or do not fit the facts of the case should  be dismissed.


E.    **Defendant's reliance upon <u>Short v. WCI Outdoor Products, Inc.</u>, 2000 U.S. Dist. Lexis 16009 (E.D. Pa. 2000) is misplaced.**

Defendant cites the case of <u>Short v. WCI Outdoor Products, Inc.</u> at any opportunity it can, and even where it has no bearing on the particular subject at issue, in a transparent attempt to disparage Mr. Colberg's reputation with the court.  Mr. Colberg's opinions were precluded in <u>Short</u> on the basis that he did not provide alternative designs or perform testing to support his conclusions that an operator presence control failed to operate properly on a lawnmower due to the fact that the operator presence control cable was excessively long and the cable was made out of a material susceptible to rusting.  Mr. Colberg wished to perform testing on the product at issue and also wanted to have the opportunity to develop alternative designs, but was simply not given authorization to do so by the plaintiff therein.  At any rate, <u>Short</u> is easily distinguished from this action.  In the instant matter Mr. Colberg provides alternative designs in the form of the retractable guard and the automatic shut-off devices of the operator presence control and the positive clutch/band brake mechanism.  Mr. Colberg has developed a drawing of the automatic shut-off device system.  He relies upon his own vast engineering experience and knowledge as well as the testing performed by Vermeer with respect to the guard and engineer Sevart with respect to the automatic shut-off devices which establish that such designs are effective and feasible and do not diminish the utility of the machine.  Further, Mr. Colberg also relies upon the fact that the technology of the automatic shut-off system has existed since the 1960s and his engineering knowledge and experience to conclude that such devices could have easily been provided on the subject stump grinder.  Such knowledge and experience also supports his opinion that the retractable guard he has proposed is also feasible and would positively effect the safety of the machine.

With regard to Mr. Colberg's opinions regarding instructions and warnings, an alternative design is not necessary since Mr. Colberg's opinions concern the failure of Defendants to conspicuously place instructions and warnings on the product itself to ensure that such instructions and warnings would be communicated to the operator.  Mr. Colberg's opinions in this regard are also based upon sound methodology as he relies not only upon his own experience but also upon studies establishing that compliance is substantially increased by the placement of instructions and warnings on the product in addition to including the same in the product manual.

## IV.    Conclusion

Based upon the foregoing, Plaintiff, Kyle Smith, respectfully requests that the court deny the motion to preclude the report and testimony of Plaintiff's expert, Richard A. Colberg by Defendants, Promark Products West, Inc. and Ariens Co., Inc. and that Mr. Colberg be permitted to offer his opinions regarding the defectiveness of Defendants' Model 16SP Stump Grinder at the trial of this matter.

BEGLEY, CARLIN & MANDIO, LLP


BY: /s/ S. Richard Klinges, III, Esquire
       S. Richard Klinges, III, Esquire
       I.D. # 02018
       Todd M. Sailer, Esquire
       I.D. # 86013
       680 Middletown Boulevard
       Langhorne, PA l9047
       (215) 750-0110
       Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KYLE SMITH | : | CIVIL ACTION - LAW |
| | : | |
| v. | : | No. 02-CV-2718 (RLB) |
| | : | |
| PROMARK PRODUCTS WEST, INC. | : | |
| | : | |
| and | : | |
| | : | |
| ARIENS COMPANY | : | |
| | : | |

**<u>CERTIFICATE OF SERVICE</u>**

_____ I hereby certify that a true and correct copy of Plaintiff's Answer to Defendants' Motion to Preclude the Report and Testimony of Plaintiff's Expert, Richard A. Colberg was forwarded to Defendants' counsel listed below by regular mail.

_____

Leland Kellner, Esquire<br/>
LAVIN, COLEMAN, O'NEILL, RICCI<br/>
Penn Mutual Tower, Suite l000<br/>
510 Walnut Street<br/>
Philadelphia, PA 19l06

<u>/s/ S. Richard Klinges, III, Esquire</u>
S. Richard Klinges, III, Esquire
Todd M. Sailer, Esquire