## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYLE SMITH | : | CIVIL ACTION - LAW |
| | : | |
| v. | : | No. 02-CV-2718 (RLB) |
| | : | |
| PROMARK PRODUCTS WEST, INC. | : | |
| | : | |
| and | : | |
| | : | |
| ARIENS COMPANY | : | |
| | : | |

### PLAINTIFF'S SURREPLY TO THE REPLY BRIEF OF DEFENDANTS, PROMARK PRODUCTS WEST, INC. AND ARIENS COMPANY REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**I.      Introduction**

Plaintiff, Kyle Smith, hereby submits this surreply to respond to arguments raised by Defendants in their reply brief filed on November 2, 2004.

**II.     Timeliness of Defendants' Motion for Summary Judgment**

Defendants assert that Plaintiff attempts to create a red herring and that Plaintiff's objection to the untimeliness of Defendant's motion is "disingenuous and unprofessional." While Plaintiff accidentally used the dates from the scheduling order providing that the discovery period ended on March 31, 2004, rather than the court's January 29, 2004 order which extended the fact discovery deadline to July 30, 2004, this does not change the fact that Defendant's motion is untimely. Defendants' counsel themselves sent a letter to Plaintiff's counsel dated July 27, 2004 advising of their interpretation that dispositive motions were due on or before October 5, 2004, five days after the conclusion of the expert deadlines of September 30, 2004.  (See letter attached to Plaintiff's initial Memorandum of Law as Exhibit "J").  Thereafter, on October 4, 2004, rather  than seeking

an extension from the court to file its motion for summary judgment, Defendants' counsel sent Plaintiff's counsel an additional letter stating that its motion was not due on October 5, 2004 but was actually due on October 7, 2004 on the flawed basis that the last Saturday and Sunday are not included in the time computation pursuant to Federal Rule of Civil Procedure 6 when the total period of time prescribed or allowed is less than 11 days. (Exhibit "K" to Plaintiff's initial brief). Plaintiff's counsel forwarded a letter to Ariens counsel dated October 5, 2004 asserting that Plaintiff's counsel disagreed with Defendant's counsel's assertions, since Defendants clearly had a much greater opportunity than 11 days to file a motion for summary judgment in this action. While Plaintiff's counsel believes that it is improper to make conclusions and assertions regarding other counsel's professionalism in a court pleading, if anything was unprofessional it was Defendants' counsel's reliance upon a bogus interpretation of Rule 6 to justify the anticipated untimeliness of its motion for summary judgment rather than seeking an extension of time from the court. Therefore, Defendants' Motion for Summary Judgment should be dismissed as untimely.[1]

### III.    Defendants' argument that the affidavit of Karl Kirchoffer should be disregarded is invalid.

Plaintiff's expert Richard Colberg has opined that had the stump grinder been equipped with an operator presence control and positive clutch/band brake system, such devices would have brought the cutting wheel of the stump grinder to a stop within three seconds after a release of the operator presence control. Mr. Colberg opined that in an emergency situation precious seconds are wasted in the slow down procedure of the machine which lacks any shut down devices. (Colberg report, Exhibit "H" to Plaintiff's initial Memorandum of Law). As stated in Plaintiff's Memorandum

---

[1] Defendants claim that Plaintiff's Answer to Defendants' Motion to Preclude Plaintiff's expert, Richard A. Colberg was untimely based upon Judge Buckwalter's procedures that any response to motions in limine are to be filed five days before trial. Defendants' argument is not only baseless but is misleading. First, such a rule is not included in any order issued by the court in connection with this case. Moreover, no trial date has been set likely due to the fact that Defendants' motion for summary judgment is still outstanding. Plaintiff complied with the timing requirements under Local Rule 7.1 in filing his answer to Defendants' Motion to Preclude Plaintiff's expert, Richard A. Colberg. Therefore, Plaintiff's answer is not untimely and such motion should not be granted as uncontested as requested by Defendants.

of Law in Opposition to Defendants' Motion to Preclude Testimony of Richard A. Colberg, the technology for these designs existed as far back as the 1960s, long before the subject stump grinder was manufactured in 1985, and such devices could have been incorporated on the subject stump grinder. Plaintiff's expert Colberg relied in part upon testing performed by John Sevart, P.E. wherein Mr. Sevart equipped a Promark Model 16SP stump grinder with an operator presence control and positive clutch and band brake system and used the modified stump grinder to actually grind stumps. Mr. Sevart determined that the system caused the cutting wheel of the stump grinder to stop between three quarters of a second to two seconds after being activated. He also determined that the design modification in no way compromised the utility of the machine in grinding stumps. (See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Preclude the Testimony of Richard A. Colberg at 10 to 14).

In their original brief, Defendants made the bizarre assertion that it is preferable to rely upon an operator flipping the 490 pound stump grinder away from a person who has become involved with the cutting wheel rather than equipping the stump grinder with the widely available design alternatives of the operator presence control and positive clutch and band brake system. Defendants speculate that Kirchoffer's actions in flipping the machine removed the cutting wheel from Plaintiff's leg more expediently than the design alternatives would have been able to stop the cutting wheel. Defendants rely upon ambiguous deposition testimony of Plaintiff and Mr. Kirchoffer in support of this conjecture. For instance, Defendants rely upon testimony by Kirchoffer that the accident "happened so fast" and Plaintiff's testimony that the accident "happened in a flash" and that "it just took a second" when he was asked what happened as his leg was being pulled into the machine. All of these statements concern the circumstance of Plaintiff's leg becoming involved with the cutting wheel of the stump grinder and do not describe the entire sequence of the accident as a whole. Defendants also rely upon Kirchoffer's answer of "yes" to a question "what did Kyle do after he got his leg caught in the machine? You turn it over immediately?" However, this testimony says nothing regarding the specific length of time that it took Kirchoffer to flip the machine. Mr. Kirchoffer has advised that after he became aware that Plaintiff's leg had slipped beneath the machine, he realized from prior experience with the machine that there was no way that he could quickly shut down the machine and stop the cutting wheel. Mr. Kirchoffer further stated that since

he was startled and had never been presented with that type of situation before it took in excess of five seconds before he decided that the only thing he could do would be to try to flip the stump grinder away from Mr. Smith. He also stated that due to the weight of the stump grinder it was difficult to flip the machine and that in order to flip the machine away from Mr. Smith he had to reposition his feet, bend downward at the knees and exert a great amount of force upon the stump grinder. He stated that this process of flipping the machine away from Mr. Smith took additional time. (Affidavit of Karl Kirchoffer Exhibit "E" to Plaintiff's initial Memorandum of Law at paragraphs 4-6).

Defendants rely upon Hackman v. Valley Fair, 932 F.2d 239 (3d Cir. 1991) and Martin v. Merill Dow Pharm., Inc., 851 F.2d 703 (3d Cir. 1988) to argue that Mr. Kirchoffer's affidavit is contradictory to his deposition testimony and should be rejected. Defendants' argument is unfounded and should be dismissed. Both the Hackman and Martin cases involve situations where a plaintiff directly contradicted prior testimony or sworn statements to avoid summary judgment. Hackman involved the issue of whether plaintiff had complied with a six month statute of limitations for processing a union grievance after being informed that the union did not intend to request arbitration. In his deposition the plaintiff admitted that he was informed by the union on May 31, 1989 or June 1, 1989 that the union would not request arbitration, but plaintiff did not file his complaint until December 4, 1989, over six months later. After the defendants moved for summary judgment based upon the statute of limitation, plaintiff filed an affidavit alleging that he was confused during the deposition when he stated that the union notification occurred on May 31, 1989 or June 1, 1989 and that he was not notified until June 7, 1989. The court disregarded plaintiff's affidavit due to the contradiction on the basis that the plaintiff did not provide a satisfactory explanation for the contradictory assertions in his affidavit and upheld the district court's finding that Plaintiff failed to comply with the statute of limitations.

The Martin case involved a lawsuit against the manufacturer of the drug Bendectin where it was alleged that the mother's ingestion of Bendectin during pregnancy caused birth defects of her child. According to the defendant's expert the critical periods of development for the relevant organs ended on day 31, day 42 and day 43 of the plaintiff's pregnancy. Plaintiff had made numerous statements that the Bendectin was prescribed to her on May 19, 1966 and that was the first point at

which she took the drug, and also made statements that she began taking the drug at approximately the second month of her pregnancy. Defendant moved for summary judgment on the basis that the mother ingested the drug subsequent to the period of time of the development of the relevant organs. In response, the Plaintiff filed an affidavit of the mother stating that she had taken Bendectin much earlier than May 19, 1966. The court noted that although a subsequent correcting or clarifying affidavit may be sufficient to create a material dispute of fact after statements are given, the court disregarded plaintiff's affidavit since it "flatly contradicted no less than eight of her prior sworn statements" and no explanation was given for the contradictions. Id. at 705-706.

The instant matter is clearly distinguishable from Hackman and Martin. In both of those cases the affidavits at issue clearly and directly contradicted prior unambiguous deposition testimony and sworn statements. However, where deposition testimony is ambiguous an affidavit may be submitted to clarify such testimony. Videon Chevrolet, Inc. v. General Motors Corp., 992 F.2d 482, 488 (3d Cir. 1993); Bailey v. United Airlines, 279 F.3d 194, 200-01 (3d. Cir. 2002); Stein v. Foamex Inter., Inc., 2001 WL 936566 (E.D. Pa.); Giancristoforo v. Mission Gas and Oil Products, Inc., 776 F.Supp. 1037, 1043 (E.D. Pa. 1991). It has been stated that the Martin court articulated a rule applicable only in extreme circumstances. Armour v. The County of Beaver, Pennsylvania, 271 F.3d 417, 431 n.5 (3d Cir. 2001). "For a court to disregard and strike an affidavit...the contradiction must be clear; an affidavit that explains rather than contradicts prior testimony should not be disregarded." Stein, supra. Additionally, "not every discrepancy between an affidavit and earlier deposition testimony will justify a decision to disregard the affidavit, and a court must be careful not to infringe on the jury's role in resolving questions of credibility." Wise Investments, Inc. v. Bracy Contracting, Inc., 232 F. Supp. 2d 390, 400 (E.D. Pa. 2002). It has also been held that the doctrine applies where "international self-contradiction is being used as a means of obtaining unfair advantage." In Re Tire Worker Asbestos Litigation, 1991 WL 15860 (E.D. Pa.).

Kirchoffer's affidavit does not directly contradict any statements he made at his deposition as his deposition testimony was ambiguous in that he did not provide any time estimate regarding the length of time it took him to flip the stump grinder away from Mr. Smith. Indeed, he was never asked how long it took him to perform this act. As stated in Plaintiff's initial brief, Kirchoffer's statement that he immediately flipped the machine merely meant that he did not continue to grind

the stump after realizing that Plaintiff had slipped underneath the machine, but began to decide on what he could do help Mr. Smith and then took action in flipping the machine. This is certainly logical since Mr. Kirchoffer would have to take time to reach a conclusion as to how he could assist Mr. Smith before acting. Moreover, it would certainly take additional time to perform the physical act of flipping the machine after deciding to take that course of action. Defendants would like the court to believe that five seconds is an eternity, but given the fact that Mr. Kirchoffer was presented with an emergency situation that he had never experienced before, five seconds to process his thoughts that he could not stop the cutting wheel in a rapid manner and to decide that he could only flip the machine to remove the cutting wheel from Plaintiff's leg is not a very long period of time at all. Unfortunately, due to the existence of the severe hazard of the unguarded cutting wheel, that amount of time plus the amount of time necessary for Kirchoffer to flip the machine was a long enough period of time to cause great damage to Plaintiff's leg. Moreover, the instant matter is distinguishable from Hackman and Martin since in both of those cases it was a party in interest, the plaintiff, who was making the contradictions to avoid summary judgment, whereas Kirchoffer is an independent witness with no interest in this case.

Defendants' also speculate that Plaintiff's injury was immediate upon initial contact with the grinding wheel and that none of the automatic shut off devices proposed by Colberg would have reduced Plaintiff's injury. Defendants have no evidence to suggest that rapid shut down of the cutting wheel within three seconds or even shorter as established by the testing of John Sevart, P.E. would not have reduced Plaintiff's injuries from those sustained from involvement with the cutting wheel for over five seconds as established by Kirchoffer's affidavit. At any rate, this issue is inappropriately raised in the context of summary judgment. The resolution of this issue involves determinations of fact and factual inferences which is a function of the jury. Even without the benefit of Kirchoffer's affidavit it is still a jury question whether the automatic shut off devices would have been more likely than not to reduce or minimize Plaintiff's injuries. Moreover, it is likely that the size and extent of Plaintiff's wound was greatly increased by Kirchoffer's act in flipping the machine since the cutting wheel would thereby travel upward on Plaintiff's leg rather than being contained to one area. This is likely how Plaintiff ended up with the large open wound to his right leg as opposed to a laceration contained to one area, which would have been the likely

result had Kirchoffer been able to quickly activate a system on the stump grinder to cause rapid stoppage of the cutting wheel.

**IV.    Defendants' arguments that Plaintiff does not establish the necessary elements for his failure to warn claim are invalid.**

The Promark 16SP manual instructs users to "always go straight up or down on steep hills and avoid steep side angles."  This instruction does not appear on the machine itself, nor are there any instructions on the machine advising the operator to read and understand the operator's manual prior to use.  Defendants stress the importance of an operator reading the operator's manual and safety instructions prior to operating the stump grinder in the manual itself.  Defendants state in the manual that every operator should read the owner's manual to be sure of safety instructions and proper operating procedure.  Defendants also state in the section of the operator's manual titled "Safety Instructions" to "be aware-unit should not be operated until the owner's manual is studied, all safety details are noted and the user has complete knowledge of all controls."  This page of the operator's manual also includes twelve instructions to users of the stump grinder which include the instruction to operate the stump grinder up or down on steep side angles and an instruction stating "do not operate in any position but from the rear and behind the control panel." (Operator's Manual, Exhibit "S" to Plaintiff's Initial Memorandum of Law at 6).  Despite Defendants' strong belief in the importance that an operator read the operator's manual prior to use, Defendants did not include an instruction on the machine to read the operator's manual prior to use.  Plaintiff's expert Colberg has opined that the failure of the machine to include an instruction to always operate a stump grinder up or down on side angles and an instruction to read and understand the operator's manual prior to use renders the machine defective, unreasonably dangerous and that such defective condition was the cause of Plaintiff's injuries. (Colberg report, Exhibit "H" to Plaintiff's Initial Memorandum of Law at 3-4,7).

Defendants assert that there is no authority to support Plaintiff's claims that the above-stated warning should have been included on the stump grinder itself.  However, it has been held that:

A  manufacturer  may  be  liable  for  failure  to

> adequately warn where its warning is not prominent and not calculated to attract the users attention to the true nature of the danger due to its position, size, or coloring of its lettering. A warning may be found to be inadequate if its size or print is too small or inappropriately located on the product. The warning must be sufficient to catch the attention or person who could be expected to use the product, to apprize them of its dangers, and to advise them of the measures to take to avoid these dangers.

Pavlik v. Lane, Ltd/Tobacco Exporters inter., 135 F.3d 876, 887 (3d Cir. 1998)(quoting Nowak v. Faberge USA, Inc., 812 F.Supp. 492, 497 (M.D. Pa. 1992). It stands to reason that if liability may attach where a warning is not prominent due to its position, size or coloring based upon the reasoning that it is insufficient to catch the attention of expected users, then the complete failure to include vital warnings on a product can also form the basis of a failure to warn strict liability claim.

Defendants also assert that an instruction on the machine stating "failure to follow safety instructions could result in major injury or loss of limb" was sufficient. However, the problem with Defendants' logic is that the instructions cited above to always operate the stump grinder up or down on a side angle and to not operate the stump grinder in any position but from the rear and behind the control panel are not provided to the operator. They are only included in the operator's manual and there is no instruction on the machine to alert the operator to read and understand the operator's manual prior to use or to even advise the operator that an operator's manual exists. Defendants make unsubstantiated allegations in their Reply Brief that Plaintiff's suggestion that manufacturers should provide an instruction for the user to read and understand the operator's manual before use which would direct the operator to the instructions included in the manual is absurd. Defendants contend that Plaintiff will next recommend a decal instructing the user to read the instruction for the user to read and understand the operator's manual before use and the world and all its products will be wallpapered with warnings, but this amounts to no more than apparent paranoia on the part of Defendants. It is certainly not overly burdensome to place a simple warning decal on a product to alert the user that an operator's manual exists and should be read and understood prior to use, particularly where, as in this case, the manufacturer itself strongly believes that reading and understanding the operator's manual and safety instructions is vital to the safe use of the product.

Certainly, the stump grinder manufacturer Praxis and Vermeer did not find that the idea of providing such an instruction on their stump grinders to be absurd. (See Praxis and Vermeer photographs attached to Plaintiff's initial Memorandum of Law at Exhibits "U"and "V").

Defendants further continue to maintain that Kirchoffer would not have operated the stump grinder up and down on the grade at the Groner property even if Defendants had adequately communicated the instruction to always operate the stump grinder up or down on a steep grade since Kirchoffer and Smith stated that they were not on a "steep hill." Like many of Defendants' assertions, this argument is nothing more than speculation and is in fact inconsistent with the available evidence. It is also legally insufficient to support summary judgment.

To reach a jury on a failure to warn theory of liability the evidence must only support a reasonable inference, rather than a guess, that the existence of an adequate warning might have prevented the injury. <u>Pavlik v. Lane, Ltd./Tobacco Exporters</u>, inter. 135 F.3d 876, 881-82 (3d Cir. 1998). The focus should be "on the additional precautions that *might* have been taken by the end user had the allegedly defective warning been different." <u>Id</u>. at 882. The facts show that this standard is met in this case. The word "steep" is ambiguous and subject to varying interpretations. In fact, Defendant's engineer, Hugh Grow, could not even answer what degree of slope the unit should not have been operated on asserting that "it is a dynamic thing as to a specific situation for a specific machine." (Grow Deposition, Exhibit "A" at 59). Without a definition for steep it is likely that an operator would not take chances regarding when he or she should operate the stump grinder up or down on a grade or across a grade. Rather, it is likely that he or she would operate the stump grinder up or down on most grades and would not engage in the whimsical exercise of deciding whether the grade was sufficiently steep for the instruction to apply or not. In this case, the issue is resolved by Kirchoffer's own statements that had he been aware of the instruction on the date of the accident he would have operated the stump grinder up or down on the slope and not across the slope. He further stated that if it was not possible to operate the stump grinder up or down on the grade in accordance with the instruction then he would have not have utilized the stump grinder at the Groner residence. (Kirchoffer Affidavit, Exhibit "E" to Plaintiff's Memorandum of Law). Contrary to Defendants' contention, the statements by Kirchoffer do not differ from Kirchoffer's deposition testimony. Kirchoffer was never asked at his deposition what he would have done had he been

aware of the instruction.

It is also contended by Defendants that there is no evidence that Plaintiff's injury would have been avoided had Kirchoffer operated the machine either up or down on the grade. At the very least, this is an issue regarding causation and one which involves questions of fact and factual inferences, which is a subject for jury determination. (See Plaintiff's Memorandum of Law at 16). There is clearly more than enough evidence of the causation element to support Plaintiff's defective warning claims.

At the time of the accident, Kirchoffer was grinding a stump on sloped terrain. Kirchoffer positioned the stump grinder on the side of the slope with the left side of the machine facing up the slope and the right side of the machine facing down the slope. (Kirchoffer deposition, Exhibit "D" to Plaintiff's Memorandum of Law at 47-48). Kirchoffer clearly stated that the ground to the left of him was higher and the ground to the right of him was lower. (Id. at 48). Plaintiff also stated that the machine was on a slight angle. (Plaintiff's deposition, Exhibit "C" to Plaintiff's Memorandum of Law at 61). By both Plaintiff's and Kirchoffer's account, Plaintiff was located to Kirchoffer's left holding the left handlebar of the machine just prior to the accident. (Kirchoffer deposition, Exhibit "D" to Plaintiff's Memorandum of Law at 49; Smith deposition, Exhibit "C" to Plaintiff's Memorandum of Law at 60). While Plaintiff stated that for the most part he was on flat ground, given that the stump grinder was on angled terrain with the area to the left of the machine angled upward and the area to the right of the machine angled downward and Plaintiff was situated to the left of the machine holding the left handle bar, Plaintiff must have been situated on angled ground. It is thus likely that Plaintiff's leg was caused to slip into the cutting wheel of the machine as a result of the sloped terrain angled toward the stump grinder.

Moreover, Mr. Kirchoffer stated that had he been aware of the instruction contained in the Promark Model 16SP operator's manual stating not to operate the stump grinder in any position but from the rear and behind the control panel, he would not have requested Plaintiff to assist him in steadying the stump grinder by positioning himself to the left of the stump grinder and holding on to the left handlebar of the stump grinder. (Affidavit of Karl Kirchoffer, Exhibit "E" to Plaintiff's Initial Memorandum of Law at paragraph 10). Thus, Defendants' failure to instruct the operator to read the operator's manual before use also contributed to cause Plaintiff's injuries.

**V.    Defendant's reliance upon <u>Phillips</u> is unfounded.**

Defendants continued to maintain that <u>Phillips v. Cricket Lighters</u>, 841 A.2d 1000 (Pa. 2003) supports its argument that Plaintiff was an unintended user since he was not operating the stump grinder behind the control panel.    However, the <u>Phillips</u> case in no way provides support to Defendants' position.  As stated in Plaintiff's initial Memorandum of Law, <u>Phillips</u> merely found that a child was an unintended user of a cigarette lighter based only upon a distinction between the age and characteristics of the intended user of the product and the actual user.  Defendants assert that they disagree with Plaintiff's contention, but do not offer the court any legal authority or justification to find otherwise.  Defendants merely state that the <u>Phillips</u> opinion "sweeps broadly over the whole terrain of Pennsylvania product liability law."  However, even if this subjective opinion is given credit, the breadth of the <u>Phillips</u> court's review of Pennsylvania product liability law does not alter the substance of the fact that the court was focused on the age and characteristics of the user when it found that the user at issue was not an intended user of the product.  Additionally, this conclusory and unsubstantiated statement is insufficient to prevail over well established Pennsylvania authority that the intended user issue concerns only the type of person using the product.  There is not one Pennsylvania authority holding that a person can be deemed an unintended user based upon the manner in which they were using a product as suggested by Defendants.

In every Pennsylvania case that has reached the intended/unintended user issue the courts have focused solely upon the type of person using the product as in <u>Phillips</u>.  <u>Griggs v. Bic Corp.</u>, 981 F.2d 1429 (3d Cir. 1992), is similar to <u>Phillips</u> where the court determined that a cigarette lighter was not defective because the child using the lighter was not an intended user of the product.  In <u>Riley v. Warren Manuf., Inc.</u>, 455 Pa. Super. 384, 688 A.2d 221 (1997) the court focused on whether a child as opposed to an adult would be considered an intended user of a bulk feed trailer where the child reached his hand into a discharge tube and was injured by blades that were present within the discharge tube.  688 A.2d at 228-29.  In <u>Stratos v. Super Saglas Corp.</u>, 1994 WL 709375 (E.D. Pa.) the court was faced with the issue of whether a child was an intended user of a bed where the child was strangled after becoming entrapped in a moving frame of the bed.  The <u>Stratos</u> court noted that the intended user must be determined in the context of the knowledge and assumptions of the

ordinary consumer and the relevant community.  Stratos, supra at 2 (citing Metzgar v. Playskool, Inc., 30 F.3d 459 (3d Cir. 1994)).  The court found that the evidence did not establish that an ordinary consumer would have understood that the manufacturer intended that the bed be used solely by infirm adults in the home and not by a child or that children were reasonably obvious unintended users of the bed.  Id. at 3.  The Metzgar case cited by Stratos analyzed whether a 15 month old child was an unintended user of a building block where the product was recommended for children age 1 ½ to 5 years old.  Metzgar v. Playskool, Inc., 30 F.3d 459 (3d Cir. 1994).  The court found that the age recommendation by the manufacturer did not render the child a reasonably obvious unintended user of the product.  30 F.3d at 464-65.  In Pacheco v. Coates Co., Inc., 26 F.3d 418 (3d Cir. 1994) it was found that an automobile mechanic injured by a tire changer was "undeniably an intended user" of the product.  26 F.3d at 422.  Finally, similar to Phillips and Gregs, the court in Klemka v. Dillon Cos., Inc., 1996 WL 571753 (E.D. Pa.) it was also determined that a child was not an intended user of a cigarette lighter.  The language in Klemka clearly establishes that the focus is on the characteristics of the user and not the manner of use of the product.  The Klemka court stated "in Metzgar the court concluded that the Pennsylvania Supreme Court would limit strict liability causes of action to situations in which the manufacturer had intended the product to be used by the *type of person* who actually used the defective product."  Klemka, supra. (emphasis added).  Moreover, in discussing Metzgar and Stratos,  the court stated that those cases "set forth the test for determining intended use by a person was clear: would an ordinary consumer have objectively understood that the manufacturer of the product intended it to be used by certain persons, not others?" Id. at 2.  Thus, a review of the above-stated cases makes it clear that Defendants' argument that Plaintiff was an unintended user based simply upon the method of use of the product should fail.

Furthermore, it has been held that strict liability extends to bystanders or persons in the vicinity of a product even if such a person is not the actual user of the defective product.  In Fedorchick v. Massey Ferguson, Inc., 438 F.Supp. 60 (E.D. Pa. 1977) the plaintiff was seated in the driver's seat of a dump truck while another worker was attempting to empty a bucket of earth into the dump truck.  As the loader operator attempted to raise the bucket of the loader the loader tipped forward and catapulted the operator from his seat.  The plaintiff attempted to rescue the loader operator by disengaging the loader's controls, but in doing so the plaintiff was injured by being

struck by the runway loader. <u>Fedorchick</u>, <u>supra</u> at 61. The plaintiff asserted that the loader was defective since it was inherently unstable and since it lacked warnings of the need for a stabilizing rear attachment (extends to bystanders or persons in the vicinity of a product). The <u>Fedorchick</u> court held that Section 402(A) applies to a person who suffers harm proximately caused by a defective and unreasonably dangerous product, regardless of whether the person used or consumed the product. <u>Id</u>. at 63. The court found that the critical inquiry is whether the party was within the orbit of danger at the time of the injury. <u>Id</u>. Further, the court in <u>Pegg v. General Motors Corp.</u>, 258 Pa. Super. 59, 391 A.2d 1074 (1978) determined that a cause of action in strict liability should have been submitted to the jury by the trial court where a motor vehicle passenger was burned by the ignition of swimming pool sanitizer which the driver had placed in his car, thus supporting the rule that persons within the zone of danger of a defective product can recover in strict liability even if they are not the user of the product. Similarly, in <u>Webb v. Zern</u>, the Pennsylvania Supreme Court found that a person who was injured when a keg of beer exploded could bring a products liability action although the injured party was not using the keg and in fact was not even the person who initially tapped the keg earlier in the day. <u>Webb v. Zern</u>, 422 Pa. 424, 220 A.2d 853 (1966). It was also determined in <u>Herman v. Welland Chemical, Ltd.</u>, 580 F.Supp. 823, 828 (M.D. Pa. 1984) that a fireman who was struck by a car while directing traffic following a chemical spill on a highway could recover in strict liability from the manufacturer of the chemical where the fireman obviously was not a user or consumer of the allegedly defective product. In light of these authorities, it is evident that Defendants' operator/non-operator distinction is irrelevant to the issue of whether Plaintiff states a valid cause of action in strict liability. Even if the court were to find that Plaintiff was not using the machine as intended by Defendants it is undeniable that Plaintiff was in the orbit of danger of the defective stump grinder when he was injured.

Moreover, Defendants have maintained that the stump grinder is safe if operated by a person behind the control panel, although Defendants do not present any factual data or evidence in support of this assertion. The reason for this is because the design of the stump grinder is in fact unreasonably dangerous and defective whether the focus is upon an operator or user located behind the control panel, an operator positioned next to the machine or upon bystanders. In his deposition, Hugh Grow stated that he has investigated or evaluated more than twenty stump grinder accidents

over his career with Promark and Ariens.  (Grow Deposition, Exhibit "P" to Plaintiff's initial Memorandum of Law at 12).  In connection with the <u>Apostoleris</u> litigation, Mr. Grow testified that he was aware of approximately 35 claims or reports of injuries resulting from the use of the Promark Model 16D and 16SP stump grinders that resulted in litigation was aware of approximately another dozen or so that did not result in litigation.  (Grow Deposition attached hereto as Exhibit "B" at 73-75).  Both the 16D and 16SP machines are mid-mounted cutting machines meaning that the cutting wheel is located in the middle of the machine between the engine on one side and the handlebars on the other.  (Grow Deposition, Exhibit "A" at 17).  Mr. Grow stated that the differences between the 16D and 16SP were that the 16SP was self-propelled, was over one-hundred pounds heavier, and was longer than the 16D.  He also stated that the 16D had a brake on the right wheel to allow for a pivot point to swing the cutter wheel over the stump, whereas the 16SP utilized a differential for articulating the cutting wheel over the stump.  He could not think of any other major differences other than the balance and handling was slightly different on the machines.  (Grow Deposition, Exhibit "A" at 16-18).  The two machines are the same with regard to the placement and exposure of the cutting wheel, the lack of guarding around the cutting wheel and the lack of the design alternatives proposed by Mr. Colberg to allow for rapid stoppage of the cutting wheel.  Mr. Grow stated that there have been bystander injuries through contact with the cutting wheels on Promark machines.  He further stated that he did not recall any other bystander sliding into a 16SP other than the Plaintiff herein but that he remembered an incident where a bystander was injured by a 16D machine where a worker was kicking chips and the operator swung the cutting wheel over top of his foot.  (Grow Deposition, Exhibit "A" at 52-54).  Therefore, the logical conclusion is that many people are injured by the Promark machines while operating the machines from behind the control panel.  Consequently, the stump grinder is clearly not as foolproof and safe as Defendants claim even for a person who is operating the machine behind the control panel.

**VI.    Defendants arguments that the 16SP is not unreasonably dangerous pursuant to its "Azzarello analysis" should be rejected.**

Defendants go through a seven factor test to attempt to establish that the risk/utility analysis favors a finding that the 16SP stump grinder is not unreasonably dangerous. However, the seven factor test applied by Defendants has not even been adopted as Pennsylvania law. Certainly, Defendants do not cite any authority for this test. Under Nowak v. Faberge, Inc., 32 F.3d 755 (3d Cir. 1994), which was elsewhere cited by Defendants, the court noted that several factors have been suggested by courts and commentators to consider in making the risk/utility determination and in a footnote alluded to a test adopted by the California Supreme Court as well as the seven factor test used by Defendants, which was drafted by John W. Wade in a law journal article. Nowak, supra at 758-59. The Nowak court did not apply either test and did not indicate a preference of one over the other. Similarly, in Dambacher v. Mallis, 336 Pa. Super. 22, 485 A.2d 408 (1984), Fitzpatrick v. Madonna, 424 Pa. Super. 473, 476-77, 623 A.2d 322, 324 (1993), Phillips v. A.P. Green Refractories Co., 428 Pa. Super. 167, 180, 630 A.2d 874, 881 (1993) and Riley v. Warren Manuf., Inc., 455 Pa. Super. 384, 391, 688 A.2d 221, 225 (1997),  the courts noted that the aforementioned tests had been developed by the California Supreme Court and by Dean Wade, but neither test was adopted.   The Riley court added that these tests are not required to be met to persuade a court that a product is unreasonably dangerous, but are merely suggestions for the court to consider when making its social policy analysis. Riley, supra.  Defendants unilaterally elected to apply the Wade test. However, Defendants are not in a position to determine which test should be used, if any.  Regardless, it is evident that the stump grinder should be found to be unreasonably dangerous and defective under either test.

Under Azzarello the court decides whether as a matter of law the jury could find the product at issue defective. Dambacher v. Mallis, 336 Pa. Super. 22, 46, 485 A.2d 408, 420 (1984).  It is the judicial function to decide whether under the plaintiff's averment of the facts recovery would be justified.  Id. at 421   (citing Azzarello, 480 Pa. at 558, 391 A.2d at 1026).   After this judicial determination is made, then the case is submitted to the jury to determine whether the facts of the case support the plaintiff's averments of the complaint.  Id.  Azzarello gave examples of the type of questions a court is to ask such as:

> Should an ill conceived design which exposes the user to the risk of harm entitle one injured by the product to recover?...When does the utility of a product outweigh the unavoidable danger it may pose?

Azzarello, supra at 1026.  The Dambacher court indicated that if the court decides it would be reasonable to allow the jury to find for the plaintiff then the issue of lack of due safety will be submitted to the jury.  Dambacher, supra at 422.  The Dambacher court also quoted a Supreme Court of New Jersey case which found that the court could make the appropriate determination as a matter of law only "if the minds of reasonable men could not differ on whether the risks posed by a product outweigh its utility or vice versa."  Id. at 422 (quoting O'Brien v. Muskin Corp., 94 N.J. 169, 186, 463 A.2d 298, 307 (1983)).

The California Supreme Court factors are: the gravity of the danger posed by the challenged design; the likelihood that such danger would occur, the mechanical feasibility of a safer design; the financial cost of a safer design and the adverse consequences to the product and to the consumer that would result from a safer design.  Dambacher, supra at 423 n.5 (citing Barker v. Lull Engineering Co., Inc., 20 Cal. 3d. 413, 431, 573 P.2d 443, 455 (1978).  An analysis under these factors establishes that the stump grinder is unreasonably dangerous and defective.

First, the gravity of the danger of a stump grinder with over sixty percent of a 14 inch cutting wheel exposed and unguarded and which does not implicate designs to allow the cutting wheel to be stopped rapidly in the event of an emergency is evident.  Secondly, given the fact that the stump grinder would be used on job sites with various numbers of workers present as well as the fact that the stump grinder would be used on varied landscapes including dirt and mud, the likelihood that the danger would occur is also clear.

Thirdly, it has been established that the safer design alternatives proposed by Plaintiff's expert Colberg are mechanically feasible.  Mr. Colberg proposed a retractable guard to enclose the grinding wheel of the stump grinder.  He stated that this type of guard may be designed to rotate up inside an existing portion of the housing or it may be designed to rotate outside of the housing.  He also added that this guard would be able to compensate for varying levels of ground and tree stump while providing protection from contact with the cutting wheel.  (Exhibit "H" to Plaintiff's initial Memorandum of Law at 5).  In forming his opinions, Mr. Colberg relied upon a review of the exact

type of guard that he proposes which was developed by the competing manufacturer Vermeer. Mr. Colberg viewed a video produced by Vermeer showing a stump grinder employing this type of guard actually grinding stumps, which showed that the guard worked flawlessly and that it did not impede the utility of the machine for its intended purpose of grinding stumps. Mr. Colberg also relied upon his own knowledge, experience and training in the field of mechanical engineering to formulate his opinions. (See Plaintiff's Memorandum of Law in Opposition to Defendants Motion to Preclude Colberg at 6-9).

Further, Mr. Colberg opined that the stump grinder should have been equipped with an operator presence control and positive clutch and braking system which could be activated to cause the cutting wheel to stop rapidly in the event of an emergency. Such technology was feasible at the time the stump grinder was manufactured as it had been utilized or developed in the 1960s for use with lawnmowers. Mr. Colberg also relied upon testing performed by engineer John Sevart, P.E. who actually purchased a Promark Model 16SP stump grinder and modified it to incorporate the same automatic shut off devices proposed by Mr. Colberg. Mr. Sevart's testing established that the automatic shut off devices could cause the cutting wheel to stop within two seconds and could be adjusted to be brought to a stop from approximately three quarters of a second to 2 seconds. Mr. Sevart also used this machine to grind stumps and it was established that the utility of the machine was not compromised by the addition of these modifications. (See Plaintiff's Memorandum of Law in Opposition to Defendants Motion to Preclude Colberg at 10-14).

Fourth, the financial cost of Mr. Colberg's design alternatives are negligible. Mr. Colberg estimated that the guard he proposes could have been manufactured for the stump grinder for approximately ten dollars. He stated that the stump grinder could have been equipped with an operator presence control for between five dollars and ten dollars and that the positive clutch and band brake system could have been included for approximately ten dollars to fifteen dollars over the centrifugal clutch which exists on the subject machine. (Colberg report, Exhibit "C" to Plaintiff's initial Memorandum of Law at 5-6).

Fifth, it has been established that no adverse consequences would result to the product or to the consumer from the design alternatives advocated by Mr. Colberg. On the contrary, only positive consequences would result. The utility of the machine would not be negatively affected while the

safety to the user and persons within the orbit of danger of the stump grinder would be drastically increased.

This matter should also pass the threshold determination of unreasonable dangerousness if the court determines that the Wade factors should be applied. The Wade factors consider 1) the uselessness and desirability of the product - its utility to the user and to the public as a whole; 2) the safety aspects of the product - the likelihood that it will cause injury, and the probable seriousness of the injury; 3) the availability of substitute product which would meet the same need and not be as unsafe; 4) the manufacturers ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; 5) the user's ability to avoid danger by the exercise of care and the use of the product; 6) the user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product or the existence of suitable warnings or instructions; 7) the feasibility on the part of the manufacturer of spreading the loss through setting the price of the product or carrying liability insurance. Dambacher, supra at 423 n.5.

Under factors 1 through 4, while stump grinders can be said to be useful in grinding stumps, it is clear that as designed, the subject stump grinder is likely to cause serious injury due to the lack of guarding around the cutting wheel and the lack of automatic shut off devices. The availability of a substitute product which would meet the same needs and not impair the usefulness or utility of the stump grinder has been established in the form of a retractable guard around the cutting wheel and the automatic shut off devices of the operator presence control and positive clutch and band brake system.

As stated above, Defendants' assertions that the 16SP is safe for a person operating the stump grinder from behind the control panel are unfounded as established by the testimony of Hugh Grow indicating that many injuries are sustained by persons while located in such position. Defendants also rely upon warnings stating "keep hands and feet clear of cutting wheel" and "failure to follow safety instructions could result in major injury or loss of limb." However, as stated herein and in Plaintiff's original Memorandum of Law, the subject stump grinder fails to communicate sufficient warnings and instructions to potential operators. Moreover, as stated by Mr. Colberg, the

first priority in safety design is eliminating hazards, which is followed by guarding of any such hazards if they cannot be eliminated. Warnings are the last line of defense where it is impossible to provide sufficient guarding of a hazard. With respect to the 16SP, Defendants bypassed the crucial step of guarding and did not even provide sufficient warnings to the operator. Defendants also proclaim that the subject stump grinder has approximately the same amount of wheel exposed as Promark's competitors' machines which were examined by Defendants' expert. However, the photographs of the machines show that a substantially greater portion of the cutting wheel is exposed with respect to the subject stump grinder in comparison to the competitors' models, particularly with respect to the Vermeer and Praxis models, which provide a shield on the side of the cutting wheel. (See photographs of stump grinders, Exhibits "G", "M" and "N" to Plaintiff's initial Memorandum of Law). Defendants' arguments that Plaintiff has not shown the design alternatives suggested by Colberg as being feasible are unfounded as explained above.

The fifth Wade factor cannot be applied under Pennsylvania law since it amounts to an analysis of contributory negligence. Contributory negligence is not a defense to a products liability claim. Bowersfield v. Suzuki Motor Corp., 111 F.Supp 2d 612 (E.D. Pa. 2000). Moreover, persons could easily come into contact with the cutting wheel of the stump grinder even where exercising care in the use of the product. Persons could exercise care yet still inadvertently slip or fall into the cutting wheel of the stump grinder, such as what occurred in the instant matter.

The sixth Wade factor also should be inapplicable to the instant matter. In this case, Plaintiff never operated a stump grinder. (Smith Deposition attached hereto as Exhibit "C" at 28; Kirchoffer Deposition attached hereto as Exhibit "D" at 20-21). Plaintiff usually helped with filling in the holes left after the stumps were ground or with cleaning and he stated that he never paid much attention to the stump grinders. (Exhibit "C" at 33). Therefore, it cannot be said that Plaintiff was aware of the dangers inherent in the product and their avoidability. Further, even if a user would be aware of the dangers this does not compel the conclusion that the dangers are avoidable. A person must be close to the stump grinder to operate it and an operator could easily inadvertently slide or fall into the cutting wheel of the machine. Certainly, where inexpensive devices such as those proposed herein could be added to the subject stump grinder, the addition of such devices would be much

more preferable to merely assuming that users will anticipate the dangers of the product and avoid them on their own.  Further, Defendants' suggestion that the dangers of the stump grinder are exceedingly obvious is inconsistent with Defendants' representations in their operator's manual of the importance that the operator's manual and safety instructions be read prior to use of the machine. Defendants' rely upon deposition testimony by Kirchoffer stating that it was common sense to operate the stump grinder from the rear where the handlebars are located.  However, this statement is taken out of context.  Certainly, where there is only a single operator most persons would operate the machine by using the handlebars.  However, there was no warning on the machine instructing persons not to use the stump grinder from any position but from the rear behind the control panel. Kirchoffer stated that had he been aware of such a warning which was included in the operator's manual but not on the machine he would not have had Smith assist him by holding onto the left handlebar of the machine.  (Exhibit "E" to Plaintiff's initial Memorandum of Law).[2]

The seventh Wade factor of the feasibility of spreading the loss obviously weighs in Plaintiff's favor.  The reasoning behind the adoption of strict liability in Pennsylvania is that risk of loss for injury resulting from defective products should be borne by the suppliers and not by the injured party, since the suppliers are in the best position to absorb the loss by distributing it as a cost of doing business.  Azzarello v. Black Brothers Co., Inc., 480 Pa. 547, 552 391 A.2d 1020, 1023 (1978).  In this case, as stated by Colberg, the design alternatives of a guard around the cutting wheel and the automatic shut off devices could have been provided for negligible costs.  Any such cost could have easily been distributed by Defendants through a slight increase in the price of the stump grinder.  Moreover, Defendants could have easily facilitated the absorption of loss through liability insurance and Defendants in fact have insurance coverage in connection with the instant action. Defendants' concern that a jury will likely favor the Plaintiff since it is a deep pocket manufacturer is not only speculative but could easily be cured through jury instruction.  At any rate, this concern it is not a sufficient reason to deny compensation to Plaintiff for the severe injuries he sustained due

---

[2] It is interesting to note that Defendants recognize the severe danger of a cutting wheel that rotates at 2400 rpm, (Defendants' Reply Brief at 11), yet Defendants' stump grinder does not incorporate adequate designs to mitigate this danger.

to the defective nature of Defendants' product.


BEGLEY, CARLIN & MANDIO, LLP


BY: /s/ S. Richard Klinges, III. Esquire
      S. Richard Klinges, III, Esquire
      I.D. # 02018
      Todd M. Sailer, Esquire
      I.D. # 86013
      680 Middletown Boulevard
      Langhorne, PA l9047
      (215) 750-0110
Date: November 16, 2004      Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KYLE SMITH | : | CIVIL ACTION - LAW |
| | : | |
| v. | : | No. 02-CV-2718 (RLB) |
| | : | |
| PROMARK PRODUCTS WEST, INC. | : | |
| | : | |
| and | : | |
| | : | |
| ARIENS COMPANY | : | |
| | : | |

## CERTIFICATE OF SERVICE

_____I hereby certify that a true and correct copy of Plaintiff's Surreply to the Reply Brief of Defendants, Promark Products West, Inc. and Ariens Company Regarding Defendants' Motion for Summary Judgment was forwarded to Defendants' counsel listed below by regular mail.

_____

Leland Kellner, Esquire
LAVIN, COLEMAN, O'NEILL, RICCI
Penn Mutual Tower, Suite l000
510 Walnut Street
Philadelphia, PA 19l06

/s/ S. Richard Klinges, III. Esquire
S. Richard Klinges, III, Esquire
Date: November 16, 2004        Todd M. Sailer, Esquire

279380.1
Nov 16 2004